UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X

IN RE: INITIAL PUBLIC OFFERING
SECURITIES LITIGATION

**OPINION AND ORDER**

**MASTER FILE NO. 21 MC 92
(SAS)**

------------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This consolidated action comprises hundreds of securities class

actions brought against issuers and underwriters of technology stocks that had

their initial public offerings ("IPOs") during the late 1990s.  On April 2, 2009, the

parties filed a Stipulation and Agreement of Settlement ("Stipulation") that seeks

to conclude eight years of litigation in 309 coordinated class actions.  Plaintiffs

also filed a motion for an order: (1) preliminarily approving the proposed

Stipulation; (2) certifying the Settlement Classes for the purposes of the proposed

Stipulation only; (3) approving the form and program of Class notice described in

the Stipulation; and (4) scheduling a hearing before the Court to determine

whether the proposed Stipulation should be finally approved.  For the reasons

stated below, plaintiffs' motion is granted.

1

## II.   BACKGROUND

### A.   Plaintiffs' Allegations

Plaintiffs' allegations are discussed at length in a series of earlier Opinions.[1]  In brief, plaintiffs allege that the underwriters of hundreds of IPOs required allocants in those IPOs to purchase shares in the aftermarket, often at inflated prices, and to pay the underwriters undisclosed compensation. Additionally, the underwriters allegedly prepared analyst reports that contained inaccurate information and recommendations.  Plaintiffs allege that they lost billions of dollars as a result of these manipulations and the fraudulent statements made to cover up the scheme.  Plaintiffs have brought claims under both the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

### B.   Settlement Terms

On April 1, 2009, the parties entered into a settlement of the 309 cases, which is subject to this Court's approval.[2]  The Stipulation provides that defendants will pay a total of $586 million ("Settlement Amount") in exchange for

---

[1]      *See, e.g., In re Initial Pub. Offering Sec. Litig.* ("*2004 Class Cert.*"), 227 F.R.D. 65 (S.D.N.Y. 2004).

[2]      *See* 4/1/09 Stipulation and Agreement of Settlement ("Stipulation").

2

plaintiffs releasing all Settled Claims against them.[3] The Issuers' Insurers and the Underwriters have also agreed to advance $10 million for the purposes of notice and administration costs.[4] The Stipulation further provides that the Settlement Amount less any advances will be deposited into an escrow account at least fourteen days before the date of the hearing scheduled by the Court to consider final approval of the settlement.[5] The parties have stipulated that final approval of the settlement in all of the actions is required.[6]

### C. Class Certification

Plaintiffs inform the Court that the parties have stipulated to the certification in each case of the following settlement class pursuant to Rule 23(a)

---

[3]    *See id.* ¶¶ 9, 25.  "Settled Claims" means "any and all claims (including but not limited to claims under Section 11 of the Securities Act, or Section 10(b) or Section 16(b) of the Exchange Act, or any rules promulgated under any such section or Act, or claims under state statutes or common law) that were, could have been or might have been asserted against any or all of the Protected Persons in the Actions or in any other proceedings, that arise out of, are based upon or relate to the conduct alleged to be wrongful in the Actions." *Id.* ¶ 1(pp).  For a general understanding of the release provisions, "Protected Persons" means "all of the Issuers, Underwriters, Insurers, and the issuers and underwriters in the IPOs [] at issue in the IPO Litigation, whether or not named as defendants in any of the Actions . . . ." *Id.* ¶ 1(mm).

[4]    *See id.* ¶ 9(a).

[5]    *See id.* ¶ 9(b).

[6]    *See id.* ¶ 7(a).

3

and Rule 23(b)(3):

> [A]ll Persons who purchased or otherwise acquired any of the Subject Securities at issue in such case during the Settlement Class Period applicable to such action and were damaged thereby.
>
> (a) Subject to the review provisions provided in Paragraph 20 [of the Stipulation],[7] excluded from the Settlement Class is each Person, other than a Natural Person, that was identified as a recipient of an allocation of shares from the "institutional pot" in the IPO or Other Charged Offering of any of the 309 Subject Securities, according to a list derived from the final "institutional pot" list created at the time of each IPO or Other Charged Offering by the lead Underwriter in that Offering ("Excluded Allocants").
>
> (b) Also excluded from the Settlement Classes are (i) each Person that currently is or previously was a named defendant in any of the 309 Actions (hereafter "Named Defendant"), (ii) any attorney who has appeared in the Actions on behalf of a Named Defendant, (iii) members of the immediate family of any Named Defendant, (iv) any entity in which any Excluded Allocant or Named Defendant has or during any of the class periods had a majority interest, (v) the legal representatives, heirs, successors or assigns of any Excluded Allocant or Named Defendant; and (vi) any director, officer, employee, or beneficial owner of any Excluded Allocant or Named Defendant during any of the Settlement Class Periods. Notwithstanding the prior sentence, a person shall not be excluded from the Settlement Classes merely by virtue of his, her or its beneficial ownership of the securities of a

---

[7]     The Stipulation provides that a Settlement Class Member will be treated as an "Authorized Claimant" if a number of conditions are met, including the submission of a Proof of Claim. *See id.* ¶ 20.

publicly-traded Excluded Allocant or Named Defendant.[8]

In each Action, the Class Period is from the date of the IPO until December 6, 2000.[9]

### D.   Fees and Expenses

According to the proposed Notice of Pendency, plaintiffs' counsel will move the Court to award attorneys' fees not to exceed 33 1/3 percent of the Total Designation Amount in each Action.[10]  Plaintiffs' counsel will also move the Court to award expenses of approximately $56 million in connection with the prosecution of the Actions plus interest.[11]

Furthermore, Plaintiffs' Counsel estimate that Proposed Settlement Class Representatives and Lead Plaintiffs will apply to the Court for reimbursement of their reasonable time and expenses in a total amount not to

---

[8]     *See* Stipulation ¶¶ 8, 8A.

[9]     *See* Schedule 1 to Notice of Pendency and Proposed Global Settlement of 309 Class Actions, Motion for Approval of Settlement, Plan of Allocation, Attorneys' Fees and Expenses, PSLRA Awards of Reimbursement of Representatives' Time and Expenses and Settlement Fairness Hearing ("Proposed Notice of Pendency"), Ex. C(1) to Stipulation.

[10]    *See* Proposed Notice of Pendency at 3-4.

[11]    *See id.* at 4.

exceed $4 million.[12]  Finally, it is estimated that an additional $27.5 million will

be incurred by the Claims Administrator for the notification of the potential

settlement class members and processing of claims forms.[13]  The amounts of fees

and expenses for all Actions are listed in Schedule 2 of the Proposed Notice of

Pendency.[14]

### E.    Plan of Designation and Allocation

According to the Stipulation, the Settlement Amount is to be

distributed to all Authorized Claimants in accordance with the Plan of Allocation,

and none shall revert to defendants under any circumstances.[15]  The Stipulation

further provides that the Plan of Allocation is "not a necessary term of the

Stipulation" and is "not a condition of this Stipulation or the Settlement that any

particular Plan of Allocation be approved."[16]

The proposed Plan of Allocation is set forth in the Proposed Notice of

Pendency submitted by plaintiffs.  According to the proposed Plan of Allocation,

---

[12]    *See id.*

[13]    *See id.*

[14]    *See* Schedule 2 to Proposed Notice of Pendency.

[15]    *See* Stipulation ¶ 17.

[16]    *Id.* ¶ 16.

the $586 million Settlement Amount and interest earned will be reduced by taxes,

costs, fees, and expenses to produce a "Net Settlement Fund."[17]  This Net

Settlement Fund will then be allocated to the Actions in proportion to the amount

of potentially recoverable damages in accordance with a table of amounts as set

forth in Schedule 2 of the proposed Notice of Pendency ("Net Designation

Amounts").[18]  In order to ensure that no case is "unfairly disadvantaged by its

participation in this settlement," each case will be allotted a "floor" or minimum

Net Designation Amount of $300,000.[19]  This floor only applies in 35 cases,

"resulting in total additional designations (to those cases) of $3,925,139[] over and

above the designation amounts resulting from the damage methodology."[20]  The

highest Net Designation Amount in the 309 cases is approximately $20 million.[21]

     Authorized Claimants will be eligible to receive a pro rata share of

the net settlement fund designated for the case or cases for which they have a

---

[17]     Proposed Notice of Pendency at 20.

[18]     *See* Schedule 2 to Proposed Notice of Pendency.

[19]     *See* Proposed Notice of Pendency at 20.

[20]     *Id.* at 12; *see* Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Settlement ("Pl. Mem.") at 9.

[21]     *See* Schedule 2 to Proposed Notice of Pendency.

claim up to the amount of their recognized losses.[22]  Where the Net Designation

Amount for a particular case exceeds the actual amount of the recognized losses of

all Authorized Claimants, the excess will "flow into a pot to be combined with

excess Net Designation Amounts from all other Actions . . . and will be utilized to

pay underfunded [r]ecognized [c]laims in all Actions."[23]

### F.    Class Representative Approvals

Plaintiffs inform the Court that in each of the 309 cases, at least one

of the proposed settlement class representatives affirmatively approved the

settlement.[24]  However, they also report that in thirty-three cases, "the lead

plaintiffs are not the proposed settlement class representatives and have failed to

respond to communications from counsel about the settlement."[25]  In five cases,

plaintiffs report that the lead plaintiff disapproved of the settlement.[26]

Nevertheless, they inform the Court that in each of the thirty-eight cases for which

the lead plaintiff has either not responded or disapproved of the settlement, a class

---

[22]    *See* Proposed Notice of Pendency at 20.

[23]    *Id.*

[24]    *See* Pl. Mem. at 8.

[25]    *Id.*

[26]    *See id.*  The five cases are *Agilent Technologies*, *Avici*, *Eloquent*, *ePiphany*, and *Focal Communications*.  *See id.* n.7.

8

member who desires to serve as settlement class representative has approved the settlement.[27]

## G.   Notice

Notice to the class will be administered by The Garden City Group, Inc., a firm plaintiffs claim is experienced in class action settlement administration and notice procedures.[28]  Because the Garden City Group previously provided services on a prior proposed settlement in this case, it already maintains a database of potential class members in 298 IPO cases.[29]

Plaintiffs propose that notice be sent by first-class mail.[30]  For the 298 cases involved in the prior proposed settlement, the identification of the potential class members had already been accomplished.[31]  For the remaining eleven cases, the issuers will provide their transfer records, and the underwriter defendants will provide the records of settling trades, at no cost.[32]  The administrator will also

---

[27]   *See id.*

[28]   *See id.* at 10.

[29]   *See id.*

[30]   *See id.* at 11.

[31]   *See id.*

[32]   *See id.*

notify approximately 2,000 brokers and nominee owners of the proposed settlement and request either that they provide a list of their beneficiaries or that they forward the notice on to their beneficiaries.[33]

Plaintiffs inform the Court that the notice administrator will also maintain a website which will allow claimants to file proofs of claim and obtain copies of the stipulation and other court filings.[34]  Finally, the administrator will publish the summary notice in the national editions of the Wall Street Journal, USA Today, The New York Times, and over PR Newswire within ten days of the mailing.[35]

## III.   APPLICABLE LAW

### A.   Preliminary Approval

Unlike settlements in ordinary suits, the settlement of a class action must by approved by the court.[36]  The court owes a duty to class members to ensure that the proposed settlement is "fair, reasonable and adequate."[37]  In

---

[33]   *See id.*

[34]   *See id.*

[35]   *See id.*

[36]   *See* Fed. R. Civ. P.  23(e).

[37]   Fed. R. Civ. P. 23(e)(2).

10

making this determination, the court's "primary concern is with the substantive

terms of the settlement;" accordingly, the court must "compare the terms of the

compromise with the likely rewards of litigation."[38]  The trial judge must "apprise

herself of all facts necessary for an intelligent and objective opinion of the

probabilities of ultimate success should the claim be litigated."[39]  The court should

not go so far as to effectively conduct a trial on the merits, but should make

"findings of fact and conclusions of law whenever the propriety of the settlement

is seriously in dispute."[40]  The court must also scrutinize the negotiating process

leading up to the settlement.  "A presumption of fairness, adequacy, and

reasonableness may attach to a class settlement reached in arm's-length

negotiations between experienced, capable counsel after meaningful discovery."[41]

In determining whether a settlement is "fair, reasonable and

adequate," courts in this Circuit look to the following factors:  (1) the complexity,

expense and likely duration of the litigation; (2) the reaction of the class to the

_____

[38]     *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d
Cir. 1995).

[39]     *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

[40]     *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983).

[41]     *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir.
2005) (citing *Manual for Complex Litigation, Third*, § 30.42 (1995)).

11

settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[42]   Ultimately, the approval of the proposed settlement of a class action is a matter of discretion for the trial court.[43]   Nevertheless, a court should be mindful of the "'strong judicial policy in favor of settlements, particularly in the class action context.'"[44]

## B.   Class Certification

### 1.   Certification of Settlement Classes

The use of a settlement class allows the parties to concede, for

---

[42]      *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  *See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (citing *Grinnell* and applying its nine-factor test to evaluate class action settlement).

[43]      *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000).

[44]      *Wal-Mart Stores*, 396 F.3d at 116 (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)).

purposes of settlement negotiations, the propriety of bringing the suit as a class

action and allows the court to postpone formal certification of the class until after

settlement negotiations have ended. The United States Supreme Court has

expressly approved the use of the settlement class device, while also warning that

the device raises special concerns.[45] A settlement-only class must meet all the

requirements of Rule 23, with one important exception: because the case will

never go to trial, the court need not consider the manageability of the proceedings

should the case or cases proceed to trial.[46] In the settlement context, the

"specifications of [Rule 23] — those designed to protect absentees by blocking

unwarranted or overbroad class definitions — demand undiluted, even heightened,

attention."[47]

      As courts and commentators have noted, when settlement occurs early

in the case the parties have less information on the strengths and weaknesses of

the claims, and thus the court and class members may be hampered in their ability

---

[45]    *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 618 (1997) ("the 'settlement only' class has become a stock device").

[46]    *See id.* at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

[47]    *Id.*

to determine the fairness of the settlement:

> Extended litigation between or among adversaries might bolster confidence that the settlement negotiations were at arm's length. If, by contrast, the case is filed as a settlement class action or certified for settlement with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims or defenses, to determine the appropriate definition of the class, and to consider how class members will actually benefit from the proposed settlement.[48]

The use of this device may also raise questions about collusion and the ability of plaintiffs' counsel to represent the interests of the entire class.[49]  Thus, because of these concerns, when a settlement class is certified after the terms of settlement have been reached, courts must require a "clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations

---

[48]     *Manual for Complex Litigation, Fourth* § 21.612.

[49]     *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 787 (3d Cir. 1995) ("the court performs its role as supervisor/protector without the benefit of a full adversarial briefing on the certification issues. With less information about the class, the judge cannot as effectively monitor for collusion, individual settlements, buy-offs . . . and other abuses"); *see also Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co.*, 834 F.2d 677, 680 (7th Cir. 1987) ("[t]he danger of a premature, even a collusive, settlement is increased when . . . the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates").

leading to it."[50]

## 2. *Miles I* and *Miles II*

On October 13, 2004, I issued an Opinion and Order certifying

classes in each of six focus cases (the "2004 Class Certification Opinion").[51] The

classes consisted of "all persons and entities that purchased or otherwise acquired

the securities of [the issuer] during the Class Period and were damaged thereby,

subject to various exclusions."[52] The Class Periods for the Exchange Act claims

were the periods from the respective IPOs through December 6, 2000. For the

Securities Act Claims, the Class Periods were limited to periods in which all

tradeable shares in the market could be traced to the IPOs.[53]

In June 2005, the Second Circuit granted defendants' petition for

leave to appeal pursuant to Rule 23(f) of the Federal Rules of Civil Procedure.

The Circuit directed the parties to address the proper standard for a class

certification motion and whether the *Basic* presumption of reliance was

appropriately extended to plaintiffs' claims.

---

[50] *Weinberger*, 698 F.2d at 73.

[51] *See 2004 Class Cert.*, 227 F.R.D. at 122.

[52] *Id.* at 74 (quotation omitted).

[53] *See id.* at 118-19.

On December 5, 2006, the Second Circuit announced its Opinion in *Miles v. Merrill Lynch & Co.* ("*Miles I*").[54]  In *Miles I*, the Circuit clarified the standard to be applied in class certification actions (thereby amending the previously articulated standard in this Circuit) and then applied that standard to this case.[55]

The court also concluded that plaintiffs "cannot satisfy the predominance requirement for a (b)(3) class action" because individual questions predominated over common questions in the areas of knowledge and reliance.[56] *First*, the court held that plaintiffs could not take advantage of the *Basic v. Levinson* presumption of reliance.[57]  The court noted that "the market for IPO shares is not efficient," citing the fact that no analyst reports are published during the 25-day "quiet period."[58] *Second*, the court ruled that many potential claimants would have known that the price was "affected by the alleged manipulation,"

---

[54]     471 F.3d 24 (2d Cir. 2006).

[55]     *See id.* at 40.

[56]     *Id.* at 45.

[57]     *See id.* at 42. In *Basic v. Levinson*, the Supreme Court determined that a trader may invoke a rebuttable presumption that she relied on the integrity of the price set by the market if the market is efficient. *See* 485 U.S. 224, 247 (1988).

[58]     *Miles I*, 471 F.3d at 43.

16

thereby making it difficult for plaintiffs to prove that they were ignorant of inflated prices, a prerequisite of a section 10(b) claim.[59] The court noted that the classes as defined included initial IPO allocants, who were "required to purchase in the aftermarket" and who were "fully aware of the obligation that is alleged to have artificially inflated share prices."[60] It also noted plaintiffs' admission that there was an "industry-wide understanding" of aftermarket purchases, evidenced by the knowledge of the many thousands of people employed by the institutional investors who had been parties to the tie-in agreements and by news reports and an a Securities Exchange Commission ("SEC") Staff Legal Bulletin that had publicized such practices in 1999 and 2000.[61]

This appeared to close the door on any opportunity for class certification in these cases. However, on April 6, 2007, the *Miles* panel issued a decision denying rehearing of *Miles I* but clarifying certain points in its original opinion ("*Miles II*").[62] Plaintiffs had argued in their petition for rehearing that the Circuit had erred both in finding that predominance could not be satisfied and in

[59]     *Id.*

[60]     *Id.*

[61]     *Id.*

[62]     *See Miles v. Merrill Lynch & Co.* ("*Miles II*"), 483 F.3d 70 (2d Cir. 2007).

17

failing to remand to this Court for evaluation of the class under the clarified standard.[63]  Specifically, with regard to the first point, plaintiffs argued that non-allocants who purchased shares in the aftermarket "would have relied on the market price of the shares and would have lacked knowledge of the alleged fraud . . . ."[64]

The Circuit explained that its decision in *Miles I* applied only to the broad class certified by this Court.[65]  Thus, the Circuit resolved both of plaintiffs' arguments by observing that "[n]othing in [*Miles I*] precludes the Petitioners from returning to the District Court to seek certification of a more modest class, one as to which the Rule 23 criteria might be met, according to the standards we have outlined."[66]  The Circuit concluded, "we leave it to the Petitioners in the first instance to seek whatever relief they deem appropriate from the District Court, which can be expected to give such a request full and fair consideration."[67]

**3.    Standard of Review**

---

[63]    *See id.* at 72.

[64]    *Id.*

[65]    *See id.* at 73.

[66]    *Id.*

[67]    *Id.*

18

Plaintiffs bear the burden of demonstrating – by a preponderance of the evidence – that the proposed class meets the requirements for class certification.[68]  This Court must "'assess all of the relevant evidence admitted at the class certification stage' when determining whether to grant a Rule 23 motion."[69]  "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement."[70]  However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[71]

### 4.    Requirements of Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure governs class certification.  "'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility."[72]  To be certified, a putative class

---

[68]    *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

[69]    *Id.* (quoting *Miles I*, 471 F.3d at 42).

[70]    *Miles I*, 471 F.3d at 41.

[71]    *Id.*

[72]    *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting *Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989)).

must first meet all four prerequisites set forth in Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy.[73]

The numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable."[74] Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims.[75] Sufficient numerosity can be presumed at a level of forty members or more.[76]

Commonality requires a showing that common issues of fact or law affect all class members.[77] "Commonality does not mandate that all class members make identical claims and arguments."[78] When "common questions do

---

[73]    *See Teamsters*, 546 F.3d at 201-02.

[74]    Fed. R. Civ. P. 23(a)(1).

[75]    *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007). *See also Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) ("'[I]mpracticality' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class.").

[76]    *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 *Newberg On Class Actions* § 3.05 (2d ed. 1985)).

[77]    *See* Fed. R. Civ. P. 23(a)(2).

[78]    *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (citing *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 153-54 (2d Cir. 1983)).

predominate, differences among the questions raised by individual members will not defeat commonality."[79]

"Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[80] Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where "injuries derive from a unitary course of conduct by a single system."[81] A lack of typicality may be found in cases where the named plaintiff "was not harmed by the [conduct] he alleges to have injured the class"[82] or the named

---

[79]     *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996). *Accord Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (citing *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994)); 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d ed. 2008) ("To the extent that 'co-extensive' suggests that the representatives' claims must be substantially identical to those of the absent class members, it is too demanding a standard.").

[80]     *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[81]     *Marisol A.*, 126 F.3d at 377.

[82]     *Newman v. RCN Telecom Services, Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006). *Accord Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002) (finding an absence of typicality where the "named claimants had not suffered 'injur[ies] similar to the injuries suffered by the other class members'" (quoting *McClain v. South Carolina Nat'l Bank*, 105 F.3d 898, 903 (4th Cir. 1997)).

21

plaintiffs' claim is subject to "specific factual defenses" atypical of the class.[83]

Adequacy demands that "the representative parties will fairly and adequately protect the interests of the class."[84] "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[85] "[C]lass representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"[86] However, the Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance."[87]

---

[83]   *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006), *cert. denied*, 127 S.Ct. 2952 (2007).

[84]   Fed. R. Civ. P. 23(a)(4).

[85]   *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

[86]   *Id.* at 61 (quoting *Maywalt*, 67 F.3d at 1077-78).

[87]   *Id.* (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966)). *Accord Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 344 (S.D.N.Y. 2004) (holding that inflexible application of the adequacy requirement "runs

22

Finally, the courts have added an "implied requirement of

ascertainability" to the express requirements of Rule 23(a).[88]   "[T]he requirement

that there be a class will not be deemed satisfied unless the class description is

sufficiently definite so that it is administratively feasible for the court to determine

whether a particular individual is a member."[89]   "'An identifiable class exists if its

members can be ascertained by reference to objective criteria.'"[90]

### 5.    Requirements of Rule 23(b)

In addition to showing that the proposed class satisfies the four

prerequisites of Rule 23(a), plaintiffs must show that the class is "maintainable"

under Rule 23(b).  A class satisfies this requirement if it in fits into one of the

three alternative categories delineated by Rule 23(b), subdivisions (1), (2), and (3).

In the case at bar, plaintiffs move for class certification pursuant to subdivision

---

counter to a principal objective of the class action mechanism – to facilitate
recovery for those least able to pursue an individual action").

[88]    *Miles I*, 471 F.3d at 30.

[89]    7A Wright, Miller, & Kane, *supra*, § 1760.  *Accord In re Fosamax
Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting *Rios v.
Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983)).

[90]    *In re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary
Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).
*Accord id.* at 396 ("The Court also must be able to determine the class'
membership "'without having to answer numerous fact-intensive inquiries.'"
(quoting *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001))).

23

(b)(3).

Under Rule 23(b)(3), certification is appropriate where "questions of

law or fact common to the members of the class predominate over any questions

affecting only individual members," and the court finds that class litigation "is

superior to other available methods for the fair and efficient adjudication of the

controversy."[91]  Generally, the "'predominance inquiry tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation.'"[92]  The

Second Circuit has observed that this subdivision

> encompasses those cases in which a class action would
> achieve economies of time, effort, and expense, and
> promote uniformity of decision as to persons similarly
> situated, without sacrificing procedural fairness or bringing
> about other undesirable results.[93]

"Regardless of whether [an action] as a whole satisfies Rule 23(b)(3)'s

predominance requirement," courts may employ Rule 23(c)(4) to certify a class on

a particular issue.[94]

---

[91]    Fed. R. Civ. P. 23(b)(3).

[92]    *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)).

[93]    *Id.* (quotations and citation omitted).

[94]    *Id.* at 227.  Rule 23(c)(4)(A) provides that "[w]hen appropriate . . . an action may be brought or maintained as a class action with respect to particular

In determining whether the class action mechanism is the most "fair

and efficient" method of resolving a case, courts must consider the following four

nonexclusive factors: (1) class members' interest in maintaining individual

actions; (2) "the extent and nature of any litigation concerning the controversy

already commenced by or against members of the class;" (3) "the desirability or

undesirability of concentrating the litigation of the claims in the particular forum;"

and (4) "the difficulties likely to be encountered in the management of a class

action."[95]

### 6.    Expert Testimony

In *Visa Check*, the Circuit held that "a district court may not weigh

conflicting expert evidence or engage in 'statistical dueling' of experts."[96]  The

Court's role was merely to "ensure that the basis of the expert opinion is not so

flawed that it would be inadmissible as a matter of law."[97]  However, in *Miles I*,

the Second Circuit disavowed that holding, explaining instead that "[a] district

---

issues . . . ."

[95]     *In re Nassau County*, 461 F.3d at 230 (citing Fed. R. Civ. P. 23(b)(3))
(quotation marks omitted).

[96]     *Visa Check*, 280 F.3d at 135 (quoting *Caridad v. Metro-North
Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999)).

[97]     *Id.*

judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit."[98]

## C.    Securities Fraud

To state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."[99]  Transaction causation requires a plaintiff to demonstrate that "'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[100]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[101]  "To that end, the plaintiff's complaint must plead that the loss was foreseeable and

---

[98]    *Miles I*, 471 F.3d at 41.

[99]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

[100]    *Id.* (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005)).

[101]    *ATSI*, 493 F.3d at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

26

caused by the materialization of the risk concealed by the fraudulent statement."[102]

### 1.    Transaction Causation

#### a.    Omissions

The Supreme Court has held that a presumption of reliance may apply in cases in which plaintiffs have alleged that defendants failed to disclose information.  In *Affiliated Ute Citizens of the State of Utah v. United States*, the Court held that where a plaintiff's fraud claims are based on omissions, transaction causation may be satisfied so long as the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material.[103] Facts are material if "a reasonable investor might have considered them important in the making of [a] decision."[104]

This presumption is nevertheless not conclusive.[105]  "Once the plaintiff establishes the materiality of the omission . . . the burden shifts to the defendant to establish . . . that the plaintiff did not rely on the omission in making

---

[102]    *ATSI*, 493 F.3d at 107 (citing *Lentell*, 396 F.3d at 173).

[103]    *See Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154 (1972).

[104]    *Id.* at 153-54.

[105]    *See DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987).

the investment decision."[106]  To satisfy this burden, a defendant must prove "that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.'"[107]

### b.   Misrepresentations

In *Basic v. Levinson*, the Supreme Court determined that an investor may also invoke a rebuttable presumption of reliance in cases of misrepresentations.  The Court held that an investor may avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[108]  The Court observed that "the market . . . ideally, transmits information to the investor in the processed form of a market price.  Thus the market is performing a substantial part of the valuation process . . . ."[109]  The Court noted that Congress expressly relied on the efficient capital markets hypothesis: "'The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [sic] about

---

[106]    *Id.* at 76.

[107]    *Id.* at 78 (quoting *Rochez Bros. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)).

[108]    485 U.S. at 227.

[109]    *Id.* at 244.

28

a situation where the market price reflects as nearly as possible a just price.'"[110]

Thus, "[b]ecause most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[111]

The Supreme Court thus permitted plaintiffs who demonstrate an efficient market to benefit from two presumptions: "(1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value."[112] Defendants can rebut such a presumption by demonstrating that the market price was not affected by the misrepresentations, possibly by showing that market makers knew the truth or that the concealed information "credibly entered the market and dissipated the effects of the misstatements . . . ."[113]

In dicta in *Miles I*, the Second Circuit suggested that the *Basic* presumption may not apply "to tie-in trading, underwriter compensation, and

---

[110]     *Id.* at 246 (quoting H.R. Rep. No. 1383, at 11).

[111]     *Id.* at 247.

[112]     *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004) (citing *Basic*, 485 U.S. at 245-47).

[113]     *Basic*, 485 U.S. at 248-49.

analysts' reports."[114]  The reasoning behind this statement is unclear.  In an

efficient market, prices reflect all available information, including the information

presented by tie-in trading, underwriter compensation, and analyst reports.  In the

absence of a controlling holding from the Circuit, the *Basic* presumptions remain

available where plaintiffs can demonstrate that the market is efficient.

### 2.    Factors of an Efficient Market

There are two core requirements for an efficient market:  "[l]arge

numbers of rational and intelligent investors," and "[i]mportant current

information" that is "almost freely available to all participants . . . ."[115]

Unfortunately, it is difficult to test for these requirements directly.  Therefore,

courts use a variety of factors to evaluate whether a market for securities is

efficient.

In *Cammer v. Bloom*, the court enumerated five factors that are

---

[114]    *Miles I*, 471 F.3d at 43 (citing *West v. Prudential Sec.*, 282 F.3d 935,
938 (7th Cir. 2002)).

[115]    Paolo Cioppa, *The Efficient Capital Market Hypothesis Revisited:
Implications of the Economic Model for the United States Regulator*, 5 Global
Jurist Advances 1, 5-6 (2005).  The first component does not require that all
investors be rational and intelligent, merely that there be enough rational,
intelligent investors to outweigh any irrational actions. *See id.* at 5.

frequently used to determine whether a market is efficient.[116]  These factors are the

average weekly trading volume; the number of analysts who follow the stock; the

existence of market makers and arbitrageurs; the ability of the company to file

SEC Form S-3;[117] and evidence of a rapid share price response to unexpected

news.

The court in *Krogman v. Sterritt* raised three additional factors. *First*,

the court noted that investors tend to be more interested in companies with higher

market capitalizations, thus leading to more efficiency.[118]  *Second*, the court

determined that a small bid-ask spread indicated that trading in the stock was

inexpensive, suggesting efficiency.[119]  *Third*, the court looked to the percentage of

shares that were available to the public.  Because insiders are more likely to have

private information, if substantial portions of shares are held by insiders, the price

---

[116]    *See* 711 F. Supp. 1264, 1283-87 (D.N.J. 1989).

[117]    *See generally* Cioppa, *supra* note 115, at 28 ("The SEC's three tiered
system recognized that markets for different securities in the United States are
efficient to different degrees.  Essentially, moving from the S1 filers to the S3
filers, the more widely traded and followed the issuing company and the longer it
has traded, the more efficient the market for it and the less information it must
disclose in its registration statements.").

[118]    *See* 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[119]    *See id.*

31

is less likely to reflect only the total of all public information.[120]

### a.    Average Weekly Trading Volume

As *Cammer* states, high volume suggests efficiency "because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[121]  *Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency, while turnover of one percent would justify a substantial presumption.[122]

### b.    Number of Securities Analysts

*Cammer* recognizes that a stock covered by a "significant number of analysts" is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors.[123]

### c.    Existence of Market Makers and Arbitrageurs

---

[120]    *See id.*

[121]    711 F. Supp. at 1286.

[122]    *See id.* (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* § 8.6 (Aug. 1988)).

[123]    *Id.*

*Cammer* explains that "[t]he existence of market makers and
arbitrageurs would ensure completion of the market mechanism; these individuals
would react swiftly to company news and reported financial results by buying or
selling stock and driving it to a changed price level."[124]  But *Krogman* responded
that the mere number of market makers, without more, is essentially meaningless;
"what is important is 'the volume of shares that they committed to trade, the
volume of shares they actually traded, and the prices at which they did so.'"[125]
One study found that the number of market-makers is not correlated with the
efficiency of the market.[126]  Nevertheless, this factor can provide reasonable
guidance in determining whether the *Basic* presumptions apply.

### d.    Eligibility to File Form S-3

The SEC permits a company to file Form S-3 when, in the SEC's
judgment, the market for shares in the company is reasonably efficient at

---

[124]    *Id.* at 1286-87.

[125]    *Krogman*, 202 F.R.D. at 476 (quoting *O'Neil v. Appel*, 165 F.R.D.
479, 501-02 (W.D. Mich. 1996)).

[126]    *See* Dr. Allen Michel *et al.*, 24 Am. Bankr. Inst. J. 58, 60 (2005)
(citing Brad Barber *et al.*, *The Fraud-on-the-Market Theory and the Indicators of
Common Stocks' Efficiency*, 19 J. Corp. L. 285, 286 (1994)).

processing information.[127]  The *Cammer* court emphasized the SEC's statement

that the Form S-3 is "predicated on the Commission's belief that the market

operates efficiently for these companies [that file Form S-3s], i.e., that the

disclosure in Exchange Act reports and other communications by the registrant,

such as press releases, has already been disseminated and accounted for by the

market place."[128]  Because of the SEC's expertise in this area, I agree that this

factor provides a strong indication of efficiency.

### e.    Other Factors

Empirical evidence of rapid price changes in response to unexpected

information is highly probative of efficiency because it demonstrates that the

market was likely to have incorporated the information in question into the share

price.[129]  However, there is no consensus as to how quickly share prices must

---

[127]    *Cammer*, 711 F. Supp. at 1284 (observing that the SEC permits seasoned issuers to incorporate by reference because "'[t]o the extent that the market accordingly acts efficiently, and this information is adequately reflected in the price of a registrant's outstanding securities, there seems little need to reiterate this information in a prospectus in the context of a distribution.'") (quoting SEC Securities Act Release No. 6235, 45 Fed. Reg. 63,693 (1980)).

[128]    *Id.* (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (1981)).

[129]    *See id.* at 1287 (noting that this factor is "the essence of an efficient market and the foundation for the fraud on the market theory.").

change to justify a finding of efficiency.

Similarly, the markets for companies with higher market

capitalizations and shares with a smaller bid-ask spread are more likely to be

efficient.[130]  Finally, the percentage of shares available to the public generally

bears a direct relationship to efficiency.[131]

### D.    Class Notice and Fairness Hearing

In addition to reviewing the proposed terms of settlement and making

a preliminary determination on the fairness, reasonableness and adequacy of the

settlement terms,[132] the court must also direct the preparation of notice of the

certification of the settlement class, the proposed settlement, and the date of the

final fairness hearing.[133]  The Private Securities Litigation Reform Act ("PSLRA")

requires that notice to the class include each of the following statements and a

---

[130]    *See Krogman*, 202 F.R.D. at 478.

[131]    *See id.*

[132]    *See Manual for Complex Litigation, Fourth* § 21.632.  *See also In re
Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)
(citing *Manual for Complex Litigation, Third* § 30.41) ("Where the proposed
settlement appears to be the product of serious, informed, non-collusive
negotiations, has no obvious deficiencies, does not improperly grant preferential
treatment to class representatives or segments of the class and falls within the
range of possible approval, preliminary approval is granted.")).

[133]    *See* Fed. R. Civ. P. 23(e)(1) ("The court must direct notice in a
reasonable manner to all class members who would be bound by the proposal.").

brief summary of each in a cover page: (1) statement of plaintiff recovery; (2)

statement of potential outcome of the case; (3) statement of attorneys' fees and

costs sought; (4) identification of lawyers' representatives; (5) reasons for

settlement; and (6) any other information required by the Court.[134]  "There are no

rigid rules to determine whether a settlement notice to the class satisfies

constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise

the prospective members of the class of the terms of the proposed settlement and

of the options that are open to them in connection with the proceedings."[135]

The class notice should also inform potential class members of the

date of the "fairness hearing."  At the fairness hearing, class members (and non-

settling defendants whose rights may be affected by the proposed settlement) have

the opportunity to present their views of the proposed settlement, and the parties

may present arguments and evidence for and against the terms.  The court then

makes a final determination as to whether the proposed settlement is "fair,

reasonable and adequate."[136]

---

[134]     *See* 15 U.S.C. § 78u-4(a)(7).

[135]     *Wal-Mart Stores*, 396 F.3d at 114 (internal quotations and citation omitted).

[136]     *See Manual for Complex Litigation, Fourth* §§ 21.632-21.635.

## IV.   DISCUSSION

### A.   Class Certification for Settlement Purposes

#### 1.   The Rule 23(a) Requirements

Several of the findings I made in the 2004 Class Certification Opinion require only brief reexamination. I observed in that Opinion that "[t]he common issues of liability presented in these six class actions are overwhelming."[137] Although that decision was made in the context of the "some showing" standard, after reviewing the evidence I have no trouble concluding that the commonality requirement is satisfied under the heightened standard that now applies. The requirement of numerosity is also clearly satisfied.[138]

Similarly, I observed in the 2004 Class Certification Opinion that the class representatives "allege that they were harmed in the same unitary scheme as the rest of the class."[139] I rejected defendants' argument that these representatives were subject to atypical defenses.[140] Again, I conclude that the facts here justify a

---

[137]   *2004 Class Cert.*, 227 F.R.D. at 93. *See id.* at 93-94 (listing common issues).

[138]   I also find that plaintiffs have met the Rule 23(g) requirement that class counsel be adequate to represent the class.

[139]   *2004 Class Cert.*, 227 F.R.D. at 95 (quotation omitted).

[140]   *See id.* at 94-96.

finding of typicality under the applicable standard.

Defendants had also argued that certain class representatives were inadequate. In the 2004 Class Certification Opinion, I found that defendants' arguments were unavailing.[141] After careful review, I again conclude that these representatives are adequate.

### 2.    Rule 23(b) Requirement of Predominance

Rule 23(b)(3) requires that common issues of fact "predominate over any questions affecting only individual members."[142] In *Miles I*, the Second Circuit vacated this Court's certification of the classes, concluding that the predominance requirement was not met.[143] The court held that "the market for IPO shares is not efficient" and that plaintiffs had themselves alleged that there was an "industry-wide understanding that those who agreed to purchase in the aftermarket received allocations."[144] As a result, the court ruled that the *Basic* presumption

---

[141]    *See id.* at 96-99.

[142]    Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In the 2004 Class Certification Opinion, I found that this was the case, and I see no grounds for reconsideration of that holding. *See 2004 Class Cert.*, 227 F.R.D. at 121.

[143]    *See* 471 F.3d at 42-44.

[144]    *Id.* at 42-43.

could not apply to satisfy the reliance element, and evidence of knowledge would negate the inference that all of the investors had relied on the inflated prices to their detriment.  Individual issues would therefore predominate.[145]  The court also opined that ascertainment of which putative class members have "paid any undisclosed compensation to the allocation underwriters" was an aspect of the litigation that was "bristling with individual questions."[146]  As a result, I must now reexamine the predominance requirement with respect to reliance, knowledge, and ascertainability in light of the amended class definition.  I also evaluate the predominance requirement with respect to loss causation in more detail.

### a.    Reliance

Demonstrating reliance is frequently a difficult hurdle in certifying a class of plaintiffs in a securities action.  To recover, each plaintiff must demonstrate that she relied to her detriment on defendants' false statements and market manipulation.  Instead of demonstrating individual reliance, plaintiffs seek to rely on the *Basic* and *Affiliated Ute* presumptions of reliance.[147]

### i.    The *Basic* Presumption

---

[145]    *See id.* at 43-44.

[146]    *Id.* at 44.

[147]    *See* Pl. Mem. at 27.

Plaintiffs contend that the markets for the 309 cases were "efficient" during the relevant periods – meaning that they conformed to some degree to the efficient capital markets hypothesis.[148] In support of this claim, plaintiffs proffer the expert reports of Professor Daniel R. Fischel which were submitted during plaintiffs' 2004 and 2007 motions for class certification.[149] Professor Fischel is the Lee and Brena Freeman Professor of Law and Business at the University of

---

[148]    There are three general forms of the efficient capital markets hypothesis. *First* is the weak form, which asserts simply that the current share price in an efficient market reflects all information about past share prices. If the weak form of the hypothesis accurately describes a market, it is impossible to predict future prices using only past prices. *Second*, the semi-strong form, which asserts that a share price in an efficient market reflects all public information concerning the security (including but not limited to past share prices). *Third*, the strong form, which asserts that all relevant information, public and private, is reflected in the price of securities in an efficient market. The strong form has been widely discredited. *See generally* Daniel R. Fischel, *Efficient Capital Markets, The Crash, and the Fraud on the Market Theory*, 74 Cornell L. Rev. 907, 910-11 (1989). The semi-strong form is the form that generally concerns courts, and is the form to which I refer in this Opinion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 n.4 (2d Cir. 2007) ("The efficient capital market hypothesis, as adopted by the Supreme Court, posits that 'the market price of shares traded on well-developed markets reflects all publicly available information.'") (quoting *Basic*, 485 U.S. at 246).

[149]    *See* 1/20/04 Report of Daniel R. Fischel ("Fischel Rep."); 4/15/04 Rebuttal Report of Daniel R. Fischel ("Fischel Rebuttal Rep."); 7/12/04 Supplemental Report of Daniel R. Fischel ("Fischel Supp. Rep."); 9/27/07 Market Efficiency Report of Daniel R. Fischel ("Fischel Market Eff. Rep."); 9/27/07 Second Supplemental Report of Daniel R. Fischel ("Fischel 2d Supp. Rep."); 3/20/08 Second Rebuttal Report of Daniel R. Fischel ("Fischel 2d Rebuttal Rep.").

Chicago Law School and Chairman and President of Lexecon Inc., an economic

and consulting firm.[150]  Although Professor Fischel's reports address only the

markets of the six stocks which were the focus of the 2004 and 2007 motions,[151] he

has since submitted an affidavit opining that his findings in 2004 and 2007 with

respect to the efficiency of the markets of the six focus cases are equally

applicable to the 303 non-focus cases at issue.[152]

     Defendants had collectively submitted numerous expert reports to

contest the efficiency of the markets of the six focus cases in 2004 and 2007.[153]

---

[150]    *See* Resume of Professor Daniel R. Fischel, Ex. A to Fischel Rep.

[151]    These stocks are Corvis, Engage, FirePond, iXL, Sycamore, and VA Linux.

[152]    *See* 4/30/09 Affidavit of Daniel R. Fischel ("Fischel Aff.").
Nevertheless, Fischel has provided the Court with specific data only with respect
to the six focus cases. Thus, for those factors for which the Court possesses
additional information about the six focus cases but not the other 303 cases, the
Court will assume solely for the purpose of this motion that what is true about the
six focus cases is equally applicable to the 303 other cases.

[153]    *See, e.g.*, 12/20/07 Expert Report of Christopher B. Barry in the
Matter of iXL Enterprises ("Barry Rep."); 12/21/07 Expert Report of Hendrik
Bessembinder ("Bessembinder Rep."); 3/3/08 Expert Report of Bradford Cornell
("Cornell Rep"); 12/21/07 Expert Report of Paul A. Gompers ("Gompers Rep.");
12/20/07 Expert Report of Allan W. Kleidon ("Kleidon Rep."); 3/7/08 Expert
Report of Maureen O'Hara ("O'Hara Rep."); 12/19/07 Expert Report of Paul
Pfleiderer in the Matter of iXL Enterprises ("Pfleiderer Rep."); 3/12/08 Expert
Report of Mark Ready ("Ready Rep"); 2/23/04 Expert Report of Erik R. Sirri in
the Matter of iXL Enterprises ("Sirri Rep."); 12/19/07 Expert Report of Chester
Spatt ("Spatt Rep."); 12/20/07 Expert Report of Matthew Spiegel ("Spiegel Rep");

However, they have since informed the Court that – for purposes of settlement

class certification only – they are not challenging the efficiency of the markets in

any of these cases.[154]  Indeed, by stipulating to certify the classes, they have

---

12/21/07 Expert Report of René M. Stulz ("Stulz Rep").  Christopher B. Barry is a
Professor of Finance and Holder of the Robert and Maria Lowdon Chair of
Business Administration at Texas Christian University in Forth Worth, Texas.  *See*
Barry Rep. ¶ 1.  Hendrik Bessembinder is a Presidential Professor who holds the
A. Blaine Huntsman Chair in Finance at the David Eccles School of Business of
the University of Utah.  *See* Bessembinder Rep. ¶ 1.  Bradford Cornell is a
Visiting Professor of Financial Economics at the California Institute of
Technology and a Professor Emeritus at the Anderson Graduate School of
Management at the University of California.  *See* Cornell Rep. ¶ 1.  Paul A.
Gompers is a Professor of Business Administration at the Harvard Business
School.  *See* Gompers Rep. ¶ 1.  Allan W. Kleidon is a Senior Vice President at
Cornerstone Research, a financial and economic consulting firm.  *See* Kleidon
Rep. ¶ 1.  Prior to joining Cornerstone Research, he was an Associate Professor of
Finance at the Graduate School of Business at Stanford University.  *See id.*
Maureen O'Hara is the Robert W. Purcell Professor of Finance at the Johnson
Graduate School of Management at Cornell University.  *See* O'Hara Rep. ¶ 1.
Paul Pfleiderer is the C.O.G. Miller Distinguished Professor of Finance at the
Graduate School of Business, Stanford University.  *See* Pfleiderer Rep. ¶ 1.  Mark
Ready is a Professor of Finance at the School of Business at the University of
Wisconsin – Madison.  *See* Ready Rep. ¶ 1.  Erik R. Sirri is an Associate Professor
of Finance and holder of the Walter H. Carpenter Chair at Babson College.  *See*
Sirri Rep. ¶ 1.  From 1996 to 1999, he was the Chief Economist of the SEC.  *See
id.*  Chester Spatt is the Mellon Bank Professor of Finance and Director of the
Center for Financial Markets at the Tepper School of Business at Carnegie Mellon
University in Pittsburgh.  *See* Spatt Rep. ¶ 1.  Matthew Spiegel is a Professor of
Finance at the Yale School of Management who focuses on the area of financial
economics.  *See* Spiegel Rep. ¶ 2.  René M. Stulz is the Everett D. Reese Chair in
Money and Banking at Ohio State University.  *See* Stulz Rep. ¶ 1.

[154]     *See* 5/5/09 Letter from Defendants to the Court.

effectively conceded that the markets were efficient enough for plaintiffs to rely

on the *Basic* presumption. Nevertheless, I will briefly address each of the factors

courts consider when evaluating market efficiency. In doing so I will address

some of the criticisms made by defendant's experts of Fischel's analysis.

### Trading Volume

Fischel found that the weekly trading volume of each of the focus

case stocks averaged significantly above the two-percent threshold. His findings

are summarized in the following table:[155]

|                 | Weekly volume during class period | Weekly volume during quiet period | Volume, first day of trading |
| --------------- | --------------------------------- | --------------------------------- | ---------------------------- |
| **Corvis**      | 4.2%                              | 4.6%                              | 8.5%                         |
| **Engage**      | 4.3%                              | 12.6%                             | 32.2%                        |
| **FirePond**    | 4.2%                              | 8.4%                              | 28.7%                        |
| **iXL**         | 4.2%                              | 4.0%                              | 22.0%                        |
| **Sycamore**    | 8.7%                              | 6.1%                              | 12.9%                        |
| **VA Linux**    | 10.2%                             | 10.2%                             | 19.8%                        |

Fischel also analyzed the trading volume with respect to each of the

other 303 litigated stocks.[156] He found that 301 of them had average weekly

---

[155]    *See* Fischel Market Eff. Rep. ¶¶ 12 (Corvis), 29 (Engage), 52
(FirePond), 70 (iXL), 92 (Sycamore), 119 (VA Linux).

[156]    *See* Fischel Aff. ¶ 11.

turnover of at least one percent, indicating a substantial presumption of market efficiency, and 290 had average weekly turnover of at least two percent, justifying a strong presumption of efficiency.[157]  Thus, the trading volume for all litigated stocks suggest that the markets for these stocks were efficient.

However, as discussed, extraordinarily high volume may be indicative not of an efficient market but rather of a market having difficulty valuing a stock.  Fischel's statistics for first-day trading of the focus stocks indicate exactly this sort of valuation problem.  None of these statistics support a finding of efficiency on the first day of trading, though the evidence in support of a finding of efficiency is strongest as to Corvis.  The trading volume presents strong evidence of market efficiency during the entire class period, except the first days, for Engage, FirePond, Sycamore, and VA Linux, and during the first day only for Corvis.

## Coverage by Investment Analysts

Fischel has provided the Court with statistics on mass media coverage of the focus case stocks.  However, there is no basis for concluding that non-specialized media coverage is correlated with market efficiency.  I therefore

---

[157]    *See id.  See also Cammer*, 711 F. Supp. at 1286 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* § 8.6 (Aug. 1988)).

disregard statistics that refer to general media and look only to securities analyst coverage.

Fischel also provided the Court with the number of reports issued during the quiet period of each focus case stock that, though focusing on other companies, mention the relevant focus case stock. Generally, these mentions are in passing and do not disclose new and useful information.[158] Further, these mentions do not imply that investment professionals are following the company and making buy/sell recommendations to investors. Therefore, I am disregarding reports during the quiet period that merely mention the focus case stocks without providing new, useful information to investors.

Fischel also found that the focus case stocks were "covered extensively by investment professionals . . . ."[159] His findings are summarized in

---

[158]    For instance, defendants' expert Paul Gompers criticized Fischel's citation of reports that mention Sycamore during the quiet period. Gompers notes that five of these reports were focused on other companies, and Fischel has incorrectly dated all but one of the others. *See* Gompers Rep. ¶ 36. Gompers observes that the remaining report "contained information already available in the IPO prospectus, not new information or analysis." *Id. See also* Barry Rep. ¶ 11 (noting that "[o]nly analyst reports that examine a firm's prospects should count in assessing market efficiency").

[159]    Fischel Market Eff. Rep. ¶ 13.

the following table:[160]

|  | Analyst reports during the class period | Firms issuing reports during the class period | Analyst reports mentioning the issuer during the quiet period |
|---|---|---|---|
| **Corvis** | 190 | 23 | 11 |
| **Engage** | 506 | 32 | 2 |
| **FirePond** | 86 | 9 | 0 |
| **iXL** | 159 | 14 | 5 |
| **Sycamore** | 708 | 39 | 7 |
| **VA Linux** | 223 | 15 | 3 |

The chart shows that there was significant and extensive coverage of these stocks by investment professionals during the class period. Fischel similarly determined that the 303 other litigated stocks were the subjects of analyst reports during their respective class periods and that "[m]any of the 303 stocks at issue were followed by numerous analysts."[161]

However, the level of analyst coverage during the quiet period with respect to the focus cases was much smaller than after the conclusion of that period. At best, this factor may weigh in favor of efficiency during the quiet

---

[160]    *See id.* ¶¶ 13 (Corvis), 30 (Engage), 53-54 (FirePond), 71 (iXL), 93 (Sycamore), 120 (VA Linux).

[161]    Fischel Aff. ¶ 12.

period for Corvis but not for the other stocks.  While the Court has not been

provided specific data with respect to analyst reports for the other 303 litigated

stocks, the data will most likely show that there were fewer analyst reports during

the quiet periods.

## **Presence of Market Makers**

Fischel determined that there were substantial numbers of market

makers in each of the focus cases.  His findings regarding the number of market

makers are presented in the following table:[162]

|          | Market makers at IPO | Market makers at close of class period |
|----------|----------------------|----------------------------------------|
| **Corvis**   | 43 | 53 |
| **Engage**   | 27 | 38 |
| **FirePond** | 32 | 18 |
| **iXL**      | 28 | 31 |
| **Sycamore** | 50 | 65 |
| **VA Linux** | 47 | 40 |

Fischel also analyzed the number of market makers with respect to

the 303 other litigated stocks.  He found that of the 303 stocks at issue, 296 stocks

were listed on the NASDAQ at their initial listing, and each of these stocks had at

---

[162]     *See* Fischel Market Eff. Rep. ¶¶ 17 (Corvis), 34 (Engage), 57
(FirePond), 75 (iXL), 97 (Sycamore), 124 (VA Linux).

least 14 market makers at the time of its IPO and on December 6, 2000 or its last

day of trading, more than the eleven market makers the *Cammer* court found to be

sufficient to support a finding of an efficient market.[163]  Fischel notes that the

remaining seven stocks were traded on the NYSE or the American Stock

Exchange, and that courts have held that trading on these exchanges provides the

necessary evidence to satisfy this factor.[164]  The number of market makers in the

litigated stocks is therefore indicative of efficiency.

### Presence of Arbitrageurs

Fischel concluded that there was substantial short interest in each of

the focus case stocks, which was indicative of efficiency.[165]  However, the

evidence demonstrates that there were significant obstacles to arbitrage at the

---

[163]     *See* Fischel Aff. ¶ 13; *Cammer*, 711 F. Supp. at 1283 n.30.  Fischel explains that two of the litigated stocks switched their listing to the New York Stock Exchange ("NYSE") during their class periods and several others ceased trading before December 6, 2000.  *See* Fischel Aff. ¶ 13 n.5.

[164]     *See* Fischel Aff. ¶ 13.  *See also In re Alstom SA Secs. Litig.*, 253 F.R.D. 266, 180 (S.D.N.Y. 2008) (concluding that institutional investors held a substantial percentage of the stock and the stock was traded on the NYSE, thereby making it easy for institutional investors to act as arbitrageurs).

[165]     *See* Fischel Market Eff. Rep. ¶¶ 18 (Corvis), 35 (Engage), 58 (Firepond), 76 (iXL), 98 (Sycamore), 125 (VA Linux).

outset of trading of each of the focus case stocks.[166]   Although Fischel does not

provide specific data with respect to the short interest in each of the 303 litigated

stocks, it is reasonable to conclude that the evidence will be similar to the focus

case stocks.  Therefore, this factor weighs against a finding of efficiency during

the first weeks of trading.

### Eligibility to File an S-3 Registration Statement

Fischel notes that at the time of the IPOs of the focus case stocks,

"regulations required that a company have reported under the 1934 Act for one

year or more in order to file [a] Form S-3."[167]   Because none of the focus case

stocks had reported under the Exchange Act for one year or more, they were

ineligible to file a Form S-3 at the time of their IPOs.[168]   In *Cammer*, the court

---

[166]     *See* Corvis Short Interest, Ex. 3 to Fischel Market Eff. Rep.; Engage
Short Interest, Ex. 11 to Fischel Market Eff. Rep.; Firepond Short Interest, Ex. 19
to Fischel Market Eff. Rep.; Sycamore Short Interest, Ex. 35 to Fischel Market
Eff. Rep.; VA Linux Short Interest, Ex. 43 to Fischel Market Eff. Rep. *But see*
Amy K. Edwards & Kathleen Weiss Hanley, *Short Selling in Initial Public
Offerings*, working paper (Apr. 2008) (concluding that "short selling is prevalent
early in the aftermarket trading of IPOs" and that "[t]his finding is inconsistent
with theoretical models that predict high initial returns, in part, by assuming
constraints on short sales").

[167]     *See* Fischel Market Eff. Rep. ¶ 8.

[168]     *See id.* ¶¶ 20 (Corvis), 37 (Engage), 60 (FirePond), 78 (iXL), 100
(Sycamore), 127 (VA Linux).

noted that if a company was not eligible to file a Form S-3, this factor will not

necessarily weigh against a finding of market efficiency if "such ineligibility was

only because of timing factors rather than because the minimum stock

requirements set forth in the instructions to Form S-3 were not met."[169]  Fischel

found that for five of the six focus case stocks, the market values of their public

"floats" during their class periods were at least $75 million, which is the size of

the float required by the SEC at that time to be eligible to file a Form S-3.[170]  In the

case of iXL, the float exceeded $75 million until November 2000, when it dropped

below that value.[171]  Fischel does not opine with respect to the rest of the 303

litigated stocks.[172]  Because there is no evidence with respect to the 303 other

litigated cases, and in any case, the ineligibility of a company to file Form S-3

because of timing requirements does not necessarily indicate inefficiency, I find

---

[169]     *Cammer*, 711 F. Supp. at 1287.

[170]     *See* Fischel Market Eff. Rep. ¶¶ 8 (explaining requirement that float
have a market value of at least $75 million to have been eligible to file a Form S-
3); 20 (Corvis); 37 (Engage); 60 (Firepond);100 (Sycamore); 127 (VA Linux)).

[171]     *See id.* ¶ 78.

[172]     *See* Fischel Aff. ¶ 14 (opining only that "courts have not considered []
ineligibility [to file a Form S-3 because of timing requirements] to be an indicator
of market inefficiency").

that this factor does not weigh for or against market efficiency.[173]

## Incorporation of Information into Share Price

Fischel has observed that "the more rapidly prices reflect publicly-available information, the more sensible it is to apply" the efficient capital markets hypothesis.[174]  Using event study methodology, Fischel determined that the focus case shares tended to react significantly to unexpected corporate events.  For each focus case, Fischel listed examples where unexpected information was released to the public and the share price moved in a statistically significant manner.[175]  Fischel also analyzed stock price reactions to news for the 303 other litigated stocks and found that stock prices "reacted quickly" to new and publicly available information.[176]

Defendants' experts submitted a number of challenges to Fischel's

---

[173]   The allegations against DoubleClick and its underwriters are based on misconduct with respect to the company's secondary and tertiary offerings which took place on December 11, 1998 and February 18, 2000, respectively.  *See* Consolidated Amended Class Action Complaint, *In re DoubleClick, Inc. Initial Pub. Offering Sec. Litig.*, 01 Civ. 3980.  Fischel notes that DoubleClick's class period thus began after its IPO and is the only stock out of the 309 stocks that filed an S-3.  *See* Fischel Aff. ¶ 14 n.7.

[174]   Fischel, *Efficient Capital Markets*, *supra* note 148, at 912.

[175]   *See* Fischel Market Eff. Rep. ¶¶ 21-24 (Corvis), 38-47 (Engage), 61-65 (FirePond), 79-87 (iXL), 101-114 (Sycamore), 128-135 (VA Linux).

[176]   Fischel Aff. ¶ 15.

findings. *First*, they argued that because Fischel analyzed share price movements on a daily basis, he obscured the fact that some of the share price movements occurred hours after the disclosure of new information.[177]  For instance, defendants' expert Gompers specifically observed that Fischel attributes the increase in Sycamore's stock price on January 21, 2000 to a morning announcement that Sycamore planned to use technology from ION Networks in its products.  Although this announcement was made in the morning, much of Sycamore's stock price adjustment occurred in the afternoon.[178]  Gompers concludes that this delay is evidence against a finding that the market for Sycamore shares was efficient.[179]

In response, Fischel noted that academic research indicated that the adjustment to share prices following an announcement "lasts anywhere from one to seventeen hours after a news release . . . ."[180]  Indeed, evidence that share prices

---

[177]     *See* Stulz Rep. ¶ 72 (concluding, in those cases, that "either . . . the market responded inefficiently to the news or . . . the price increase was caused by some source unidentified by Professor Fischel, telling us nothing about cause-and-effect relationships between news and stock price movements.").

[178]     *See* Gompers Rep. ¶ 51.

[179]     *See id.*

[180]     Fischel 2d Rebuttal Rep. ¶ 12 (citing R. Jennings & L. Starks, *Information Content and the Speed of Stock Price Adjustment*, 23 J. Acct. Res. 336, 337 (1985)).

effectively incorporate new information within hours of the announcement of that information indicates efficiency, not inefficiency. While in a perfectly efficient market share prices would adjust instantaneously, the *Basic* presumption does not require a perfectly efficient market, only a market efficient enough to incorporate information into the share price with reasonable speed.

*Second*, Gompers – after examining the twenty-eight days identified by Fischel as having a statistically significant price change for Sycamore – concluded that the price moved without the release of relevant new information on twenty-two of those days.[181]  Fischel responded that a conclusion of inefficiency does not follow merely because significant share price changes are not *always* explained by known announcements.[182]  He argued that "most of the daily variation in stock prices generally is unexplained by market factors, industry factors, or firm-specific news."[183]  He also noted that prices can change when investors trade on private information, and that it is not always possible to identify the relevant information that moved share prices years after the fact.[184]

---

[181]     *See* Gompers Rep. ¶ 44.

[182]     *See* Fischel 2d Rebuttal Rep. ¶ 13.

[183]     *Id.* ¶ 10 (citing Richard Roll, $R^2$, 43 J. Fin. 541, 541 (1988)).

[184]     *See id.*  Fischel fails to explain certain price changes, indicating that his model may not be wholly comprehensive (and he does not contend that it is

*Third*, Gompers critiques Fischel's application of this methodology to Sycamore. He notes that "[f]inding a few examples of rapid reaction to information does not demonstrate that the market *always* responds fully and rapidly to public information throughout the purported Class Period."[185]  However, as with the other factors, there is no claim that this factor conclusively proves efficiency. A conclusion as to efficiency is made after all of the factors are examined. Fischel's study demonstrates a correlation between the studied factors and the requisite degree of efficiency.

Notwithstanding defendants' experts' criticisms, Fischel's study indicates that the prices of focus case stocks were generally responsive to the release of information throughout the class period. However defendants' experts rightfully observe that this study tells little about the efficiency of the stocks during the quiet period.[186]

## Other Factors

Fischel determined that the market capitalizations of the focus case

---

so). However, I do not find that this undercuts (or supports) his finding of efficiency.

[185]     Gompers Rep. ¶ 43 (emphasis in original).

[186]     *See, e.g.*, Stulz Rep. ¶ 68 (observing that none of the FirePond events occurred during its quiet period).

shares were above the median NASDAQ National Market capitalization on the

first day of trading, at the end of each stock's quiet period, and at the end of the

class period.[187] He found the same to be true of all but one of the other 303

litigated stocks.[188]

In addition, Fischel determined that the bid-ask spreads of the focus

case shares throughout the proposed class period were less than the median bid-

ask spread of all NASDAQ National Market shares, at least for portions of their

trading histories.[189] Fischel further found that this was also true for 274 of the 294

stocks at issue that traded on the NASDAQ during their entire class periods.[190] He

noted that the remaining twenty stocks had bid-ask spreads between the median

and seventy-fifth percentile of all NASDAQ stocks.[191]

Fischel also noted that only a small percentage of the issuers' shares

were held by the public at the time of their IPOs, but concluded that because those

---

[187]    *See* Fischel Market Eff. Rep. ¶¶ 25 (Corvis), 48 (Engage), 66
(FirePond), 88 (iXL), 115 (Sycamore), 136 (VA Linux).

[188]    *See* Fischel Aff. ¶ 16.

[189]    *See* Fischel Market Eff. Rep. ¶¶ 26 (Corvis), 49 (Engage), 67
(FirePond), 89 (iXL), 116 (Sycamore), 137 (VA Linux).

[190]    *See* Fischel Aff. ¶ 17.

[191]    *See id.*

shares had sufficient value, there were "substantial incentives for public

shareholders to acquire and act on information . . . ."[192]  Therefore, these factors

also point to the efficiency of the markets in all of the litigated cases.

### General Criticisms

Defendants' experts also made a number of general challenges against

plaintiffs' showing of efficiency.  I will briefly address some of them.

### Widespread Knowledge

Some market participants who knew of the alleged scheme could be

expected to act on the basis of that knowledge.[193]  If such knowledge were

sufficiently widespread, the manipulation would fail because market participants

would bid the shares to their fundamental value.  This is called the "truth-on-the-

market" defense.  Under this corollary of the fraud on the market theory, "if the

information is already known to the market, [] the misrepresentation cannot then

---

[192]     Fischel Market Eff. Rep. ¶¶ 27 (Corvis), 50 (Engage), 68 (FirePond),
90 (iXL), 117 (Sycamore), 138 (VA Linux).  *See also* Fischel Aff. ¶ 18 (arriving at
the same conclusion with respect to the 303 other litigated stocks).

[193]     Fischel argues that because a participant in the scheme would not
know of the existence of any other tie-in agreements or the extent of such
agreements, "there would be no incentive to engage in arbitrage."  Fischel
Rebuttal Rep. ¶ 20.  Fischel's argument carries little force.  An allocant who
knows of the scheme would naturally infer that similar schemes were occurring.

defraud the market."[194]  Indeed, several experts opined that in an efficient market,
the alleged artificial inflation would not persist for the period alleged by
plaintiffs.[195]

   However, plaintiffs have revised their Master Allegations to allege
that the scheme was not well-known.[196]  Where information about the full extent of
the scheme is not public, even in a perfectly efficient market artificial inflation
could persist for a long period.  This is especially true where those with private
knowledge of the manipulation do not trade on that knowledge.  For example, if
allocants knew of certain underwriters' intention to boost share prices and
participated to earn the underwriters' goodwill, it is unlikely that those allocants
would then trade on that knowledge given that such trades would depress those

---

[194] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)
(citations omitted).

[195] *See* Stulz Rep. ¶ 108 (observing that the artificial inflation could
persist only if "the market for the Focus stocks was not efficient."); Spatt Rep. ¶
28 (opining that Fischel's simultaneous arguments that investors had a limited
understanding of the effects of the tie-in agreements and that the markets for the
litigated stocks were efficient are "fundamentally inconsistent" with each other);
Kleidon Rep. ¶ 14 ("The argument that there were only a few articles describing
this practice is not relevant, since any new information is incorporated
immediately into the stock price in an efficient market.").

[196] *See* Amended Master Allegations ("Am. Master Allegations") ¶¶ 33,
35.

share prices, frustrating the purpose of the underwriters and depleting that goodwill. Thus, if anything, sustained inflation in efficient markets would seem to suggest that the scheme was not widely known.

### Inefficiency as a Result of Stabilization Activities

In addition to criticizing Fischel's analysis, several of defendants' experts presented affirmative evidence that the market for the focus case shares was inefficient. Stulz observed that underwriters were permitted to support the price of shares for some time after the IPO.[197] This may prevent share prices from reflecting all adverse information, and "[t]he possibility of stabilization activities has a pervasive effect on the trading of investors since they know that such activities can limit their losses."[198] When underwriters do take steps to stabilize share prices, they generally do so only for the first few days or weeks after trading begins.[199] While this factor indicates that prices during the first days or weeks of trading may not be efficient, it has little bearing on prices after that period.

---

[197]    *See* Stulz Rep. ¶ 58.

[198]    *Id.* ¶ 58 n.31.

[199]    *See* Katharina Lewellen, *Risk, Reputation, and IPO Price Support*, 61 J. Fin. 613, 630 (2006) ("Overall, the evidence suggests that stabilization is strongest on the first trading day, particularly during the first minutes of trading, but it continues to a lesser degree for the following two weeks.").

## Deviation of Market Valuation from Fundamental Valuation

Gompers used discounted cash-flow analysis ("DCFA") to demonstrate that the market for Sycamore shares was inefficient. DCFA involves determining the future value of all of a company's expected income and expenditure streams, and then discounting those streams to their present value. The sum of all of these discounted cash flows is considered the fundamental value of a company.[200] Gompers argues that the deviation of the market valuation of Sycamore from its fundamental valuation indicates an inefficient market.[201] He contends that a company's misleading positive statements about its business prospects or the manipulation of prices by engaging in trading would cause analysts to increase estimates of growth, which would also increase future cash flow calculations and fundamental value.[202] Using DCFA, Gompers also determined that "irrational investor sentiment was widespread" among companies in Sycamore's industry, suggesting that this market was generally inefficient during the proposed class period.[203]

---

[200]   *See* Gompers Rep. ¶ 133.

[201]   *See id.* ¶¶ 134, 146.

[202]   *See id.* ¶ 154.

[203]   *Id.* ¶ 147.

Fischel responds that Gompers has failed to account for "uncertainty about the average growth rates of technology firms at the time."[204]  He further notes that academic research has found that when this uncertainty is incorporated into some models, the valuation appears reasonable.[205]

In addition, while a positive news announcement regarding business prospects may be worthy of a revision of earnings estimates, unexplained increases in demand would not require such a revision.  Thus, where prices have been directly manipulated, a deviation of the market valuation from the fundamental valuation would not be surprising.  Such observation indicates only that the market for the stock is inflated, not that the market is inefficient.

## The Internet Bubble

Barry observes that finance scholars widely recognize that there was market inefficiency in technology stocks from 1998 to 2000.[206]  However, academics are not in agreement that there was a bubble.  One source observes:

> The extraordinary rise in Internet values . . . has generally been called the 'Internet bubble'.  The fact that prices fell

---

[204]    Fischel 2d Rebuttal Rep. ¶ 15.

[205]    *See id.* (citing L. Pastor & P. Veronesi, *Was There a Nasdaq Bubble in the Late 1990s?*, 81 J. Fin. Econ. 61, 62 (2006)).

[206]    *See* Barry Rep. ¶ 13.

> in March of that year, and continued to fall throughout
> 2000, gave some credibility to this designation. However,
> one cannot infer necessarily from this *ex-post* realization
> that market values did not in fact reflect fundamental
> values about cash flows. Tautologically, changing
> expectations about cash flows or discount rates, coupled
> with realization of various Internet fundamentals, could
> also explain the rise and drop in prices. We, as well as
> anyone else, will not be able to answer this question
> definitively here.[207]

Another paper cited by defendants observes that while stock market

crashes are often cited as evidence against rational share price models, behavioral

theory (which incorporates investor irrationality) "has not really made much

progress in understanding crashes . . . ."[208] Based on the available evidence,

defendants have failed to demonstrate that the overall market conditions preclude

the application of the *Basic* presumptions during the relevant period.

## Conclusion

Having reviewed the evidence, I conclude that plaintiffs have proven

by the preponderance of the evidence that the markets for the litigated stocks were

---

[207]   *See* Eli Ofek & Matthew Richardson, *The Valuation and Market Rationality of Internet Stock Prices*, 18 Oxford Rev. Econ. Pol'y 265, 268 (2002). *See also id.* at 283 (discussing the "theory of rational bubbles" and observing that "a story based on an influx of irrational, retail investors is probably too simplistic").

[208]   Harrison Hong & Jeremy C. Stein, *Differences of Opinion, Short-Sales Constraints, and Market Crashes*, 16 Rev. Fin. Stud. 487, 515 (2003).

sufficiently efficient to justify the *Basic* presumptions during the proposed class periods. Plaintiffs have shown that the share prices are likely to have reflected public information, and that reasonable purchasers would be justified in relying on those prices.

However, there is insufficient evidence of efficiency to permit the use of the *Basic* presumption with respect to trading during the quiet periods. To the contrary, the evidence indicates that the quiet periods were marked by chaotic pricing, irrational purchases, and market inefficiencies.[209] Fischel's own evidence demonstrates that the markets for the focus case shares were inefficient during the first weeks of trading. A purchaser of these securities during the relevant quiet period could not reasonably rely on the market price to reflect the market's judgment of the security's value. Therefore, the *Basic* presumptions cannot apply to these periods.

### ii.    The *Affiliated Ute* Presumption

Nevertheless, plaintiffs' claims concern defendants' failure to disclose the manipulative scheme. Plaintiffs allege that defendants' principal misconduct related to their omissions with respect to the existence of the tie-in

---

[209]    Of course, *Miles I* determined that the IPO market itself was not efficient. *See* 471 F.3d at 42. The analysis of the focus cases at the time of their IPOs based on the expert submissions of the parties supports that conclusion.

agreements and the undisclosed compensation.[210] Therefore, plaintiffs are also

entitled alternatively to the *Affiliated Ute* presumption, which provides that

"reliance is presumed when the claim rests on the omission of a material fact."[211]

In the 2004 Class Certification Opinion, I found that the *Affiliated Ute*

presumption applied "to the extent [plaintiffs'] 10b-5 claims derive from material

omissions."[212]  There is no reason for me to revisit this holding.[213]  Therefore,

---

[210]     *See* Am. Master Allegations ¶¶ 19, 33, 35 (alleging that the
"Registration Statement/Prospectus purportedly undergoes an intensive
preparation and due diligence process and is intended to provide some of the best
sources of information concerning the offering" but that "investors in the
aftermarket [] knew nothing about the scheme" and "the overwhelming majority of
retail allocants [] also traded in ignorance of the scheme").

[211]     *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 291 (S.D.N.Y.
2003) (citing *Affiliated Ute*, 406 U.S. at 153-54).

[212]     *2004 Class Cert.*, 227 F.R.D. at 106.  In doing so I also held, contrary
to defendants' arguments, that *Affiliated Ute* applies to class actions, to claims in
which both market manipulation and material omissions are alleged, and that
*Basic* – far from disapproving of the reasoning in *Affiliated Ute* – specifically
approved of the *Affiliated Ute* presumption.

[213]     Although the Second Circuit held that the *Basic* presumption could
not apply during the IPO period in *Miles I*, it did not opine with respect to the
applicability of the *Affiliated Ute* presumption.  In *Miles II*, the court suggested
that its holding in *Miles I* was limited to the class proposed, by stating that
"[n]othing in our decision precludes [plaintiffs] from returning to the District
Court to seek certification of a more modest class . . . ."  483 F.3d at 73.  Plaintiffs
have now narrowed the class so that all recipients of shares from the "institutional
pot" would be excluded unless they are natural persons.  They have also amended
their master allegations to allege that the scheme was not widely known.  *See* Am.
Master Allegations ¶¶ 33, 35.  The narrowing of the class therefore solves the

plaintiffs have demonstrated that common issues will predominate with respect to

reliance during the class periods of all stocks, and the classes may include

plaintiffs who purchased during the quiet periods.

### b. Loss Causation

In addition to transaction causation, plaintiffs must demonstrate that

common questions predominate over individual inquiries with respect to loss

causation. By stipulating to class certification, defendants have conceded that

individual issues do not predominate with respect to loss causation. Nevertheless,

the Court has a duty to make its own evaluation of this assertion. If plaintiffs have

failed to demonstrate that they can show class-wide loss causation, no class can be

certified.

To demonstrate loss causation, plaintiffs must show a causal

connection between the alleged wrongdoing and their losses. Plaintiffs seek to

rely on the expert reports of Professor Fischel, who seeks to prove loss causation

by demonstrating *first*, that defendants' scheme inflated the prices of the

---

predominance requirement with respect to knowledge and also ensures that
plaintiffs can benefit from the *Affiliated Ute* presumption because they have
excluded all those who were likely to have knowledge of the scheme.

securities;[214] and *second*, that the inflation dissipated over the course of the class

period. The 2004 Class Certification Opinion held that Fischel's theory was "not

fatally flawed."[215] I now reexamine Fischel's theory under the heightened

standard that applies. In doing so, I address additional challenges that defendants'

experts made to Fischel's theory when they submitted reports in response to

plaintiffs' 2007 class certification motion.

### i.    Fischel's Methodology

I discussed Fischel's methodology for demonstrating loss causation in

detail in the 2004 Class Certification Opinion.[216] I therefore summarize it briefly

here. In Fischel's first analysis, he demonstrates how tie-in agreements increased

the demand for and prices of the stocks in the pre-open bid sessions and in the

aftermarket.[217]

---

[214]    This first question appears to directly overlap with the merits of
plaintiffs' claims, but it does not. At the class certification stage, plaintiffs need
not demonstrate loss causation. It is sufficient for plaintiffs to prove only that loss
causation can be shown on a class-wide basis. Thus, as long as they have shown
by a preponderance of the evidence that loss causation can be demonstrated on a
class-wide basis by proving *first*, that inflation existed, and *second*, that the
inflation dissipated slowly during the class period, this requirement is satisfied.

[215]    *2004 Class Cert.*, 227 F.R.D. at 115.

[216]    *See id.* at 112-14.

[217]    *See* Fischel Supp. Rep. ¶¶ 8-15.

Fischel's second analysis seeks to demonstrate the causal link

between the tie-in agreements and continued inflation in the stock prices.[218]  He

proposes the use of either of two theories: the Comparable Index Approach, which

"approximates what the returns on the security would have been had the fraud not

occurred" and the Event Study Procedure, which "treats the fraud-related

disclosures as events and substitutes the predicted return on event days."[219]   Under

both approaches, a value line would be constructed, which substitutes returns had

the fraud not occurred.[220]  The difference between the value line and the price line

would be the measure of artificial inflation.[221]  Fischel claims that these models

can be used to analyze artificial inflation, loss causation, and damages.[222]

---

[218]    See id. ¶¶ 16-23.

[219]    See id. ¶ 5.  Fischel explains the Event Study Procedure in more detail
in his Second Supplemental Report. See Fischel 2d Supp. Rep. ¶¶ 42-51.

[220]    See Fischel Supp. Rep. ¶¶ 6-7 (explaining that under the Comparable
Index Approach, the value line would be constructed by substituting the returns on
the comparable index and under the Event Study Procedure, the value line would
be calculated by constructing a series of daily returns for the stock had fraud not
occurred).

[221]    See id. ¶¶ 6-7.

[222]    See Fischel 2d Supp. Rep. ¶ 41.  Defendants' expert Cornell had
previously conceded that Fischel's Comparable Index Approach and Event Study
Procedure were acceptable models for the calculation of damages. See Cornell
Rep. ¶ 4; see also 2004 Class Cert., 227 F.R.D. at 113 (discussing how Fischel's
methodologies have usually been utilized to determine damages, rather than loss

Each of the focus case stocks eventually plummeted to a value close

to zero.[223]  As I noted in the 2004 Class Certification Opinion, once artificial

inflation is proven to have occurred, "[s]ome loss causation may be inferred

simply from the disappearance of the original inflation."[224]  Indeed, there can be

---

causation).  I also undertook a detailed analysis of the predominance requirement
with respect to damages in my 2004 Class Certification Opinion, concluding that
individual issues would not predominate over common questions.  *See* 227 F.R.D.
at 115-17.  After reviewing that analysis, I find that plaintiffs have demonstrated
by a preponderance of the evidence that damages can be calculated on a class-wide
basis.

[223]     *See* Stock Price Charts of Focus Case Stocks, Ex. C to Fischel 2d
Supp. Rep. (showing that all of the focus case stocks had lost a significant amount
of value by December 6, 2000, with some hovering just above zero).

[224]     *2004 Class Cert.*, 227 F.R.D. at 114.  Defendants previously argued
that this holding is no longer viable in light of *Dura Pharm., Inc. v. Broudo*, 544
U.S. 336 (2005).  I disagree.  *Dura* did not address the situation where the share
price fell to virtually zero.  In such a case, if inflation has been shown, it has
clearly dissipated.

        *Dura* teaches that loss causation cannot be inferred simply from a
drop in prices.  This is so because while the drop may have been caused by the
defendants' wrongdoing, it may also have been caused by any number of factors.
For example, assume the price of one share of a given company's stock is $80.
The company makes a fraudulent positive announcement and the share price
jumps to $100.  At that point, an investor purchases one share.  One week later, the
price falls to $60.  *Dura* cautions that these facts are insufficient to plead loss
causation.  The share price could have fallen because the market discovered the
fraud, but it could also have fallen for many other reasons.  *See Dura*, 544 U.S. at
342-43 ("When the purchaser subsequently resells such shares, even at a lower
price, that lower price may reflect, not the earlier misrepresentation, but changed
economic circumstances, changed investor expectations, new industry-specific or
firm-specific facts, conditions, or other events, which taken separately or together

little argument that near-worthless shares are no longer inflated.

However, the simple fact that prices fell between two points in time is

not loss causation. In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court

explained that at the moment of inflation – "as a matter of pure logic . . . the

plaintiff has suffered no loss; the inflated purchase payment is offset by ownership

of a share that *at that instant* possesses equivalent value."[225]  Value here means

market value, not fundamental value.  I now consider additional evidence of loss

causation from Fischel and criticisms from defendants' experts to determine

whether plaintiffs have demonstrated by a preponderance of the evidence that

Fischel's theory can be used to prove loss causation on a class-wide basis.

### ii.    Additional Evidence of Initial Inflation

#### First-Day Returns

---

account for some or all of that lower price.").  It is possible that the fraudulent
inflation has persisted (and that had the fraud not occurred, the share price would
now be $40).  Additional information is required to conclude that the fraud caused
the loss.

However, *Dura*'s reasoning does not apply where a stock loses
virtually all of its value.  Imagine that after the investor purchases the share, the
price falls from $100 to $0.  At this point, there is no question that the $20 of
fraudulent inflation has dissipated.  Factors unconnected to the fraud may have
caused $80 in loss, but the other $20 must be attributed to the dissipation of the
inflation.

[225]     *Dura*, 544 U.S. at 342.

In addition to previously showing that the stocks in this litigation experienced unusually high first-day returns compared to IPOs from 1980 through 1997 and IPOs that are not included in this litigation, Fischel also shows that the returns are high compared to IPOs during the period of 2001 to 2006.[226] He notes that "the average first-day return for IPOs was 10.8 percent, 95 percent of all IPOs had first-day returns less than 44 percent, and 99 percent of all IPOs had first-day returns less than 69 percent."[227] This is compared to the smallest first-day return of the six focus stocks of 49 percent and the rest of the focus stocks which had returns exceeding 135 percent.[228] This is strong evidence that the returns of the IPOs in this litigation were the product of inflation.

## Pre-Opening Quotations

As noted, Fischel hypothesizes that much of the initial inflation was accomplished through the setting of a quote by the lead underwriters during the pre-opening bid session. Fischel notes that the pre-opening bid quote exceeded the offering price for five of the six focus case stocks by 66.67 percent or more.[229]

---

[226] *See* Fischel 2d Supp. Rep. ¶ 26.

[227] *Id.*

[228] *See id.*

[229] *See id.* ¶ 30.

This compares to less than 2.5 percent of IPOs prior to the class period.[230]  He also

notes that the pre-opening bid alone accounts for as much as 81.2 percent of the

overall first-day return for the focus case stocks.[231]  This indicates that the prices

of IPO stocks were heavily influenced by lead underwriters' pre-opening quotes.

A number of defendants' experts criticized Fischel's conclusions,

attempting to show that there was no link between a lead underwriter's quote and

price inflation in the focus stocks.[232]  In response, Fischel performed a regression

analysis to test the relationships between IPO initial returns, the first bid in the

pre-opening by any market maker, the lead underwriter's first bid, and the offer

price revision.[233]  He found that there was a "powerful, statistically significant

relationship between the initial return and both the lead underwriter's first bid and

---

[230]    *See id.*

[231]    *See id.*

[232]    *See, e.g.*, Cornell Rep. ¶ 27; O'Hara Rep. ¶ 40; Ready Rep. ¶ 15
(claiming that the lead underwriter did not always make the first bid in the pre-
open market); Kleidon Rep. ¶ 50, O'Hara Rep. ¶ 40, Ready Rep. ¶ 15 (lead
underwriters were responsible for small fractions of quotes and bid
improvements); and Kleidon Rep. ¶¶ 50-52, O'Hara Rep. ¶ 40, Ready Rep. ¶¶ 26-
30, Stulz Rep. ¶¶ 51-52 (non-lead underwriters aggressively bid during the pre-
open market).

[233]    *See* Fischel 2d Rebuttal Rep. ¶ 22.

the offer price revision . . . ."[234]  The regression also demonstrated that there was

no significant relationship between the initial returns and first bids that are not

made by the lead underwriter.[235]

In addition, Fischel showed that for three of the focus case stocks – in

which first bids were entered by market makers other than the lead underwriter –

the lead underwriter's first bids were substantially higher than these bids, and

subsequent bids followed the lead underwriter's first bid.[236]  For instance, during

the pre-open market for FirePond, Ramius Securities, LLC entered bids of $20 and

$25.[237]  After Robertson Stephens, the lead underwriter, issued its first bid at $49,

the next bidder, Herzog, Heine, Geduld, Inc., put in bids for $40, substantially

greater than the first bids from Ramius Securities.[238]  The evidence follows a

similar pattern for Sycamore and VA Linux.[239]

### iii.    Additional Evidence of Sustained Inflation

---

[234]    *Id.* ¶ 23.

[235]    *See id.*

[236]    *See id.* ¶ 24.

[237]    *See* Market Maker Bidding in the Pre-Open for the Six Focus Cases, Ex. B to Fischel 2d Rebuttal Rep.

[238]    *See id.*

[239]    *See id.*

## Analyst Reports

In support of his theory that prices remained inflated throughout the class period, Fischel examined the effects of analyst reports on share prices. He observed that analyst price targets "always exceeded the inflated stock prices at the time the price target was issued, and . . . the price targets were often far above the inflated stock prices."[240] Noting that it has been widely established that analyst reports can significantly affect stock prices, he concluded that had those analysts released objective, honest reports, those reports would have led to a substantial decrease in share prices.[241] Thus, while the analyst reports themselves did not directly cause any inflation, they sustained the artificial inflation by not disclosing the truth.

## Pending Limit Orders to Buy

In addition, Fischel analyzed pending limit orders to purchase stock placed by allocants with alleged tie-in agreements, noting that such pending orders would have supported the prices of the focus case stocks after trading

---

[240]     Fischel 2d Supp. Rep. ¶ 20.

[241]     *See id.* ¶ 21.

commenced.[242]  He concluded that at all relevant times there were pending limit

orders for eight percent or more of the shares offered.[243]  He also found that for

four of the six focus stocks, more than 90 percent of these pending limit orders

were at prices that exceeded the respective stock's offer price by 50 percent or

more.[244]  For one of the focus case stocks, more than 80 percent of the limit orders

were at prices that exceeded the offer price by 50 percent or more.[245]  Although

pending limit orders for iXL stock were smaller, the data also showed that the

prices for these orders exceeded its offer price.[246]

### Support from Financial Literature

Finally, two scholarly articles cited by Fischel support the hypothesis

---

[242]    A limit order is an order to buy or sell a security at a specific price.  A limit order to purchase a set number of shares at $20 per share would be executed if and only if the shares could be purchased for $20 or less.  If the market price never dropped to or below $20 per share, the order would never be executed. Limit orders tend to support prices because they affect purchases as the price falls. Limit orders are different from market orders, which are orders to buy at the current market price.  A market order in a liquid stock will almost always be executed, but if prices are volatile the buyer might pay more than she intended. *See generally* SEC, *Fast Answers* (last modified July 31, 2007), *available at* http://www.sec.gov/answers.shtml.

[243]    *See* Fischel 2d Supp. Rep. ¶ 31.

[244]    *See id.*

[245]    *See id.*

[246]    *See id.*

that laddering can cause long-term price effects.  The first, by Rajesh Aggarwal *et al.*, constructs a model in which tie-in purchases occur in the first day or days of public trading, and allocants sell those purchases "fairly quickly" but "certainly . . . prior to the expiration of the lockup period for insiders, usually six months post-IPO."[247]  Indeed, they observe that prices for allegedly manipulated IPOs rise for five months and then fall.[248]  Their research indicates that those IPOs outperform non-implicated IPOs for the first week, match their performance until the sixth month, and then underperform for three years.[249]

In the Aggarwal model, some traders are "momentum investors" – "arbitrageurs, day-traders, sentiment investors, or information seekers" who purchase if they can infer from prices and volumes that an informed investor is purchasing the stock.[250]  These momentum investors are otherwise rational.  It is momentum from these investors that sustains the artificially high price for some

---

[247]    Rajesh K. Aggarwal *et al.*, *Underwriter Manipulation in Initial Public Offerings* (working paper Jan. 26, 2006), *available at* http://www.csom.umn.edu/Assets/62572.pdf.  Aggarwal is an Associate Professor of Finance at the University of Minnesota.

[248]    *See id.* at 15-16.

[249]    *See id.* at 16-17.

[250]    *Id.* at 2.

period after the alleged manipulation.[251]

      The second work is a paper by Qing Hao in which she concludes that while laddering can exist without "information momentum," the "benefits of laddering for underwriters are greater when market prices are affected by information momentum."[252]  Information momentum exists where high initial prices "induce more information production and additional demand," spurring prices yet higher.[253]  Hao also concludes that laddering results in "long-run underperformance and a negative correlation between short-run and long-run returns."[254]  Hao hypothesizes that "momentum is a major factor that fed laddering during the late 1990s and early 2000."[255]

---

[251]    *See id.*

[252]    Grace (Qing) Hao, *Laddering in Initial Public Offerings*, 85 J. Fin. Econ. 102, 104 (2007).  Hao is an Assistant Professor of Finance at the University of Missouri.

[253]    *Id.*

[254]    *Id.* at 105.

[255]    *Id.* at 115.  Fischel also discusses the higher volume of aftermarket trading compared to the average trading volume of IPOs prior to the class periods, for IPOs not a part of this litigation during the class periods, and for IPOs after the class periods and that allocants of the lead underwriter were substantial net purchasers in the aftermarket.  *See* Fischel 2d Supp. Rep. ¶¶ 27, 32.  This tends to show only that tie-in agreements existed and suggests that prices may have been fueled by artificial demand.

### iv.   Criticisms

### **Inflation Inconsistent with Efficient Market**

Defendants' expert Pfleiderer observes that because any inflation in

share prices due to laddering would be caused by market participants believing

that the ladderers have confidential positive information, share prices would fall

when the ladderers sold their shares.[256]   Similarly, O'Hara argues that in an

efficient market, "the information effect of any given trade . . . when it has an

effect at all, is short-lived – typically measured in seconds or minutes, and

certainly not in the months and years alleged."[257]

However, whether a trade affects prices will depend on whether the

market perceives the market participant to possess information.   Therefore, Fischel

explains that "the effect of aftermarket sales need not offset the effect of

---

[256]     *See* Pfleiderer Rep. ¶ 44.  *See also* Spiegel Rep. ¶ 9(2) ("Professor
Fischel's theory also ignores the possibility that the alleged ladderers themselves
quickly sold the positions that they had purchased; such sales would also tend to
offset any inflationary effect of the alleged laddering purchases."); ¶ 34
("[I]nformation efficiency means that an ordinary investor endowed only with
public information cannot earn a supernormal return on his investments.  Thus, the
scheme posited by Professor Fischel cannot succeed in a market that is
information-efficient.").

[257]     O'Hara Rep. ¶ 15.  *Accord* Sirri Rep. ¶ 34 (opining that any increase
in price in response to uninformed trades, such as laddering trades, would be
"short-term").

aftermarket purchases since other market participants may, as defendants' experts

themselves recognize, perceive the purchase as informed, but the sale as

uninformed."[258]  In addition, other market participants may "mimic" the buying

behavior of initial allocants because they believe that allocants may have

information about the value of the stock that they do not possess.[259]

In addition, defendants' other tactics may have also contributed to the

sustained inflation even in an efficient market.  For instance, analyst reports that

continued to tout the quality of the stocks could have fooled the market into

thinking that the stocks still had substantial fundamental value.

## Corrective Disclosures

Defendants' experts argue that no significant price movements

followed corrective disclosures for any of the stocks during the period, thereby

illustrating that the prices of the stocks were not inflated.[260]  Fischel counters this

observation, explaining that each of the focus stocks declined significantly after

adverse news was publicized.[261]  In addition, Fischel notes that defendants' experts

[258]    Fischel Rebuttal Rep. ¶ 18.

[259]    *See id.*

[260]    *See, e.g.*, Kleidon Rep. ¶ 89; Pfleiderer Rep. ¶¶ 95-98.

[261]    *See* Fischel 2d Rebuttal Rep. ¶ 43 n.94 (explaining that Corvis' stock price declined by 14 percent when Corvis announced it had lost a major customer;

fail to recognize that "when there is laddering, an absence of favorable news can be a form of disclosure."[262] For instance, investors may expect imminent financial news to support the price of the stock, and when no such positive news surfaces, prices decline.[263]

---

that Engage's stock price fell more than 28 percent, iXL's stock price fell more than 16 percent, Sycamore's stock price fell 12 percent, and VA Linux's shares fell over 21 percent after they were downgraded in analyst reports; that FirePond's stock price fell over 40 percent when the company announced poor financial results).

[262]   *Id.* ¶ 43. It appears that some of defendants' experts agree with this. *See, e.g.,* Pfleiderer Rep. ¶ 38 ("[W]hen a buy trade takes place in an anonymous market, since market participants do not know whether the buyer is an 'informed' investor or not, they will attribute some probability to both possibilities. Hence the stock price may increase to reflect the possibility that the trade was motivated by information. However, if the buyer were uninformed, the price would revert over a short period of time once market participants realize that no fresh information is forthcoming that might justify the purchase as an informed trade."); Stulz Rep. ¶ 22 ("If the market believes that an investor making a purchase might have private information favorable to the stock, the stock price will adjust to reflect the possibility of such favorable information. Similarly, however, when an investor believed to have private information sells shares, the market may conclude that the investor had unfavorable information and adjust the stock accordingly.").

[263]   Defendants' expert Christopher Barry agrees. He notes that "an analyst might highly recommend a stock with high forecasts of future earnings, and then not long afterward the company may report that earnings are, in fact, not in line with the analyst's high expectations. At that point in time, the stock price will generally reflect the actual earnings, and any price increase previously associated with the analyst's recommendation may be fully offset." Barry Rep. ¶ 60. *See also* Bessembinder Rep. ¶ 26 ("The reversal of any price impacts attributable to uninformed trades can occur because the market infers the

## Share Price Mirroring Market Conditions

Defendants' expert Cornell observes that if plaintiffs' allegations are accurate, the behavior of the share price of each focus case should be correlated with the behavior of each other focus case in "IPO time" – that is, time since the IPO. Cornell reasons that because all five were allegedly subject to similar laddering schemes, the effects of those schemes would appear at roughly the same period after the IPOs.[264] Cornell found that there were in fact negative correlations when compared in this way – however, when compared in absolute time (that is, prices on each day regardless of the date of the IPO), there was a strong positive correlation. Cornell interprets this to mean that the dramatic changes in the prices of the focus case shares was caused by general market conditions, not laddering.[265] However, plaintiffs allege that the general changes in the market resulted from the actions of defendants, as inflation in hundreds of IPOs dissipated. It is not surprising that general market conditions would have substantial effects on IPO

---

truth from the absence of subsequent confirming information, because value-oriented traders detect the mispricing, or because the parties that originally traded (e.g., those who purchased due to tie-in agreements) elect to reverse their positions.").

[264]    *See* Cornell Rep. ¶ 32.

[265]    *See id.*

79

prices.

## Controlling for Other Factors

Defendants' experts criticize Fischel's model for failing to take into

account factors other than market conditions that might influence stock prices,

such as unrelated business developments.[266]  They note that in the case of their

focus stock, there were instances of price inflation that could not have been

attributable to defendants' conduct.[267]

However, Fischel responds that he does not support an approach that

merely compares the stock price to an index mechanically without any

consideration for the special circumstances of each stock.[268]  For instance, he

---

[266]     *See, e.g.*, Stulz Rep. ¶ 104; Cornell Rep. ¶ 51; Pfleiderer Rep. ¶ 100;
Kleidon Rep. ¶ 94; Sirri Rep. ¶ 37.

[267]     *See, e.g.*, Pfleiderer Rep. ¶ 93 (observing that inflation increased in
July 2000 for iXL by 14.7% and opining that such inflation could not have been
caused by defendants' alleged misconduct when it occurred thirteen months after
the IPO); Cornell Rep. ¶ 52 (finding that in the case of Engage, inflation increased
on 42% of the trading days during the class period using the Morgan Stanley High
Tech Index); Bessembinder Rep. ¶ 43 ("Rather than measure inflation caused by
the alleged manipulation, Professor Fischel attributes all stock-specific price
changes to increases or decreases in the artificial price inflation resulting from the
alleged manipulation.  This is a fundamental and crucial flaw.").  This was also the
criticism of the Second Circuit in *Akerman v. Oryx Commc'ns, Inc.*, when it
opined that "[s]tatistical analyses must control for relevant variables to permit
reliable inferences."  810 F.2d 336, 343 (2d Cir. 1987) (citations omitted).

[268]     *See* Fischel 2d Rebuttal Rep. ¶ 46.

proposes capping the amount of inflation by the amount of artificial inflation at the

IPO date, noting that it would be unreasonable to expect inflation to exceed what

it was at the time of the IPO.[269]  He also notes that if the Court finds that increases

in the stock prices occurred in response to "non-fraud related factors," these

increases would simply be taken out and the inflation held constant.[270]  Any other

anomalies can be eliminated by adjusting the results to conform with the

evidence.[271]  These adjustments would be made on a class-wide basis.[272]

## A Trade-by-Trade Analysis

Several of defendants' experts suggested that artificial inflation be

measured on a trade-by-trade basis.[273]  In response, Fischel argued that trade-by-

trade analysis is inappropriate because plaintiffs are not just alleging the existence

of tie-in agreements but also that defendants failed to disclose that they were

---

[269]    *See* Fischel 2d Supp. Rep. ¶ 50.

[270]    *See* Fischel 2d Rebuttal Rep. ¶ 46.

[271]    *See id.*

[272]    Other criticisms related to the appropriate index to use or the time
period over which the focus case stocks should be compared to the index are
inconsequential.  The Court need only be satisfied at the class certification stage
that plaintiffs have identified a viable way to demonstrate loss causation on a
class-wide basis.  These determinations therefore need not be made at this stage.

[273]    *See, e.g.*, O'Hara Rep. ¶ 15; Stulz Rep. ¶ 60; Kleidon Rep. ¶ 23; Sirri
Rep. ¶ 36; Pfleiderer Rep. ¶ 61; Ready Rep. ¶ 7.

receiving kickbacks and that they were using their research analysts to prop up prices.[274]  In addition, the trade-by-trade analysis would not correctly measure the effects of trades that were made to satisfy obligations of the tie-in agreements. This is because trades may affect prices before they are executed – as underwriters become aware of impending demand – and after trades are executed – as a result of "positive feedback trading" or "speculative excess."[275]

### The Case of iXL

Several of defendants' experts disagree with Fischel's conclusion that iXL's price post-IPO was artificially inflated.  They note that iXL's first-day return was 49%, which is toward the lower end of the range of both the litigated and non-litigated sample.[276]  They also note that Merrill Lynch, the lead underwriter in iXL's IPO placed a bid of $12.50 in the pre-open period, which was only $0.50 higher than the offering price of $12.00 and held the best bid for less than two minutes of the thirty-minute period.[277]  Thereafter, a number of other market makers entered to set new and higher bids, but Merrill Lynch never revised

---

[274]   *See* Fischel Rebuttal Rep. ¶ 9.

[275]   *See id.* ¶ 10.

[276]   *See* Pfleiderer Rep. ¶ 35; Sirri Rep. ¶ 15.

[277]   *See* Pfleiderer Rep. ¶ 47; Sirri Rep. ¶ 16.

its bid so as to set a higher bid.[278]  They conclude that the increase in price during

the pre-open period was driven by demand by retail investors, rather than by

allocants with tie-in agreements.[279]  With respect to after-market trading,

defendants' expert Pfleiderer notes that "alleged tie-in allocants were *net sellers* in

iXL on the first day and during the first ten days of trading."[280]  He opines that if

buying by alleged tie-in allocants increased prices, then selling by the same

entities would have brought prices down.[281]

Fischel conceded that the evidence with respect to laddering in the

iXL IPO appears to be weaker than that of the other five focus stocks.[282]

---

[278]    *See* Pfleiderer Rep. ¶ 47; Sirri Rep. ¶ 16.

[279]    *See* Pfleiderer Rep. ¶¶ 52-54 (noting that "[a]t the end of the pre-open period, retail investors had placed purchase orders with a weighted average limit price of $17.66.  In contrast, the alleged tie-in allocants had placed purchase orders with a weighted average limit price of only $13.93."); Sirri Rep. ¶ 19 ("[I]n most (twelve out of fifteen) instances where the inside bid changed during the pre-market period, there was at least one 'wholesale' market maker at the inside bid.  This indicates that aggregate demand of mostly retail investors who had little or no opportunity to participate in the allocation of IPO shares had a large effect on opening price.").  *See also* Pfleiderer Rep. ¶ 61 (noting that "a review of trade by trade data for iXL from the [NASDAQ] market reveals that trading in iXL shares on the first day and during the first ten days was dominated by retail investors . . . .").

[280]    *See* Pfleiderer Rep. ¶ 57 (emphasis in original).

[281]    *See id.* ¶ 58.

[282]    *See* Fischel 2d Rebuttal Rep. ¶ 1 n.3.

Nevertheless, Fischel demonstrated that a lead underwriter's bid can serve as a strong signal to market makers that enter bids thereafter. Thus, even though Merrill Lynch may have opened bidding at $12.50, that this bid price was above the offering price may still have contributed to inflationary bidding in the pre-opening period.[283]   In addition, although iXL's first-day return was the smallest of the six focus cases at 49 percent, this return puts the stock in the top five percent of all IPOs from 2001 to 2006.[284]   Finally, although the pending limit orders were smaller for iXL than the other focus stocks, all of the pending limit order prices still exceeded iXL's offering price.[285]   And most importantly, iXL's stock price diminished to virtually zero at the end of its class period on December 6, 2000.[286]

Although the inquiry as to whether alleged laddering of the iXL stock

---

[283]   *See id.* ¶ 28 ("[W]hen the underwriter has information that indicates that aftermarket prices will be high, he enters an initial quote above the offer price.").

[284]   *See id.* ¶ 26.

[285]   *See id.* ¶ 31. Although allocants with alleged tie-in agreements were net sellers on the first day, the percentage of shares sold as a percentage of shares issued was less than one percent. *See* Summary of Aftermarket Trading by Allocants with Alleged Tie-In Agreements, Ex. F to Fischel 2d Supp. Rep. In addition, the data indicates that in the first five days, allocants with alleged tie-in agreements were net purchasers, albeit by an even smaller percentage of issued shares. *See id.* At best, this data is inconclusive with respect to whether the alleged tie-in agreements had any effect on inflation in the aftermarket.

[286]   *See* iXL's Stock Price Chart, Ex. C to Fischel 2d Supp. Rep.

led to inflationary pricing is far from clear, plaintiffs need not definitively show loss causation at the class certification juncture. This is a merits issue that need not be definitively determined at this stage. The only question here is whether plaintiffs have demonstrated – by a preponderance of the evidence – that loss causation can be proven class-wide for iXL using Fischel's methodology. They have succeeded in doing so.

## Conclusion

Although defendants have raised a number of serious challenges to Fischel's methodology, none of them tip the balance in defendants' favor. Plaintiffs have demonstrated by a preponderance of the evidence that loss causation can be proven on a class-wide basis by showing that inflation existed at the time of the IPO and by demonstrating that inflation slowly dissipated throughout the class periods of each litigated stock.

### c.    Knowledge

In *Miles I*, the Second Circuit held that common questions do not predominate because "[t]he claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme."[287]  While the 2004 Class Certification

---

[287]    *Miles I*, 471 F.3d at 43.

Opinion excluded from the proposed class "those investors who exhibit the

hallmarks of full participation in the alleged scheme,"[288] the Circuit took issue

with the inclusion of "those who participated in part and those who were required

to remain 'ready' to purchase in the aftermarket if the underwriters so desired, all

of whom knew of the alleged scheme."[289] Finally, the Circuit observed that even

were these parties excluded, plaintiffs had alleged that "the community of market

participants and watchers" had knowledge of the scheme.[290]

   Plaintiffs' initial complaints and Master Allegations failed to convey

that they were not alleging widespread knowledge. The Amended Complaints and

Amended Master Allegations now allege that aftermarket investors "knew nothing

about the scheme," nor did "the overwhelming majority of retail allocants . . . ."[291]

---

[288] *2004 Class Cert.*, 227 F.R.D. at 103.

[289] *Miles I*, 471 F.3d at 44 (citation omitted).

[290] *Id.*

[291] Am. Master Allegations ¶¶ 33, 35. Defendants have previously insisted that plaintiffs' earlier pleadings are binding on this Court. However, I have already held that plaintiffs' earlier pleadings are not conclusive admissions, though they may have evidentiary value. *See In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 291 n.96 (S.D.N.Y. 2008). Defendants are correct that the Second Circuit's determinations in *Miles I* are binding on plaintiffs and on this Court. However, to the extent that plaintiffs have altered their allegations, those determinations may not be applicable. For example, *Miles I* concluded that based on defendants allegations concerning who knew of the manipulation, knowledge must have spread "throughout the community of market participants and

86

Widespread knowledge of the alleged scheme is relevant in two ways. *First*, plaintiffs must explain how the manipulation succeeded if the market were efficient and a large number of market participants knew of defendants' alleged activities. I addressed this issue in my discussion of market efficiency. *Second*, an individual class member cannot be said to have relied on defendants' misrepresentations if he knew that they were false. Thus, if there is a significant question as to whether a substantial proportion of class members knew of the scheme, this individualized inquiry would predominate over common questions of law or fact and no class could be certified.

### i.      Allocants

The original classes I certified excluded investors who "exhibit[ed] the hallmarks of full participation in the alleged scheme."[292] In *Miles I*, the Second Circuit noted that

> that exclusion leaves within the class those who participated in part and those who were required to remain 'ready' to purchase in the aftermarket if the underwriters so desired, all of whom knew of the alleged scheme. Moreover, the exclusion of full participants from the class

---

watchers." *Miles I*, 471 F.3d at 44. Because plaintiffs now allege that a substantially smaller number of participants knew of the manipulation, that finding no longer applies.

[292]     *2004 Class Cert.*, 227 F.R.D. at 103.

> does nothing to lessen the broad extent of knowledge of the
> scheme throughout the community of market participants
> and watchers, and it is this widespread knowledge that
> would precipitate individual inquiries as to the knowledge
> of each member of the class, even as redefined.[293]

The Circuit thus questioned whether an allocant who knew of a plan

to inflate the price of the shares that she had been allocated can be inferred to have

had knowledge of the scheme to inflate the price of shares in other IPOs.

Plaintiffs have remedied this problem by excluding all allocants, except natural

persons, who are recipients of shares from the "institutional pot" in any of the 309

stocks at issue in this litigation.[294]  In addition, any person that is or was

previously named a defendant; any attorneys who have appeared in the actions on

behalf of a named defendant; any members of the immediate family of any named

defendant; any entity in which an excluded allocant or named defendant was a

majority owner; any legal representatives, heirs, successors or assigns of any

excluded allocant or named defendant; and any director, officer, employee, or

beneficial owner of any excluded allocant or named defendant during any of the

class periods is also excluded from the class definition.[295]  The parties have

---

[293]    *Miles I*, 471 F.3d at 44 (citation omitted).

[294]    *See* Stipulation ¶ 8A(a).

[295]    *See id.* ¶ 8A(b).

therefore ensured that all persons who can be expected to have learned about the alleged scheme are not permitted to participate in the settlement.[296]

### ii.    Non-Allocant Investors

As for those investors who did not receive any allocations in any IPOs, there is insufficient evidence to conclude at this time that there was widespread knowledge of the alleged scheme among them.  Fischel analyzed media coverage during the proposed class periods and concluded that it did not indicate that there was widespread knowledge of the alleged scheme.[297]  *First*, he observed that these reports do not disclose specific details about the scheme, including which companies are involved (none of the focus cases are mentioned), the number of allocants that had tie-in agreements, or the details of these agreements.[298]  *Second*, he determined that of the quarter of a million articles published in the relevant period that include the term "initial public offering" or

---

[296]     While it is certainly possible that others who are not excluded from participating in the settlement knew about the scheme, I am confident that their number is far less than those that have been excluded from the class definition.  As such, common questions of knowledge should predominate over individual issues.

[297]     *See* Fischel 2d Supp. Rep. ¶ 22.

[298]     *See id.* ¶ 23.

"IPO," only seven articles mentioned tie-in agreements.[299] *Finally*, he found that

the focus case stocks continued to underperform key indices after the publication

of these reports, which indicates that the reports did not resolve the artificial

inflation.[300]  If the reports had caused the complete dissipation of the inflation in

the stock prices, the prices would have dropped immediately and the stocks would

have begun to trade in line with the market, but they did not.  Fischel has therefore

demonstrated that while there were a few scattered discussions throughout the

media of the allegations during the relevant periods, they were insufficient to put

non-allocant investors on notice as to the manipulations in any of the focus cases.

The same could be concluded with respect to the other litigated stock.

Plaintiffs have thus shown by a preponderance of the evidence that

when the classes are properly circumscribed and institutional allocants are

excluded, individual questions of knowledge will not predominate over common

ones.

### d.    Ascertainability

Ascertainability is a prerequisite for class certification.  In *Miles I*, the

---

[299]    *See id.* ¶ 24.  Four of these articles were re-publications of one of the original three.  *See id.*

[300]    *See id.* ¶ 25.

Circuit found that the determination of membership in the class was "bristling with

individual questions . . . ."[301]   Clearly investors who paid undisclosed

compensation to the underwriters would be excluded from the class.   But

determining whether various types of compensation paid by plaintiffs to the

underwriters would require individual inquiries.[302]

Plaintiffs contend that the proposed Settlement Class definition

addresses any previous concerns about ascertainability.   All entities, other than

natural persons, that received an initial allocation from the institutional pot have

been excluded from the settlement classes.   Because those who paid undisclosed

compensation to the underwriters are a subset of the initial allocants, by excluding

all of the initial allocants, all those who are alleged to have shared profits with the

underwriters are also excluded from the class.[303]   Plaintiffs argue that defendants

have produced lists of such excluded names during discovery and this proves that

these entities are therefore identifiable.[304]   Although drawing up the remaining lists

---

[301]   *Miles I*, 471 F.3d at 44.

[302]   *See id.*

[303]   *See* Am. Master Allegations ¶ 17 ("The Underwriter Defendants kept
track of certain of their customers' actual or imputed profits from the allocation of
shares in the IPOs and then demanded that certain customers share a material
portion of the profits obtained from the sale of those allocated IPO shares . . . .").

[304]   *See* Pl. Mem. at 25.

of eligible claimants will be difficult, they are certainly ascertainable.[305]  Plaintiffs

have proven by a preponderance of the evidence that there is an identifiable class.

I therefore find that all of the requirements of class certification have been met.

### 3.    Section 11 Class

#### a.    Class Period

In the 2004 Class Certification Opinion, I held that plaintiffs' section

11 class periods must be limited to "exclude all purchases made after untraceable

securities entered the market."[306]  This is because "'after market purchasers [must]

trace their shares to an allegedly misleading registration statement [in order to]

have standing to sue'" under section 11 of the Securities Act.[307]  If these cases

were proceeding to trial, it would be necessary for the section 11 class periods to

end at the time when unregistered shares became tradeable.

But because the parties have agreed to a settlement, there is no need

to create a subclass for section 11 claims and shorten the class period.  This is

---

[305]    Plaintiffs note that draft "institutional pot" lists will have to be
distinguished from final lists, but inform the Court that they have agreed with
defendants – for settlement purposes – on how these determinations will be made.
*See id.*

[306]    *2004 Class Cert.*, 227 F.R.D. at 118-19.

[307]    *See id.* at 117 (quoting *Demaria v. Andersen*, 318 F.3d 170, 178 (2d
Cir. 2003)).

because the members of the section 11 class are also members of the section 10(b)

class. The class includes all persons who "purchased or otherwise acquired any of

the Subject Securities at issue in such case during the Settlement Class Periods

applicable to such case and were damaged thereby."[308]

### b.    Adequacy of Settlement Class Representatives

Plaintiffs have also informed the Court that "[n]ot every case has a

proposed settlement class representative who is a member of the section 11

litigation class this Court previously defined."[309]  However, they argue that a

separate section 11 settlement class representative is not necessary so long as the

section 11 claim arises out of the "'identical factual predicate'" as the settled

conduct and there was "'adequate representation'" of the claim, which is

determined by the "'alignment of interests of class members, not proof of vigorous

---

[308]     Stipulation ¶ 8A.  This conclusion is consistent with my 2005
Opinion and Order that preliminarily approved the prior settlement. *See In re
Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186 (S.D.N.Y. 2005).  In that opinion,
while I noted that I had previously certified a section 11 class with a shortened
class period – finding that there were predominance and manageability issues
related to answering the question of tracing – I found it unnecessary to shorten the
class period and exclude post-tracing purchasers from the class at settlement. *See
id.* at 194-95.  I concluded that because the litigation was no longer going to trial,
manageability was no longer an issue, and "the predominance defect [] no longer
fatal." *Id.* at 195.

[309]     6/5/09 Letter from Stanley D. Bernstein, on behalf of the Plaintiffs'
Executive Committee, to the Court.

pursuit of that claim.'"[310]  I agree.  The section 11 claims arise from "a shared set

of facts" as the Exchange Act claims for the class period proposed by the

parties.[311]  I am further satisfied that the interests of the proposed settlement class

representatives are aligned with those of any section 11 claimants.  I hereby certify

the proposed settlement classes.

### B.    Proposed Settlement

#### 1.    Settlement Discussions

The Court requested and the parties provided affidavits from retired

Judges Nicholas Politan and Daniel Weinstein, the two mediators that assisted the

parties to accept the terms of the instant settlement.[312]  Judges Politan and

Weinstein have both attested that the settlement negotiations spanned nine

months, included seven full mediation sessions, and countless phone conferences

and other meetings with individual parties.[313]  In addition, they confirm that the

---

[310]    *Id.* (quoting *Wal-Mart Stores*, 396 F.3d at 107, 113).

[311]    *See Wal-Mart Stores*, 396 F.3d at 109.

[312]    *See* 5/8/09 Affirmation of the Honorable Nicholas H. Politan ("Politan Aff."); 5/8/09 Affirmation of the Honorable Daniel Weinstein ("Weinstein Aff.").

[313]    *See* Politan Aff. ¶16; Weinstein Aff. ¶ 16.

terms were the product of arms' length bargaining.[314] They note specifically that
"[c]ounsel on all sides were well-prepared, extremely knowledgeable about the
facts and the law, and advocated vigorously for their client."[315] Thus, a
presumption of fairness, adequacy, and reasonableness attaches to this
settlement.[316]

## 2. The *Grinnell* Factors

Courts in this circuit look to the nine *Grinnell* factors to determine
whether a settlement is "fair, reasonable and adequate" in accordance with Rule
23(e). I will evaluate each of the factors or group of factors in turn.

### a. The Complexity, Expense and Likely Duration of the Litigation

It has been eight years since thousands of investors brought the class
action lawsuits that are the subject of this consolidated action.[317] These actions
alleged that 55 underwriters, more than 300 issuers, and hundreds of individuals

---

[314]   *See* Politan Aff. ¶ 18; Weinstein Aff. ¶ 18.

[315]   Politan Aff. ¶ 18; Weinstein Aff. ¶ 18.

[316]   *See Wal-Mart Stores*, 396 F.3d at 116.

[317]   *See In re Initial Pub. Offering (IPO) Sec. Litig.*, 277 F. Supp. 2d
1375, 1376 (J.P.M.L. 2003).

associated with these issuers defrauded the public.[318]  In an Order dated August 12,

2003, the actions were consolidated for pre-trial supervision by this Court, but

ultimately, would have been re-assigned to judges in this district had the actions

gone to trial.[319]  In addition, plaintiffs note that "a vast amount of additional

factual and expert discovery remains to prepare for trials, and motions would be

filed raising every possible kind of pre-trial, trial and post-trial issue

conceivable."[320]  No one disputes that adjudication of these actions would have

been a daunting task, and the expense and effort involved would certainly have

been burdensome to the parties and the Court.  This factor therefore weighs

heavily in favor of preliminary approval.

### b.    Reaction of the Class to the Settlement

Plaintiffs have informed the Court that out of 309 actions, the lead

plaintiff in only five of the actions disapproved of the proposed settlement.[321]  In

those five actions, however, another class member who desires to serve as

---

[318]    *See 2004 Class Cert.*, 227 F.R.D. at 71.

[319]    *See In re Initial Pub. Offering (IPO) Sec. Litig.*, 277 F. Supp. 2d at
1376-77.

[320]    *See* Pl. Mem. at 15.

[321]    *See id.* at 8.

settlement class representative has approved the settlement.[322] "'Substitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons is a common and normally an unexceptionable (routine) feature of class action litigation . . . .'"[323] It is too early to tell whether these five lead plaintiffs will lodge formal objections or whether more objectors will join in disapproving the settlement.[324] Because of the uncertainty involved, this factor does not weigh for or against preliminary approval.

### c. Stage of Proceedings and Amount of Discovery Completed

This factor is aimed at ensuring that the parties have a "thorough understanding of their case" prior to settlement.[325] Litigation in this case has been ongoing for eight years. The Court has decided multiple motions to dismiss, considered numerous motions for class certification, and the parties have submitted more than a dozen expert reports, taken more than a hundred

---

[322]    *See id.*

[323]    *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 00 Civ. 1898, 2006 WL 1004725, at *4 (S.D.N.Y. Apr. 17, 2006) (quoting *Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006)).

[324]    Nevertheless, I note that a small number of objections compared to the many potential class members is "indicative of the adequacy of the settlement." *Wal-Mart Stores*, 396 F.3d at 118 (citation omitted).

[325]    *Id.*

depositions, and reviewed tens of millions of pages in discovery.[326]  In addition,

plaintiffs have informed the Court that they are "proposing this settlement with

eyes open."[327]  I find that this factor weighs in favor of preliminary approval.

> **d.     Risks of Class Prevailing (Establishing Liability, Damages, and Maintaining the Class Through Trial)**

Plaintiffs concede that "[e]stablishing liability is, at best,

uncertain."[328]  They contend that defendants have denied any wrongdoing in the

case, arguing that the tie-in agreements were really "underwriters gauging

indications of interest as part of the IPO price discovery process."[329]  Plaintiffs

admit that it is possible a jury might find defendants' version of events to be more

compelling, reducing their recovery to nothing.[330]  Plaintiffs also argue that if

history is any indication, their chances of success at trial is – at best – fifty

percent.[331]

---

[326]    *See* Pl. Mem. at 15.

[327]    *Id.*

[328]    *Id.* at 16.

[329]    *Id.*

[330]    *See id.*

[331]    *See id.* n.8 (citing a Practice Law Institute Securities Litigation & Enforcement Institute study finding that of the twelve securities cases that were tried to jury verdict – six went to the defense and six went to the plaintiffs).

Even more complicated is the issue of loss causation and damages.

Fischel has proposed a method of proving that the alleged scheme inflated stock

prices as early as the beginning of trading and that this inflation dissipated

throughout the class period.[332]  As discussed, defendants have challenged this

proposed methodology during previous motions for class certification, submitting

reports from a number of other experts in the field.[333]  There is a likelihood that

defendants' theories might be credited by the jury, thereby limiting the amount of

recovery plaintiffs would receive.[334]

Finally, the maintenance of class certification in these cases through

trial is fraught with risks.  Plaintiffs inform the Court that defendants have

compromised on several issues that defendants had previously argued would make

these class actions unmanageable if they went to trial.[335]  In addition,

decertification is always a likely possibility during trial in complex class actions

such as these.  These factors therefore weigh in favor of preliminary approval.

### e.    Ability of Defendants to Withstand a Greater Judgment

---

[332]    *See id.*

[333]    *See id.*

[334]    *See id.* at 17.

[335]    *See id.*

It cannot be disputed that the economic landscape has changed

dramatically even in the last year, affecting the capability of many of the

defendants to pay a large recovery in these actions.  Plaintiffs note that one

underwriter has already filed for bankruptcy and others have survived only with

government assistance.[336]  It is unlikely that defendants would be able to withstand

a greater judgment than the settlement amount that they have offered.  It is

therefore in plaintiffs' best interests to resolve these actions, and quickly.  This

factor also weighs heavily in favor of preliminary approval.

> **f.      Range of Reasonableness of Settlement Fund in Light
> of Best Possible Recovery and Attendant Risks of
> Litigation**

The Second Circuit has held that a settlement that is within a range

"'that recognizes the uncertainties of law and fact in any particular case and the

concomitant risks and costs necessarily inherent in taking any litigation to

completion,'" will not be reversed on appeal.[337]  The Settlement Amount will

undoubtedly be the most scrutinized part of the Stipulation.  Potential objectors

may argue that the $586 million settlement is much less than the one billion dollar

---

[336]     *See id.*

[337]     *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464
F.2d 689, 693 (2d Cir. 1972)).

guarantee that the Court had previously preliminarily approved in 2005 and is therefore outside of the "range of reasonableness." However, a few points are worth noting.

*First*, to state the obvious, the one billion dollar guarantee was only a guarantee. None of the proceeds were to be distributed to putative class members until "after the conclusion of all of the above-mentioned proceedings with respect to the Underwriters."[338] That guarantee differed substantially from the terms of the instant Stipulation. The guarantee required plaintiffs to continue to litigate their claims against the Underwriters.[339] Forcing plaintiffs to litigate the matter until verdict would have been not only costly but uncertain. Only in the event that plaintiffs were unable to secure additional recovery from the Underwriters would they be entitled to any part of the one billion dollar guarantee. By contrast, the Stipulation provides that all Authorized Claimants, without condition, will be entitled to receive a portion of the recovery proceeds. Considering the risks I have

---

[338]     *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 192 (S.D.N.Y. 2005).

[339]     Indeed, I noted in my Opinion and Order preliminarily approving the prior settlement that, according to that Stipulation, plaintiffs would not receive any recovery from the settling Issuer defendants if there was a settlement with the Underwriter defendants. *See id.* at 192 n.27 (citing 2004 Stipulation and Agreement of Settlement ¶ 1(ff)).

101

already outlined with continuing these Actions, including the risks plaintiffs face
establishing liability and damages and maintaining the class actions through trial,
this settlement is reasonable.

Second, while the Settlement Amount is less than the potential
recovery in the prior settlement in absolute terms, the class definition has been
significantly narrowed.  All investors who received IPO allocations from the
"institutional pots" are now excluded from recovery, thereby severely limiting the
number of potential claimants.[340]  As a result, although the "pie" might be smaller,
each Authorized Claimant should receive a larger slice.

Finally, it cannot be discounted that the current economic
environment has changed the "ball game" with respect to what plaintiffs could
expect even with a verdict.  As noted, one of the underwriters has filed for
bankruptcy while a number of others have escaped a similar fate only because of
government intervention.  Simply put, plaintiffs cannot expect to receive a similar
recovery to that they had hoped to receive during more bullish years.  I therefore
find that the settlement is within a range of reasonableness in light of possible

---

[340]     Plaintiffs note that their damage experts estimate that institutional
investors generally account for about seventy percent of aftermarket trade volume.
See Pl. Mem. at 18.  Their exclusion will therefore substantially reduce the number
of Authorized Claimants.

recovery and upon consideration of the attendant risks in proceeding to trial.[341]

### C.     Form of Class Notice

Plaintiffs have submitted the proposed class notice to the Court for its review and consideration.[342]  Pursuant to the PSLRA, the proposed notice includes a cover page summarizing the required information and sections titled "Statement of Plaintiff Recovery," "Statement of Potential Outcome of Case," "Statement of Attorneys' Fees and Costs Sought," and "Reason for Settlement."[343]  The proposed notice also identifies the members of the Plaintiffs' Executive Committee.[344]  In addition, the proposed notice informs potential class members who is included in the class, how such persons would be eligible for payment, what they must do to claim payment, how to exclude themselves from the settlement class, and how to

---

[341]     As discussed above, the settlement release clause of the Stipulation covers a number of potential claims that plaintiffs may or may not have been able to bring against defendants for their alleged misconduct during the applicable class periods. *See* Stipulation ¶ 1(pp). The Second Circuit has held that broad release clauses are permissible so long as they arise from the "identical factual predicate" as the settled conduct. *See Wal-Mart Stores*, 396 F.3d at 107 (quoting *TBK Partners Ltd. v. Western Union Corp.*, 675 F.2d 456, 458 (2d Cir. 1982)).

[342]     *See* Proposed Notice of Pendency.

[343]     *See id.* at 3-5, 8-10.

[344]     *See id.* at 16.

object to the settlement.[345]  Finally, while not required by law, the proposed notice also outlines the Plan of Allocation.[346]  I find that the proposed notice is sufficiently informative to advise potential class members of the terms of the proposed settlement and of the options available to them.

Regarding notification, plaintiffs have proposed mailing the notice first-class to each potential class member.[347]  In addition, the administrator will notify 2,000 brokers and nominee owners of the proposed settlement and request that they provide a list of beneficiaries or that they forward the notice on to their beneficiaries.[348]  Finally, the notice will be posted on a website that is maintained by the administrator and will be published in the national editions of the Wall Street Journal, USA Today, The New York Times, and over PR Newswire within ten days of the mailing.[349]  I find that notification by such means satisfies Rule 23 requirements and due process concerns and therefore approve it.[350]

---

[345]    *See id.* at 10-16, 17-18.

[346]    *See id.* at 20-22.

[347]    *See* Pl. Mem. at 11.

[348]    *See id.*

[349]    *See id.*

[350]    *See Eisen v. Carlisle & Jacquelin, et al.*, 417 U.S. 156, 174-75 (1972) (finding use of "the mails" to be sufficient to satisfy due process concerns).

## D.     Date of Fairness Hearing

A Settlement Fairness Hearing pursuant to Federal Rule of Civil Procedure 23(e) is scheduled to take place before the Court on September 10, 2009 at 4:30 p.m. The purpose of the Fairness Hearing is to finally determine (a) whether the actions satisfy the applicable prerequisites for class action treatment under Federal Rules of Civil Procedure 23(a) and (b) for the purposes of settlement; (b) whether the terms of the proposed settlement described in the Stipulation are fair, reasonable, and adequate, and should be approved by the Court; (c) whether the proposed Designations and Plan of Allocation is fair and reasonable and should be approved by the Court; (d) whether the Order and Final Judgment as provided under the Stipulation should be entered in each of the Actions, dismissing the Complaints on the merits and with prejudice, and to determine whether the release of the settled claims, as set forth in the Stipulation, should be ordered; (e) whether the application of Lead Counsel for an award of attorneys' fees and expenses should be approved; (f) whether the applications filed by proposed settlement class representatives and/or lead plaintiffs for their reasonable time and expenses incurred as a result of representing the proposed settlement classes should be approved; and (g) such other matters as the Court may deem appropriate.

## V.   CONCLUSION

For the reasons stated above, plaintiffs' motion is granted in its entirety.  The Clerk of the Court is directed to close this motion [document no. 5807 in action 21 MC 92].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           June 9, 2009

## - Appearances -

### For Plaintiffs' Executive Committee:

Stanley D. Bernstein, Esq.
Robert Berg, Esq.
Rebecca M. Katz, Esq.
Christian Siebott, Esq.
Ann M. Lipton, Esq.
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street
New York, New York 10016
(212) 779-1414

Robert A. Wallner, Esq.
Ariana J. Tadler, Esq.
Peter G.A. Safirstein, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 946-9453

### Liaison Counsel for Underwriter Defendants:

Gandolfo V. DiBlasi, Esq.
Penny Shane, Esq.
David M.J. Rein, Esq.
Richard J.L. Lamuscio, Esq.
Sullivan and Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

### Liaison Counsel for Issuer Defendants:

Jack C. Auspitz, Esq.
Joel C. Haims, Esq.
Hilary M. Williams, Esq.
Angela T. Rella, Esq.
Reema S. Abdelhamid, Esq.
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000