UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

IN RE: INITIAL PUBLIC OFFERING
SECURITIES LITIGATION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/5/09

**OPINION AND ORDER**

**MASTER FILE NO. 21 MC 92
(SAS)**

------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This consolidated action comprises hundreds of securities class

actions brought against issuers and underwriters of technology stocks that had their

initial public offerings ("IPOs") during the late 1990s.  On April 2, 2009, the

parties filed a Stipulation and Agreement of Settlement ("Stipulation") that seeks

to conclude eight years of litigation in all 309 coordinated class actions.  Following

the Court's preliminary approval of the proposed settlement, plaintiffs now move

for an Order of Final Approval of the Settlement, Plan of Allocation, and Class

Certification.  The Plaintiffs' Executive Committee (the "Committee") moves the

Court to grant Attorneys' Fees and Reimbursement of Expenses and Private

Securities Litigation Reform Act ("PSLRA") Awards to the Lead Plaintiffs and

Class Representatives of the 309 settled actions.  For the reasons stated below,

1

plaintiffs' motion for an Order of Final Approval of the Settlement, Plan of Allocation, and Class Certification is granted. The Committee's motion for the Award of Attorneys' Fees and Expenses and PSLRA Awards is granted, but not for the amounts requested.

## II.  BACKGROUND

### A.  Plaintiffs' Allegations

Plaintiffs' allegations are discussed at length in a series of earlier Opinions.[1] In brief, plaintiffs allege that the underwriters of hundreds of IPOs required allocants in those IPOs to purchase shares in the aftermarket, often at inflated prices, and to pay the underwriters undisclosed compensation.[2] Additionally, the underwriters allegedly prepared analyst reports that contained inaccurate information and recommendations.[3] Plaintiffs allege that the issuers participated in or were at least aware of this misconduct and benefitted financially by large run-ups in the prices of their stock.[4] Finally, plaintiffs allege that they lost

---

[1]  *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65 (S.D.N.Y. 2004).

[2]  *See* Amended Master Allegations ("Am. Master Allegations") ¶¶ 14, 17.

[3]  *See id.* ¶ 86.

[4]  *See id.* ¶ 112.

2

billions of dollars as a result of these manipulations and the fraudulent statements made to cover up the scheme. Plaintiffs have brought claims under both the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

## B.    Settlement Terms

In April 2009, the parties entered into a global settlement of the 309 cases, which is subject to this Court's approval.[5] The Stipulation provides that defendants will pay a total of $586 million ("Settlement Amount") in exchange for plaintiffs releasing all Settled Claims against them.[6] The Stipulation further provides that the Settlement Amount less any advances will be deposited into an escrow account at least fourteen days before the date of the fairness hearing.[7] The

---

[5]    *See* 4/1/09 Stipulation and Agreement of Settlement ("Stipulation").

[6]    *See id.* ¶¶ 9, 25. "Settled Claims" means "any and all claims (including but not limited to claims under Section 11 of the Securities Act, or Section 10(b) or Section 16(b) of the Exchange Act, or any rules promulgated under any such section or Act, or claims under state statutes or common law) that were, could have been or might have been asserted against any or all of the Protected Persons in the Actions or in any other proceedings, that arise out of, are based upon or relate to the conduct alleged to be wrongful in the Actions." *Id.* ¶ 1(pp). For a general understanding of the release provisions, "Protected Persons" means "all of the Issuers, Underwriters, Insurers, and the issuers and underwriters in the IPOs [] at issue in the IPO Litigation, whether or not named as defendants in any of the Actions . . . ." *Id.* ¶ 1(mm).

[7]    *See id.* ¶ 9(b).

3

parties have stipulated that final approval of the settlement in all of the actions is required.[8]

## C. Class Certification

On October 13, 2004, I issued an Opinion and Order certifying classes in each of six focus cases.[9] The classes consisted of "all persons and entities that purchased or otherwise acquired the securities of [the issuer] during the Class Period and were damaged thereby, subject to various exclusions."[10] The Class Periods for the Exchange Act claims were the periods from the respective IPOs through December 6, 2000. For the Securities Act Claims, the Class Periods were limited to periods in which all tradeable shares in the market could be traced to the IPOs.[11]

In June 2005, the Second Circuit granted defendants' petition for leave to appeal pursuant to Rule 23(f) of the Federal Rules of Civil Procedure. The Circuit directed the parties to address the proper standard for a class certification motion and whether the *Basic v. Levinson* presumption of reliance was

---

[8]     *See id.* ¶ 7(a).

[9]     *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 122.

[10]     *Id.* at 74 (quotation omitted).

[11]     *See id.* at 118-19.

4

appropriately extended to plaintiffs' claims.[12]

On December 5, 2006, the Second Circuit announced its Opinion in
*Miles v. Merrill Lynch & Co.* (*"Miles I"*).[13] In *Miles I*, the Circuit revised the
standard to be applied in class certification actions and then applied that new
standard to this case.[14]

The court also concluded that plaintiffs "cannot satisfy the
predominance requirement for a (b)(3) class action" because individual questions
predominated over common questions in the areas of knowledge and reliance.[15]
*First*, the court held that plaintiffs could not take advantage of the *Basic*
presumption of reliance.[16] The court noted that "the market for IPO shares is not
efficient," citing the fact that no analyst reports are published during the 25-day
"quiet period."[17] *Second*, the court ruled that many potential claimants would have

---

[12]     In *Basic v. Levinson*, the Supreme Court determined that an investor
may invoke a rebuttable presumption that she relied on the integrity of the price set
by the market if the market is efficient. *See* 485 U.S. 224, 247 (1988).

[13]     471 F.3d 24 (2d Cir. 2006).

[14]     *See id.* at 40.

[15]     *Id.* at 45.

[16]     *See id.* at 42.

[17]     *Id.* at 43.

5

known that the price was "affected by the alleged manipulation," thereby making it difficult for plaintiffs to prove that they were ignorant of inflated prices, a prerequisite of a section 10(b) claim.[18] The court noted that the classes as defined included initial IPO allocants, who were "required to purchase in the aftermarket" and who were "fully aware of the obligation that is alleged to have artificially inflated share prices."[19] It also noted plaintiffs' admission that there was an "industry-wide understanding" of aftermarket purchases, evidenced by the knowledge of the many thousands of people employed by the institutional investors who had been parties to the tie-in agreements and by news reports and a Securities Exchange Commission ("SEC") Staff Legal Bulletin that had publicized such practices in 1999 and 2000.[20]

This appeared to close the door on any opportunity for class certification in these cases. However, on April 6, 2007, the *Miles* panel issued a decision denying rehearing of *Miles I* but clarifying certain points in its original opinion ("*Miles II*").[21] Plaintiffs had argued in their petition for rehearing that the

---

[18]    *Id.*

[19]    *Id.*

[20]    *Id.*

[21]    *See Miles v. Merrill Lynch & Co.* ("*Miles II*"), 483 F.3d 70 (2d Cir. 2007).

Circuit had erred both in finding that predominance could not be satisfied and in failing to remand to this Court for evaluation of the class under the clarified standard.[22] Specifically, plaintiffs argued that non-allocants who purchased shares in the aftermarket "would have relied on the market price of the shares and would have lacked knowledge of the alleged fraud . . . ."[23]

The Circuit explained that its decision in *Miles I* applied only to the broad class certified by this Court.[24] Thus, the Circuit resolved both of plaintiffs' arguments by observing that "[n]othing in [*Miles I*] precludes the Petitioners from returning to the District Court to seek certification of a more modest class, one as to which the Rule 23 criteria might be met, according to the standards we have outlined."[25] The Circuit concluded, "we leave it to the Petitioners in the first instance to seek whatever relief they deem appropriate from the District Court, which can be expected to give such a request full and fair consideration."[26]

According to the Stipulation, the parties have agreed to class

---

[22]   *See id.* at 72.

[23]   *Id.*

[24]   *See id.* at 73.

[25]   *Id.*

[26]   *Id.*

7

certification in each of the 309 cases pursuant to Rule 23(a) and Rule 23(b)(3):

> [A]ll Persons who purchased or otherwise acquired any of the Subject Securities at issue in such case during the Settlement Class Period applicable to such action and *were damaged thereby.*
>
> (a) Subject to the review provisions provided in Paragraph 20 [of the Stipulation],[27] excluded from the Settlement Class is each Person, other than a Natural Person, that was identified as a recipient of an allocation of shares from the "institutional pot" in the IPO or Other Charged Offering of any of the 309 Subject Securities, according to a list derived from the final "institutional pot" list created at the time of each IPO or Other Charged Offering by the lead Underwriter in that Offering ("Excluded Allocants").
>
> (b) Also excluded from the Settlement Classes are (i) each Person that currently is or previously was a named defendant in any of the 309 Actions (hereafter "Named Defendant"), (ii) any attorney who has appeared in the Actions on behalf of a Named Defendant, (iii) members of the immediate family of any Named Defendant, (iv) any entity in which any Excluded Allocant or Named Defendant has or during any of the class periods had a majority interest, (v) the legal representatives, heirs, successors or assigns of any Excluded Allocant or Named Defendant; and (vi) any director, officer, employee, or beneficial owner of any Excluded Allocant or Named Defendant during any of the Settlement Class Periods. Notwithstanding the prior sentence, a person shall not be excluded from the Settlement Classes merely by virtue of his, her or its beneficial ownership of the securities of a publicly-traded

---

[27] The Stipulation provides that a Settlement Class Member will be treated as an "Authorized Claimant" if a number of conditions are met, including the submission of a Proof of Claim. *See id.* ¶ 20.

Excluded Allocant or Named Defendant.[28]

In each settled action, the Class Period is from the date of the IPO until December 6, 2000.[29]

In a June 10, 2009 Opinion and Order ("June Opinion and Order"), I certified the settlement classes in this case after reconsidering the Rule 23(a) and (b) factors in light of the Circuit's new standards.[30] I held that plaintiffs had demonstrated by the preponderance of the evidence that reliance and loss causation could be proven on a class-wide basis.[31] I also ruled that "when the classes are properly circumscribed and institutional allocants are excluded, individual questions of knowledge will not predominate over common ones."[32] Finally, the class no longer excludes those *retail investors* who may have "paid any undisclosed compensation to the allocating underwriter(s)," which the Second

---

[28]     Stipulation ¶¶ 8, 8A (emphasis added).

[29]     *See* Schedule 1 to Notice of Pendency and Proposed Global Settlement of 309 Class Actions, Motion for Approval of Settlement, Plan of Allocation, Attorneys' Fees and Expenses, PSLRA Awards of Reimbursement of Representatives' Time and Expenses and Settlement Fairness Hearing ("Notice of Pendency").

[30]     *See Initial Pub. Offering Sec. Litig.*, No. 21 MC 92, 2009 WL 1649704 (S.D.N.Y. June 10, 2009).

[31]     *See id.* at *18, *24.

[32]     *Id.* at *26.

9

Circuit found problematic in *Miles I*.[33] Instead, the settlement classes exclude *all institutional investors* who were also initial allocants whether or not they may have paid improper and undisclosed compensation to the underwriter defendants, therefore resolving the ascertainability problems in the 2004 class certification motion.[34]

## D. Fees and Expenses

The Committee[35] requests that the Court award attorneys' fees of one-third of the Total Designation Amount in each Action and expenses of approximately fifty million dollars in connection with the prosecution of the Actions.[36] In support of its fee motion, the Committee has submitted summary time sheets demonstrating that the attorneys of the firms comprising the Committee

---

[33]     *See Miles I*, 471 F.3d at 44.

[34]     *See Initial Pub. Offering Sec. Litig.*, 2009 WL 1649704, at *26. The Amended Master Allegations state that the defendants focused their requirements on institutional investors and that the majority of retail allocants "traded in ignorance of the scheme." Am. Master Allegations ¶ 35.

[35]     Where fees are discussed in this Opinion, the Plaintiffs' Executive Committee includes the six firms that comprise it and Plaintiffs' Steering Committee member Lovell Stewart Halebian LLP.

[36]     *See* Memorandum of Law in Support of Plaintiffs' Executive Committee's Application for an Award of Attorneys' Fees, Reimbursement of Expenses for Plaintiffs' Counsel and An Award of Costs and Expenses to Representative Parties ("Pl. Fee Mem.") at 1.

10

have collectively spent 677,000 hours for a lodestar of $276 million.[37] It also notes

that it has advanced approximately forty-three million dollars in expenses.[38] The

fifty-plus other plaintiffs' firms that were involved in this litigation have reported

---

[37] *See* Summary of Lodestar and Expenses Incurred by Executive Committee Firms and Steering Committee Member Lovell Stewart Halebian LLP ("Summary of Lodestar and Expenses"), Ex. A to Compendium of Plaintiffs' Executive Committee Fee and Expense Affidavits ("Fee Compendium"); Declaration of Stanley D. Bernstein Submitted on Behalf of Bernstein Liebhard LLP in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Bernstein Decl."), Ex. D to Fee Compendium; Declaration of Neil Fraser Submitted on Behalf of Milberg LLP in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Fraser Decl."), Ex. E to Fee Compendium; Declaration of David Kessler Submitted on Behalf of Barroway Topaz Kessler Meltzer & Check, LLP in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Kessler Decl."), Ex. F to Fee Compendium; Declaration of Howard B. Sirota Submitted on Behalf of Sirota & Sirota LLP in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Sirota Decl."), Ex. G to Fee Compendium; Declaration of Jules Brody Submitted on Behalf of Stull, Stull & Brody in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Brody Decl."), Ex. H to Fee Compendium; Declaration of Fred T. Isquith Submitted on Behalf of Wolf Haldenstein Adler Freeman & Herz LLP in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Isquith Decl."), Ex. I to Fee Compendium; Declaration of Victor Edwin Stewart Submitted on Behalf of Lovell Stewart Halebian LLP in Support of Joint Application by Plaintiffs' Lead Counsel for Attorneys' Fees and Reimbursement of Expenses ("Stewart Decl."), Ex. J to Fee Compendium. Lodestar is a term that is used to describe the value of a firm's work on a particular litigation. It is derived from multiplying hours reasonably expended by a reasonable hourly rate.

[38] *See* Summary of Lodestar and Expenses.

spending over 350,000 hours, for over one hundred million dollars in lodestar and approximately $7.5 million in expenses.[39]

The Committee also supports the payment of "reasonable" class representative awards for lead plaintiffs, proposed class representatives, and/or proposed settlement class representatives.[40]  It has submitted the declarations of over four hundred lead plaintiffs and class representatives attesting to the hours spent and hourly wages lost performing work for this litigation.[41]  The Committee requests that the Court grant an aggregate award to lead plaintiffs and class representatives not to exceed four million dollars.[42]

### E.    Plan of Designation and Allocation

According to the Stipulation, the Settlement Amount is to be distributed to all Authorized Claimants in accordance with the Plan of Allocation, and none shall revert to defendants under any circumstances.[43]  The Stipulation

---

[39]    *See* Pl. Fee Mem. at 2; Expenses for all Non-Executive Committee Firms ("Summary Expense Report for Non-Executive Committee Firms"), Ex. B to Fee Compendium.

[40]    Pl. Fee Mem. at 4.

[41]    *See* Declaration of David Kessler Submitted in Connection with PSLRA Award Requests ("Kessler PSLRA Decl.") ¶ 6.

[42]    *See* Pl. Fee Mem. at 34.

[43]    *See* Stipulation ¶ 17.

further provides that the Plan of Allocation is "not a necessary term of the Stipulation" and is "not a condition of this Stipulation or the Settlement that any particular Plan of Allocation be approved."[44]

The proposed Plan of Allocation (the "Plan") is set forth in the Notice of Pendency. According to the Plan, the $586 million Settlement Amount and interest earned will be reduced by taxes, costs, fees, and expenses to produce a "Net Settlement Fund."[45] This Net Settlement Fund will then be allocated to the Actions in proportion to the amount of potentially recoverable damages in accordance with a table of amounts as set forth in Schedule 2 of the Notice of Pendency ("Net Designation Amounts").[46] For those cases in which the applied damage methodology resulted in a Net Designation Amount of less than $300,000 for a particular action, it is proposed that such case would be allotted a "floor" or minimum Net Designation Amount of $300,000.[47] This floor applies only in thirty-five cases, "resulting in total additional designations (to those cases) of $3,925,139, over and above the designation amounts resulting from the damage

---

[44] *Id.* ¶ 16.

[45] *See* Notice of Pendency at 14.

[46] *See id.*; Schedule 2 to Notice of Pendency.

[47] *See* Notice of Pendency at 8.

13

methodology."[48] The highest Net Designation Amount in the 309 cases is approximately twenty million dollars.[49]

Authorized Claimants will be eligible to receive a pro rata share of the Net Settlement Fund designated for the case or cases for which they have a claim up to the amount of their recognized losses ("Recognized Claim").[50] Where the Net Designation Amount for a particular case exceeds the actual amount of the recognized losses of all Authorized Claimants, the excess will "flow into a pot to be combined with excess Net Designation Amounts from all other Actions . . . and will be utilized to pay underfunded Recognized Claims in all Actions."[51] Finally, once all Recognized Claims are paid, any excess funds will be pooled and distributed to all Authorized Claimants in proportion to each Authorized Claimant's "Unpaid Market Loss."[52] The Unpaid Market Loss is calculated by subtracting the Recognized Claim from the Overall Market Loss – equal to the purchase price paid ("PPP") minus the sales proceeds received from a Subject

---

[48]     *Id.*

[49]     *See* Schedule 2 to Proposed Notice of Pendency.

[50]     *See* Notice of Pendency at 14.

[51]     *Id.*

[52]     *See id.*

14

Security ("SPR") or the PPP minus the holding price per Subject Security ("HPS").[53] The HPS values are calculated using the closing price of the Subject Security as of December 6, 2000.[54]

Recognized Claims will be calculated according to the following formula: For Subject Securities purchased during the Class Period but sold prior to December 6, 2000, the Recognized Claim is the lesser of (a) the alleged inflation in the price of the security ("IPS") at the date of purchase minus the IPS at the date of sale, multiplied by the number of securities purchased and sold, or (b) the PPP minus the SPR, multiplied by the number of securities purchased and sold.[55]  For those Subject Securities purchased during the Class Period and held as of December 6, 2000, the Recognized Claim will be calculated as the IPS on the date of purchase multiplied by the number of securities purchased during the Class Period.[56]  For those Authorized Claimants who have purchased and sold a Subject Security more than once during the Class Period, their Recognized Claim will be

---

[53]     *See id.* at 15.

[54]     *See id.* at 14.

[55]     *See id.* at 14-15.

[56]     *See id.* at 15.

15

determined on a Last In First Out or "LIFO" basis.[57]  Finally, each Authorized

Claimant is entitled to a minimum distribution amount of ten dollars no matter the

size of his, her, or its Recognized Claim.[58]

## F.    Class Representative Approvals

Plaintiffs inform the Court that in each of the 309 cases, at least one of

the proposed settlement class representatives affirmatively approved the

settlement.[59]  However, they also report that in five cases, the lead plaintiff

disapproved of the settlement.[60]  Nevertheless, they note that none of these lead

plaintiffs objected to the settlement or requested exclusion.[61]  In addition, they

inform the Court that in each of these five cases, a class member who desires to

serve as settlement class representative has approved the settlement.[62]

## G.    Notice

---

[57]    *See id.*

[58]    *See id.*

[59]    *See* Plaintiffs' Memorandum of Law in Support of Motion for Final
Approval of Settlement, Plan of Distribution, and Class Certification ("Pl. Mem.")
at 9.

[60]    *See id.*  The five cases are Agilent Technologies, Avici, Eloquent,
ePiphany, and Focal Communications.  *See id.* at 10 n.8.

[61]    *See id.* at 9-10.

[62]    *See id.* at 10.

16

Following this Court's preliminary approval of the settlement, The Garden City Group ("GCG") – Claims Administrator for these actions – mailed more than seven million copies of the Notice of Pendency to potential class members.[63] The Summary Notice was also published in three national newspapers – *The Wall Street Journal*, *The New York Times*, and *USA Today* – and as a press release over the *PR Newswire*.[64]

Each of the seven million potential class members received a Summary "Frontispiece" that identifies the Subject Security purchased by the class member and summarizes the settlement terms, the Notice of Pendency (the "Notice"), and a Proof of Claim form and instructions for completing the form.[65] Pursuant to the PSLRA, the Notice and attached schedules include the following information: (1) a Statement of Plaintiff Recovery, detailing the aggregate recovery and the recovery on an average per-share basis; (2) a Statement of Potential Outcome of the Case, explaining the litigation positions of both plaintiffs and defendants at the time of settlement; (3) a Statement of Attorneys' Fees and Costs

---

[63] *See* 8/25/09 Affidavit of Stephen J. Cirami, Vice President of Operations for The Garden City Group, Inc. ("Cirami Aff."), ¶ 67.

[64] *See id.* ¶ 50.

[65] The Court received and reviewed a sample of the papers from the Plaintiffs' Executive Committee.

17

Sought and Request for PSLRA Awards Reimbursing Reasonable Time and Expense for Representative Plaintiffs, stating the intention of plaintiffs' counsel to seek fees not to exceed one-third of the gross settlement and lead plaintiffs and class representatives awards not to exceed four million dollars and providing the fees and costs on a per-share basis; (4) contact information for members of the Plaintiffs' Executive Committee; and (5) a Statement of the Reason for the Settlement, noting the creation of a $586 million settlement fund for class members.[66]

Pursuant to Federal Rule of Civil Procedure 23(c)(2), the Notice also provides information about the litigation, including a description of plaintiffs' claims and the defenses put forth by defendants.[67] It sets forth the class definition and the settlement benefits.[68] It further provides instructions for submitting a proof

---

[66] *See* Notice of Pendency at 2-3.

[67] *See id.* at 2, 6-7. Rule 23(c)(2) requires reasonable notice to the class to include "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

[68] *See* Notice of Pendency at 7-9.

of claim, requesting exclusion, and objecting to the settlement.[69] The Notice also informs class members of their ability to hire separate counsel to represent them in this litigation.[70] The Notice informs class members of the date of the fairness hearing, the consequences of failing to act, and how a class member can obtain more information.[71] Finally, it includes details of the Plan of Allocation and a message to securities brokers and other nominees informing them of the Court's Order to submit the names and last known addresses of any entity or person for which they purchased securities during the class period within twenty days of receiving the Notice.[72]

GCG maintains a website at www.iposecuritieslitigation.com ("IPO website"), which includes information regarding the litigation, explains the proposed settlement, and allows class members to submit proofs of claim.[73] GCG also maintains a 24-hour toll-free hotline and an email address to assist class

---

[69]    *See id.* at 9-13.

[70]    *See id.* at 11.

[71]    *See id.* at 13.

[72]    *See id.* at 14-16.

[73]    *See* Cirami Aff. ¶¶ 53, 54.

members with their questions.[74]  As of August 25, 2009, GCG had received 371

requests for exclusion and 85,848 Proofs of Claim.[75]  As of the date of the fairness

hearing, GCG had received over 100,000 Proofs of Claim.[76]  Although the deadline

to request exclusion has passed, class members will have until December 10, 2009

to submit Proofs of Claim.[77]

### H.  Fairness Hearing

A fairness hearing was held on September 10, 2009.  Six objectors

spoke at the hearing, and they presented a wide range of concerns, including

objections with respect to the class definition, the Notice, the requested attorneys'

fees and expenses, and the requested PSLRA awards.[78]  The Committee was given

the opportunity to respond to all objections.[79]

## III.  APPLICABLE LAW

### A.  Final Approval

---

[74]  *See id.* ¶¶ 59, 64.

[75]  *See id.* ¶¶ 70, 72.

[76]  *See* 9/10/09 Transcript of Fairness Hearing ("Fairness Hearing Tr.") at 17:24-25.

[77]  *See* Cirami Aff. ¶¶ 70, 71.

[78]  *See* Fairness Hearing Tr. at 19:9-23:16; 25:14-70:8.

[79]  *See id.* at 23:17-25:12; 70:10-77:13.

Unlike settlements in ordinary suits, the settlement of a class action must by approved by the court.[80] The court owes a duty to class members to ensure that the proposed settlement is "fair, reasonable and adequate."[81] In making this determination, the court's "primary concern is with the substantive terms of the settlement;" accordingly, the court must "compare the terms of the compromise with the likely rewards of litigation."[82] The trial judge must "'apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'"[83] The court should not go so far as to effectively conduct a trial on the merits, but should make "findings of fact and conclusions of law whenever the propriety of the settlement is seriously in dispute."[84] The court must also scrutinize the negotiating process leading up to the settlement. "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced,

---

[80]     See Fed. R. Civ. P. 23(e).

[81]     Fed. R. Civ. P. 23(e)(2).

[82]     *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995).

[83]     *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1974)).

[84]     *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983).

capable counsel after meaningful discovery."[85]

In determining whether a settlement is "fair, reasonable and adequate," courts in this Circuit look to the following factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation (collectively, the "*Grinnell* factors").[86] Ultimately, the approval of the proposed settlement of a class action is a matter of discretion for the trial court.[87] Nevertheless, a court should be mindful of the "'strong judicial

---

[85]     *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citing *Manual for Complex Litigation, Third*, § 30.42 (1995)).

[86]     *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). *See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (citing *Grinnell* and applying its nine-factor test to evaluate class action settlement).

[87]     *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000).

policy in favor of settlements, particularly in the class action context.'"[88]

## B. Plan of Allocation

"'To warrant approval, the plan of allocation must meet the standards by which the . . . settlement was scrutinized – namely, it must be fair and adequate.'"[89] "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."[90] Nevertheless, "where a proposed settlement provides favorable treatment to some segment of the class, careful judicial scrutiny is required to prevent injustice and to ensure that the burden of settlement is not shifted arbitrarily to a small group of class members."[91]

## C. PSLRA Awards

Section 27(a)(4) of the PSLRA states:

> The share of any final judgment or of any settlement that is
> awarded to a representative party serving on behalf of a

---

[88]     *Wal-Mart Stores*, 396 F.3d at 116 (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)).

[89]     *In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515, 2009 WL 2025160, at *3 (S.D.N.Y. July 10, 2009) (quoting *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002)).

[90]     *Id.* (quoting *Maley*, 186 F. Supp. at 367).

[91]     *Parker v. Time Warner Entm't Co., L.P.*, No. 98 Civ. 4265, 2009 WL 1940791, at *15 (E.D.N.Y. July 6, 2009) (citations omitted).

class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.[92]

### D. Attorneys' Fees

Federal Rule of Civil Procedure 23(h) provides: "In a certified class action, a court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." "'[A] party that secured a fund for the benefit of others, in addition to himself, may recover his costs, including his attorney's fees, from the fund itself or directly from the other parties enjoying the benefit.'"[93] "This principle is known as the common fund doctrine."[94] "'The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.'"[95]

Courts may award attorneys' fees in common fund cases under either

---

[92] 15 U.S.C. § 78u-4(a)(4).

[93] *Parker*, 2009 WL 1940791, at *17 (quoting *In re Holocaust Victim Assets Litig.*, 424 F.3d 150, 157 (2d Cir. 2005)).

[94] *Id.*

[95] *Id.* (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

the "lodestar" method or the "percentage of the fund" method.[96] "The lodestar

method multiplies hours reasonably expended against a reasonable hourly rate.

Courts in their discretion may increase the lodestar by applying a multiplier based

on factors such as the riskiness of the litigation and the quality of the attorneys."[97]

"The trend in this Circuit is toward the percentage method, [] which directly aligns

the interests of the class and its counsel and provides a powerful incentive for the

efficient prosecution and early resolution of litigation . . . . In contrast, the lodestar

creates an unanticipated disincentive to early settlements, tempts lawyers to run up

their hours, and compels district courts to engage in a gimlet-eyed review of

---

[96]  *See Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at
50). Although the Second Circuit has recently abandoned use of the lodestar, it did
so in the context of fee shifting to a prevailing plaintiff under the Voting Rights
Act of 1964. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of
Albany and Albany County Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008).
Since that opinion, the Circuit has reaffirmed the principle that the *Goldberger*
factors should still be considered in determining a reasonable fee in class actions.
*See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 134 (2d Cir. 2008)). *But
see Cavalieri v. General Elec. Co.*, No. 06 Civ. 315, 2009 WL 2426001, at *3
(N.D.N.Y. Aug. 6, 2009) (while ruling on a class action fee motion, noting that the
lodestar method had been replaced by the "presumptively reasonable fee" as set out
in *Arbor Hill*). Nevertheless, this Court has always adjusted lodestars when it has
determined them to be unreasonable or unsupportable. *Arbor Hill*'s ruling that the
"presumptively reasonable fee" should apply, *see* 522 F.3d at 183, is therefore not
new to this Court's practice when it determines the appropriate fees to award.

[97]  *Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 47).

25

line-item fee audits."[98]  Nevertheless, "the lodestar remains useful as a baseline even if the percentage method is eventually chosen."[99]

"Irrespective of which method is used, the '*Goldberger* factors' ultimately determine the reasonableness of a common fund fee. They include: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."[100] Finally, "[r]ecognizing that economies of scale could cause windfalls in common fund cases, courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable."[101]

## IV.  DISCUSSION

### A.  Final Approval

#### 1.  Settlement Discussions

The Court requested and the parties provided affidavits from retired Judges Nicholas Politan and Daniel Weinstein, the two mediators that assisted the

---

[98]  *Id.* (citations and quotation marks omitted).

[99]  *Goldberger*, 209 F.3d at 50.

[100]  *Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 50).

[101]  *Id.* at 122 (citing *Goldberger*, 209 F.3d at 52).

26

parties to come to the terms of the instant settlement.[102] Judges Politan and

Weinstein have both attested that the settlement "was fully negotiated, was the best

that the settlement classes could obtain, and is fair, adequate and reasonable to the

members of the classes."[103] They inform the Court that negotiations spanned nine

months, included seven full mediation sessions, and countless phone conferences

and other meetings with individual parties.[104] In addition, they confirm that the

terms were the product of arms' length bargaining.[105] They note specifically that

"[c]ounsel on all sides were well-prepared, extremely knowledgeable about the

facts and the law, and advocated vigorously for their client."[106] Thus, a

presumption of fairness, adequacy, and reasonableness attaches to this settlement.

## 2. The *Grinnell* Factors

Courts in this Circuit look to the nine *Grinnell* factors to determine

whether a settlement is "fair, reasonable and adequate" in accordance with Rule

23(e). Although I have already evaluated eight of the nine factors in the June

---

[102]    *See* 5/8/09 Affirmation of the Honorable Nicholas H. Politan ("Politan Aff."); 5/8/09 Affirmation of the Honorable Daniel Weinstein ("Weinstein Aff.").

[103]    Politan Aff. ¶ 2; Weinstein Aff. ¶ 2.

[104]    *See* Politan Aff. ¶16; Weinstein Aff. ¶ 16.

[105]    *See* Politan Aff. ¶ 18; Weinstein Aff. ¶ 18.

[106]    Politan Aff. ¶ 18; Weinstein Aff. ¶ 18.

Opinion and Order,[107] I nevertheless consider each of the factors or group of factors again.

### a. The Complexity, Expense and Likely Duration of the Litigation

It has been eight years since thousands of investors brought the class action lawsuits that are the subject of this consolidated action.[108] These actions alleged that fifty-five underwriters, more than three hundred issuers, and hundreds of individuals associated with these issuers defrauded the public.[109] On August 9, 2001, the Chief Judge of the United States District Court for the Southern District of New York entered an Order transferring each of these cases to this Court's docket for pre-trial coordination.[110] In an Order dated August 12, 2003, a similar action in Florida was transferred to this Court for pre-trial supervision.[111]

---

[107] In that Opinion, I held that it was premature to consider the reaction of the class to the settlement.

[108] *See* Joint Declaration of Stanley D. Bernstein and Ariana J. Tadler in Support of Motion for Final Approval of Settlement, Plan of Distribution, Class Certification, and Petition for an Award of Attorneys' Fees and Reimbursement of Expenses ("Bernstein and Tadler Decl.") ¶ 4.

[109] *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 71.

[110] *See* Bernstein and Tadler Decl. ¶ 26.

[111] *See In re Initial Pub. Offering (IPO) Sec. Litig.*, 277 F. Supp. 2d at 1376-77.

28

Ultimately, all of these cases would have been re-assigned to judges in this district had the actions gone to trial. In addition, plaintiffs note that "a vast amount of additional factual and expert discovery remains to prepare for trials, and motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable."[112] This Court has already issued twenty-nine Opinions in this case. The Court of Appeals has issued three. No one disputes that adjudication of these actions would have been a daunting task, and the expense and effort involved would certainly have been burdensome to the parties and the Court. This factor therefore weighs heavily in favor of final approval.

### b. Stage of Proceedings and Amount of Discovery Completed

This factor is aimed at ensuring that the parties have a "thorough understanding of their case" prior to settlement.[113] Litigation in this case has been ongoing for eight years. The Court has decided multiple motions to dismiss, considered numerous motions for class certification, and the parties have submitted more than a dozen expert reports, taken more than a hundred depositions, and

---

[112]    Pl. Mem. at 13.

[113]    *Wal-Mart Stores*, 396 F.3d at 118.

reviewed tens of millions of pages in discovery.[114]  In addition, plaintiffs have

informed the Court that they are "proposing this settlement with eyes open."[115]  I

find that this factor weighs in favor of final approval.

### c.   Risks of Class Prevailing (Establishing Liability, Damages, and Maintaining the Class Through Trial)

Plaintiffs concede that "establishing liability is, at best, uncertain."[116]

They contend that defendants have denied any wrongdoing in the case, arguing that

the tie-in agreements were really "underwriters gauging 'indications of interest' as

part of the IPO price discovery process."[117]  Plaintiffs admit that it is possible that a

jury might find defendants' version of events to be more compelling, reducing their

recovery to nothing.[118]  Plaintiffs also acknowledge that if history is any indication,

their chances of success at trial is – at best – fifty percent.[119]

---

[114]    *See* Pl. Mem. at 14; Bernstein and Tadler Decl. ¶ 5 (noting that plaintiffs' counsel reviewed more than 30 million pages in discovery and trading records, 600 third-parties were subpoenaed, and 145 depositions were taken or defended throughout the United States and overseas).

[115]    Pl. Mem. at 14.

[116]    *Id.* at 15.

[117]    *Id.* at 14.

[118]    *See id.* at 15.

[119]    *See id.* n.9 (citing a Practicing Law Institute Securities Litigation & Enforcement Institute study finding that of the twelve securities cases that were

30

Even more complicated is the issue of loss causation and damages. Plaintiffs' expert, Daniel R. Fischel, has proposed a method of proving that the alleged scheme inflated stock prices as early as the beginning of trading and that this inflation dissipated throughout the class period.[120]  Defendants have challenged this proposed methodology during previous motions for class certification, submitting reports from a number of other experts in the field.[121]  There is a likelihood that defendants' theories might be credited by the jury, thereby limiting the amount of recovery plaintiffs would receive.[122]

Finally, the maintenance of class certification in these cases through trial is fraught with risks.  Plaintiffs inform the Court that defendants have compromised on several issues that defendants had previously argued would make these class actions unmanageable if they went to trial.[123]  In addition, decertification is always a likely possibility during trial in complex class actions such as these.  These factors therefore weigh in favor of final approval.

---

tried to jury verdict – six went to the defense and six went to the plaintiffs).

[120]    *See id.* at 15.

[121]    *See id.*

[122]    *See id.* at 16.

[123]    *See id.*

### d. Ability of Defendants to Withstand a Greater Judgment

Although plaintiffs previously argued – and this Court agreed – that

the economic climate and the insolvency of many of the defendants made it

imperative "'to take the bird in hand instead of a prospective flock in the bush,'"[124]

they now retreat from this argument. In its final approval motion, plaintiffs state

that they "do not contend that defendants could not collectively withstand a greater

judgment."[125] Indeed, the economy shows signs of recovery, and a number of the

underwriter defendants no longer appear to be faltering. While "'[t]he fact that a

defendant is able to pay more than it offers in settlement does not, standing alone,

indicate the settlement is unreasonable or inadequate,'"[126] this factor weighs

against final approval.

### e. Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and Attendant Risks of Litigation

The Second Circuit has held that a settlement that is within a range

---

[124]     Plaintiffs' Memorandum of Law in Support of Motion for Preliminary
Approval of Settlement at 17 (quoting *State of W. Va. v. Chas. Pfizer & Co.*, 314 F.
Supp. 710, 743 (S.D.N.Y. 1970)).

[125]     Pl. Mem. at 16.

[126]     *Parker*, 2009 WL 1940791, at *14 (quoting *In re PaineWebber Ltd.
P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997)).

"'that recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion,'" will not be reversed on appeal.[127] The Settlement Amount has been one of the most scrutinized parts of the Stipulation.[128] The $586 million settlement represents two percent of the aggregate expected recovery in the 309 actions[129] and is less than the one billion dollar guarantee provided by the Issuer defendants that

---

[127] *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

[128] *See, e.g.*, 7/13/09 Objection of James P. Tuthill and Wendy B. Tuthill (noting that he would recover "three ten thousandths" of his loss from the proposed settlement); 7/14/09 Objection of Melvin and Vicki Keeney (lamenting a settlement recovery of 20 cents); 7/19/09 Objection of Martin Lerner (informing the Court that he will receive one to three dollars); 8/6/09 Objection of Aldona Ulanecka (calculating her actual loss to be 1295 times larger than what she would receive under the proposed settlement). Undated objections are dated in this Opinion and Order according to when this Court received the objection. The Court has not verified these class members' potential claims, but notes that the objectors failed to consider that if they are determined to be eligible for recovery, they will receive at least ten dollars from the settlement. *See* Notice of Pendency at 15.

[129] *See* Pl. Mem. at 17 (noting that the aggregate expected recovery is $32 billion). Two objectors who jointly filed an objection appear confused as to why the expected recovery is now $32 billion when the previous 2005 settlement disclosed aggregate damages to be $55 billion. *See* 8/10/09 Objection of Michael J. Rinnis and Babette B. Rinnis ("We thought only the Federal government could so casually lo[se] $23 billion [the difference between $55 billion and 32 billion]"). However, plaintiffs explain that the difference in expected recovery is primarily the result of the narrowing of the class definition and exclusion of institutional investors. *See* Pl. Mem. at 32.

the Court previously preliminarily approved in 2005.[130]  However, a few points are worth noting.

*First*, and most importantly, it cannot be disputed that the Second Circuit's decision in *Miles I* changed the negotiating positions of plaintiffs and defendants dramatically. Although the Circuit subsequently revived the litigation in *Miles II* – opining that nothing in *Miles I* bars plaintiffs from returning to this Court with a more modest class definition – its ruling in *Miles I* effectively prevented institutional investors who were initial allocants in the IPOs from participating in any class. The exclusion of these institutional investors is largely the reason why the expected recovery in this litigation has decreased from fifty-five billion dollars to thirty-two billion dollars. Plaintiffs cannot expect to receive the same aggregate recovery after *Miles I*.

*Second*, although a number of objectors noted that the settlement was minuscule compared to the expected recovery in the case, the Second Circuit has

---

[130]    *See In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186 (S.D.N.Y. 2005). Nevertheless, a recent law review article suggests that the proposed settlement, though small, is consistent with recent settlements in securities class actions. *See* John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions: Why "Exit" Works Better than "Voice,"* 30 Cardozo L. Rev. 407, 414 (2008) ("According to one well-known study, the ratio of securities class action settlements to investors' economic losses has ranged over recent years between two and three percent.").

held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate.[131] And while the proposed settlement is being compared – justifiably or not – to the expected recovery amount as calculated by plaintiffs' damages expert, plaintiffs note that the expected recovery is based largely on assumptions, "any of which, if wrong, could doom any recovery at all or certainly drastically reduce any recovery even if successful at trial."[132]

*Finally*, although the billion dollar guarantee provided by the Issuer defendants in 2005 was larger than the current proposed settlement, it was negotiated prior to the Second Circuit's decision in *Miles I*. As noted above, the class size was restricted and the expected recovery severely limited following that decision. It is therefore inappropriate to compare the proposed settlement to the 2005 settlement.

Nevertheless, as I noted in my June Opinion and Order, the 2005 settlement is distinguishable because it was merely a guarantee. None of the

---

[131]    *See Grinnell*, 495 F.2d at 455 & 455 n.2 ("[T]hat a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved . . . In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

[132]    Pl. Mem. at 17.

proceeds were to be distributed to putative class members until "after the

conclusion of all of the above-mentioned proceedings with respect to the

Underwriters."[133] In addition, the guarantee required plaintiffs to continue to

litigate their claims against the Underwriters.[134] Forcing plaintiffs to litigate the

matter until verdict (and potentially through an appeal) would have been not only

costly but uncertain. In the end, plaintiffs could have lost against the underwriters

after expending significant additional costs.[135]

And while the Settlement Amount is less than the billion dollar

guarantee in absolute terms, the class definition has been significantly narrowed.

All institutional investors who received IPO allocations from the "institutional

---

[133]     *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 192 (S.D.N.Y. 2005).

[134]     Indeed, as I noted in my Opinion and Order preliminarily approving the prior settlement, according to that Stipulation, plaintiffs would not receive any recovery from the settling Issuer defendants if there was a settlement with the Underwriter defendants. *See id.* at 192 n.27 (citing 2004 Stipulation and Agreement of Settlement ¶ 1(ff)).

[135]     Douglas Parker criticizes the Court's arguments, noting that even if plaintiffs' counsel had lost at trial against the underwriters, the class would still have been entitled to one billion dollars from the issuers. *See* 7/13/09 Objection of Douglas M. Parker ("Parker Objection") at 4. However, this settlement was withdrawn after the Second Circuit's opinions in *Miles I* and *II*. Even if the litigation had continued, it could have taken another decade to resolve, and Parker underestimates the disadvantages of delaying relief to class members and the additional out-of-pocket costs counsel would have expended that would have severely decreased the one billion dollar payout.

36

pots" are now excluded from recovery, thereby severely limiting the number of

potential claimants. Plaintiffs estimate that "there are roughly 7,000 unique

entities (other than natural persons) that received allocations from the institutional

pot list" and that they and their employees and defendants' employees are now

excluded from the settlement class.[136] As a result, although the "pie" is smaller,

each Authorized Claimant should receive a larger slice.[137] I therefore find that the

settlement is reasonable in light of the expected recovery and attendant risks.

### f.   Reaction of the Class to Settlement

The final *Grinnell* factor that I must consider is the reaction of the

class to the settlement. "'If only a small number of objections are received, that

fact can be viewed as indicative of the adequacy of the settlement.'"[138] The Second

Circuit has also previously provided guidance as to what percentage of the class

must object before a settlement would be rendered unfair, indicating that an

otherwise fair settlement should not be deemed unfair because of opposition by

---

[136]   Pl. Mem. at 24.

[137]   Parker also attempts to refute this argument, contending that inclusion of any recovery from the underwriters would have increased the size of the pie. *See* Parker Objection at 5. However, it is unclear that plaintiffs would have been successful against the underwriters. Comparing the proposed settlement to a speculative recovery in the future is unreasonable.

[138]   *Wal-Mart Stores*, 396 F.3d at 118 (quoting 4 Newburg § 11.41, at 108).

thirty-six percent of the total class.[139]  As noted, over seven million notices were

sent to potential class members, and the Committee informed the Court at the

Fairness Hearing that GCG has received over 100,000 Proofs of Claim as of that

date.  GCG reports that as of August 25, 2009, it has received 371 requests for

exclusion.  As of the date of this Opinion, the Court has received objections from

approximately 140 class members – less than a hundredth of one percent.

Nevertheless, because many of the objectors have raised valid concerns, I will

discuss and respond to each of them.[140]

### i.      Notice Was Inadequate

Some class members opined that the Notice was inadequate and

incomplete.  For instance, Douglas Parker contends that the Notice fails to: (1) give

details of the 2005 proposed settlement so that class members can compare that

settlement with the current settlement; (2) set forth the aggregate amount of

---

[139]     *See Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987)
("We perceive no reason why a settlement cannot be considered fair despite
opposition from all who responded when the responding class members were
significantly less than half of the class.") (citing *TBK Partners, Ltd. v. Western
Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982)).

[140]     The vast majority of the objections related to the settlement amount.
The Court has responded to these objections in its discussion of whether the
proposed settlement is within the reasonable range of settlements.  *See supra* Part
IV.A.2.e.

estimated damages or the contributions of the underwriters to the settlement; (3)

provide evidence that the defendants are unable to withstand a greater settlement;

(4) disclose the reasons why five of the lead plaintiffs declined to approve the

settlement; and (5) disclose any information substantiating plaintiffs' counsel's

request for fees and expenses.[141] At the fairness hearing, a number of objectors

opined that the Notice was inadequate because it failed to provide information

substantiating the Committee's request for PSLRA lead plaintiff and class

representative awards not to exceed an aggregate of four million dollars.[142]

Objectors argued that class members need to know how much is being awarded to

these class representatives before they decide whether to participate in the

settlement.[143]

    As an initial matter, neither the PSLRA nor Rule 23 requires greater

disclosure than the contents of the Notice of Pendency that was disseminated in

these actions.[144] And although the PSLRA provides that a court may direct notice

---

[141]    *See* Parker Objection at 7-8.

[142]    *See* Fairness Hearing Tr. at 33:19:34:2.

[143]    *See id.* at 36:17-19.

[144]    *See* 15 U.S.C. § 78u-4(a)(7) (providing that the notice must include a
Statement of Plaintiff Recovery, Statement of Potential Outcome of Case,
Statement of Attorneys' Fees and Costs Sought, Statement of the Reasons for
Settlement, and must identify representatives of the plaintiffs' attorneys); Fed. R.

39

of additional information to class members, I noted at the fairness hearing that

providing too much information may also pose significant problems – doing so

may confuse class members and make it impossible for them to locate the

information in which they are most interested.[145] Nevertheless, I will discuss each

of the above objections in turn.

## The 2005 Settlement

Although I predicted that class members might compare the current

settlement to the 2005 settlement and therefore distinguished the two settlements in

my June Opinion and Order and again in this Opinion, that settlement should not

be a relevant factor in a class member's consideration of the current offer. The

2005 settlement was offered by the Issuer defendants prior to the Second Circuit's

---

Civ. P. 23(c)(2) (requiring that reasonable notice to the class must include "(i) the
nature of the action; (ii) the definition of the class certified; (iii) the class claims,
issues, or defenses; (iv) that a class member may enter an appearance through an
attorney if the member so desires; (v) that the court will exclude from the class any
member who requests exclusion; (vi) the time and manner for requesting
exclusion; and (vii) the binding effect of a class judgment on members under Rule
23(c)(3)"); *Wal-Mart Stores*, 396 F.3d at 114 (internal quotations and citation
omitted) ("There are no rigid rules to determine whether a settlement notice to the
class satisfies constitutional or Rule 23(e) requirements; the settlement notice must
fairly apprise the prospective members of the class of the terms of the proposed
settlement and of the options that are open to them in connection with the
proceedings.").

[145]     *See* Fairness Hearing Tr. at 65:3-10.

40

decisions in *Miles I* and *Miles II* and was derailed by those opinions. In any case, the settlements are easily distinguishable because the 2005 settlement was not only based on a larger expected recovery, but provided only a *guarantee* of recovery some time in the future.

## Aggregate Amount of Estimated Damages

Although the Notice does not include the aggregate amount of estimated damages for all 309 actions, it includes the estimated recovery for each of the actions, which is all that is required under the PSLRA.[146] A class member need only add all of the individual damages figures to obtain an aggregate figure. And while the Notice did not specify how much of the settlement is being paid by the underwriters as opposed to the issuers, the Court has since directed plaintiffs' counsel to disclose on the IPO website the fact that the bulk of the settlement is being paid by the underwriters and "a portion is being paid by the insurance companies for the Issuers."[147] The Court can now disclose that although the Underwriter defendants (and/or their insurers) and the insurers of the Issuer defendants participated in the settlement, no portion of the settlement is being paid

[146] *See* Schedule 2 to Notice of Pendency.

[147] IPO Securities Litigation website, http://www.iposecuritieslitigation.com/. This notice was posted on July 30, 2009, prior to the deadline for objections.

41

by the Issuer defendants themselves. Plaintiffs' counsel note that they have not been able to identify one case in which notice was deemed inadequate because of a lack of disclosure of the contributions of each defendant to the settlement, and objectors have cited to none.[148]

## Evidence of Defendants' Ability to Withstand Greater Judgment

As noted, whether the defendants can withstand a greater judgment is one of the *Grinnell* factors a court must consider when determining whether to approve a proposed settlement. However, this factor should not be over-emphasized. Just because a defendant is capable of making a larger payment does not mean that the settlement is inadequate. What is required is only a determination that the settlement is fair, reasonable, and adequate. Nevertheless, the Court has already held that this factor weighs against approval of the proposed settlement.

## Reasons that Five of the Lead Plaintiffs Did Not Approve the Settlement

Although the refusal of five lead plaintiffs to approve the settlement may appear troubling, the substitution of unnamed class members for named plaintiffs who fall out of a case because of settlement "is a common and normally

---

[148]    *See* Pl. Mem. at 28-29.

42

an unexceptionable [] feature of class action litigation . . . ."[149]  And the Committee

has informed the Court that those reasons cannot be disclosed without a waiver of

the attorney-client privilege with respect to communications between plaintiffs'

counsel and those five lead plaintiffs.[150]  The Committee also notes that none of

these five lead plaintiffs have opted out of the class, nor have any of them objected

to the settlement.[151]

### Substantiation of Request for Attorneys' Fees and Expenses

Pursuant to Court order, the Committee posted a short summary of the

work it has performed on this litigation on the IPO website.[152]  Class members

were therefore able to evaluate the request for fees in light of the work performed

in the litigation prior to the deadline for submission of objections.  In addition, the

request for attorneys' fees and expenses has since been filed with the Court and

posted on the IPO website, pursuant to Court order.[153]  An additional period of time

---

[149]     *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 00 Civ. 1898, 2006 WL 1004725, at *4 (S.D.N.Y. Apr. 17, 2006).

[150]     *See* Pl. Mem. at 29.

[151]     *See id.* at 9-10.

[152]     *See* Brief Summary of Work Performed By Plaintiffs' Counsel, http://www.iposecuritieslitigation.com/objectionsnew.php3.

[153]     *See* 8/17/09 Order; Memorandum of Law in Support of Plaintiffs' Executive Committee's Application for an Award of Attorneys' Fees,

has been extended to class members to object to plaintiffs' counsel's application.[154]
The Court has carefully considered these objections and the application in
determining the proper and fair amount to award to plaintiffs' counsel.[155]

### Substantiation of Request for PSLRA Awards

Some objectors opined at the fairness hearing that class members
could not consider the proposed settlement without information regarding each
individual lead plaintiff's or class representative's request for PSLRA awards.[156]
As noted at the fairness hearing, however, I am not aware of any settlement in

---

Reimbursement of Expenses for Plaintiffs' Counsel and an Award of Costs and
Expenses to Representative Parties, dated August 25, 2009,
http://www.iposecuritieslitigation.com/papers_d.pdf; Bernstein and Tadler Decl.,
http://www.iposecuritieslitigation.com/papers_c.pdf; Declaration of Neil Fraser,
plaintiffs' counsel, in Support of Plaintiffs' Executive Committee's Application for
an Award of Attorneys' Fees, Reimbursement of Expenses for Plaintiffs' Counsel
and an Award of Costs and Expenses to Representative Parties, dated August 25,
2009, http://www.iposecuritieslitigation.com/papers_e.pdf; Compendium of
Plaintiffs' Executive Committee Fee and Expense Affidavits,
http://www.iposecuritieslitigation.com/papers_h.pdf.

[154]    *See* 8/17/09 Order (giving class members the option of objecting in
writing by September 3, 2009 or objecting orally at the fairness hearing on
September 10, 2009).

[155]    *See infra* Part IV.E.

[156]    *See, e.g.*, Fairness Hearing Tr. at 36:17-37:16 (Bechtold's objection
on behalf of his clients who are class members); 51:15-18 (Penz's objection on
behalf of David Murray and Jackie Pio).

which a court has ruled on fee applications prior to providing notice to the class.[157] Moreover, the Notice included plaintiffs' counsel's request of awards to lead plaintiffs and class representatives not to exceed four million dollars. For purposes of deciding whether to participate in the settlement, the amount that individual lead plaintiffs or class representatives are requesting is irrelevant. Furthermore, as with the attorneys' fees, each award request has since been posted on the IPO website for review by class members.[158] Any argument that failing to give notice of such information by mail is in contravention of the PSLRA is erroneous. The Notice provides the information required by the PSLRA, including the maximum amount of the award request and the PSLRA Statement of Fees, Expenses and PSLRA Award Requests per damaged share.[159]

---

[157]    *See id.* at 27:1-6.

[158]    *See* Declaration of David Kessler, plaintiffs' counsel, Submitted in Connection with PSLRA Award Requests, dated August 25, 2009, http://www.iposecuritieslitigation.com/papers_f.pdf; Focus Case Plaintiffs' PSLRA Declarations, http://www.iposecuritieslitigation.com/papers_i.pdf; Non-Focus Case Plaintiffs' PSLRA Declarations (A-F), http://www.iposecuritieslitigation.com/papers_j.pdf; Non-Focus Case Plaintiffs' PSLRA Declarations (G-L), http://www.iposecuritieslitigation.com/papers_k.pdf; Non-Focus Case Plaintiffs' PSLRA Declarations (M-Q), http://www.iposecuritieslitigation.com/papers_l.pdf; Non-Focus Case Plaintiffs' PSLRA Declarations (R-Z), http://www.iposecuritieslitigation.com/papers_m.pdf.

[159]    One objector notes that he was a potential class member in other actions of which he had not received notice. *See* 8/8/09 Objection of James White at 1. However, the Second Circuit has held that "each and every class member

### ii.  Required Documentation Is Too Burdensome

A number of objectors noted that the documentation required to substantiate their claims is unreasonably burdensome considering the small recovery they will receive and the lapse of time since their investments.[160]  Some

---

need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members." *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988).  GCG notes that it first sent claim packets to over 5.8 million potential class members, over 2,400 potential class members in GCG's nominee database, and nineteen nominees and one underwriter defendant that had previously requested copies of the claim packet for forwarding to class members.  *See* Cirami Aff. ¶¶ 31, 32.  GCG received numerous names from various sources, including the underwriter defendants, after the initial mailing.  *See id.* ¶¶ 37-39.  It sent out over 580,000 additional claim packets to these potential class members.  *See id.*  It also engaged in extensive telephone outreach efforts to potential nominees which led to the mailing of approximately 240,000 additional packets.  *See id.* ¶¶ 40-47.  After over a million notices were returned undelivered, GCG also ran a search through the United States Postal Service's National Change of Address database to see if updated address information could be located.  *See id.* ¶ 49.  Such searches were run several times per week, and more recently, every business day.  *See id.*  GCG has re-mailed over 250,000 packets to potential class members for which an address has been found.  *See id.*  I find these efforts to be reasonable and consistent with class counsel's due process obligations.

[160]    *See, e.g.*, 7/6/09 Objection of Marc K. Unterhalter on behalf of Leon Unterhalter, Leon Unterhalter Revocable Trust, Lee Gail Unterhalter Revocable Trust, and Lee Gail Unterhalter ("The requirements to prepare documentation for a valid claim cost more in time and effort than any small settlement can compensate for."); 7/7/09 Objection of Earl Morgenstern ("Would I like to search for 9 year old records, complete claim forms, spend postage and pay taxes on $59?  No . . . ."); 7/7/09 Objection of Marilyn and Neil Bersch ("We received, in the mail, today six different offers to file a claim in this litigation.  What fun!  Six different opportunities to rummage through 10 years of financial records to see if we could

objectors question how plaintiffs' counsel and GCG have been able to locate enough information to identify potential class members but nonetheless cannot find the other information needed to substantiate class members' claims.[161] Plaintiffs' counsel respond that a "vast majority" of class members were notified during the 2005 settlement that they should retain documentation to support their claims.[162]

A requirement that potential class members provide documentation is not unusual in securities litigations. This measure is implemented for the purpose of reducing the number of fraudulent claims. Nevertheless, any documentation requirements must be reasonable in light of the time that has passed since many of

---

qualify for a piece of this significant 'pie' after the lawyers take their share . . . ."); 7/7/09 Objection of Mark A. Absher ("Who has records of stock transactions from 10 years ago? I have certain electronic records, dating back 7 years ago, and I believe that I'm the exception. Many of the brokerage firms with records are long gone."); 7/10/09 Objection of Michael G. Cowan ("To approve a settlement that requires documentation that is nearly 10-years old and not available and not recoverable is unfair and unreasonable to myself and I suspect many other members of the class.").

[161]    *See, e.g.*, 7/10/09 Objection of Brian L. Abrams ("The same discovery that revealed the identity of settlement class members through securities sales [should] also reveal[] purchase and sales data that verify class member[s'] claims are authentic . . . ."); 7/13/09 Objection of Fred C. Aldridge, Jr., Esq. ("Given the size of the proposed Settlement pool of five hundred eighty-[six] million dollars, the Class Plaintiffs and the Defendants should certainly be able to identify the members of each Class who are eligible to participate and the information required on Schedule C of the Proof of Claim or at least the number of shares or other securities purchased in the Class Period, on which a settlement could be based.").

[162]    Pl. Mem. at 27.

these securities were traded. The Court had therefore ordered plaintiffs' counsel and GCG to post a notice on the IPO website, notifying potential class members that they should submit all proofs of claim no matter the lack of appropriate documentation.[163] Thus, all potential class members who wish to participate in this settlement but who cannot locate appropriate documentation are nonetheless encouraged to submit their claims documents – GCG and plaintiffs' counsel are directed to attempt, in good faith, to determine each claim's eligibility for participation.

### iii. Claims Lack Merit

A few objectors contend surprisingly that the claims in this action have no merit. For instance, one class member opined that "[t]he lawsuit [is] frivolous. The only sin committed by the 309 companies was that they conducted their IPO[s] just before the bubble burst and the stock market crashed."[164] Two other objectors state, "[w]e believe the claims are without merit and therefore we

---

[163] *See* IPO Website, http://www.iposecuritieslitigation.com/ ("**SUBMIT YOUR CLAIM EVEN IF YOU CANNOT PROVIDE APPROPRIATE SUPPORTING DOCUMENTATION.** While there are no guarantees of eligibility, you may submit your claim even if you cannot locate the appropriate supporting documentation at this time. All claims will be considered by the Claims Administrator, Plaintiffs' Executive Committee and/or the District Court."). This notice was posted on the website on July 30, 2009.

[164] 7/8/09 Objection of Jeanne and Duncan MacVicar.

beg the court to rule against the plaintiffs."[165]  Yet another objector contends

"[w]ere this case to go to trial, it seems readily apparent that, while expensive, the

defense would win and the plaintiffs and their attorneys and representatives would

receive absolutely nothing."[166]  Finally, one objector believes that "the case is

based too much on plausibility and based insufficiently in reality.  The court

documents I reviewed indicate that nothing has been proved."[167]

Because the parties agreed to settle this litigation in the midst of

discovery, the Court has not made any rulings regarding the merits of the actions.

Nonetheless, this objection makes no sense – particularly in light of the fact that

the Issuer defendants are not contributing to this settlement.  That plaintiffs'

counsel were able to negotiate a settlement with defendants over allegedly weak

claims indicates that plaintiffs' counsel have represented their clients well.[168]

---

[165]  7/20/09 Objection of William and Claire Clausen.

[166]  7/21/09 Objection of Nan Buford Kipp ("Kipp Objection") at 2.

[167]  8/7/09 Objection of Kenneth Kuhn ("Kuhn Objection") at 1.

[168]  One objector compares the large fee the Committee has requested to the small recoveries each class member will receive and opines that the Court would only be encouraging plaintiffs' attorneys to file meritless claims for the purpose of receiving enormous fees. *See* Kipp Objection at 2 ("This kind of scurrilous litigation with no economic foundation (other than the enrichment of the attorneys involved through the 'legal' method of 'greenmail') continues to undermine the credibility of the legal system, drive up the costs of the administration of justice, drive up the costs of the pursuit of civil or criminal

### iv.    The Objections of Theodore Bechtold

On behalf of thirty-nine objectors, attorney Theodore Bechtold filed a

number of letters voicing objections to the proposed settlement.[169] Some of the

objections have been addressed above, such as the inadequacy of the settlement

amount and the inadequacy of the Notice.[170] Bechtold argues additionally,

however, that (1) the same person cannot serve as lead plaintiff in more than one

action, and (2) that this Court's "participation in some related IPOs" exacerbates

the concerns about possible conflicts of interest.[171]

---

justice in cases of actual economic damage and crowd the timely resolution of legitimate claims off the Court's dockets."). He argues that such litigation tactics should not be condoned by the Court. This objection is addressed in my discussion of attorneys' fees. *See infra* Part IV.E.2.b.vi.

[169]    *See* 7/22/09, 7/29/09, 8/5/09, and 8/9/09 Objections of Theodore Bechtold. Plaintiffs' counsel contend that Bechtold's representation of his clients and submission of objections against the proposed settlement violates Disciplinary Rule 1.9(b) of the New York Rules of Professional Conduct that provides that an attorney may not represent another client whose interests are materially adverse to the interests of a former client in the same litigation without the informed consent of the former client. *See* Pl. Mem. at 33-34 n.16. I also note that Bechtold's registration with the New York State Bar Association is listed as "delinquent." *See* Website of the New York State Bar Association, http://www.nysba.org/AM/Template.cfm?Section=Home&Template=/Templates/N YSBA_Home.cfm, last accessed on September 2, 2009. Both the allegation of misconduct by the Committee and Bechtold's delinquent status with the State Bar call into question his continued ability to serve as counsel for these objectors.

[170]    *See* 7/22/09 Objection of Theodore Bechtold.

[171]    8/9/09 Objection of Theodore Bechtold at 2.

Both of these contentions have been adequately addressed by the Court in previous opinions and rulings. For instance, in 2002, this Court held that it was appropriate for the same person to serve as a lead plaintiff in multiple IPO cases.[172] Moreover, I agree with plaintiffs' counsel's argument that such challenge has surely been waived when none of Bechtold's clients have ever questioned the appointment of any of the lead plaintiffs until now or moved to be appointed lead plaintiff or class representative.[173] Bechtold's second objection was also addressed in one of my previous decisions.[174] I held there that I had nothing more than a "'remote, contingent, or speculative'" interest in the litigation and therefore dismissed any claim that there was a conflict of interest.[175]

Bechtold also submitted a letter that criticizes the appointment as lead plaintiff in several cases in this litigation of Saul Kassin, who Bechtold claims is the same Saul Kassin that was arrested recently on federal money laundering

---

[172]    *See In re Initial Pub. Offering Sec. Litig.*, 224 F.R.D. 550, 555 n.23 (S.D.N.Y. 2004) (citing Transcript of April 16, 2002 Hearing).

[173]    *See* Pl. Mem. at 34.

[174]    *See In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 70, 92 (S.D.N.Y. 2001).

[175]    *Id.* (quoting *Hook v. McDade*, 89 F.3d 350, 356 (7th Cir. 1996), *cert. denied*, 519 U.S. 1071 (1997)).

charges.[176]  Bechtold argues that Saul Kassin's involvement in this case "taints [the] involvement of [all of the Kassins] in the IPO Securities Litigation . . . ."[177] The Committee has confirmed that the Saul Kassin that is serving as lead plaintiff in several cases is not the same man as the Saul Kassin that was arrested.[178] Bechtold's arguments are therefore rejected.[179]

## v.    Conclusion

Having carefully considered and addressed the objections to the proposed settlement, I conclude that the *Grinnell* factors weigh – on balance – in favor of approving the proposed settlement.  I therefore find that the proposed settlement is fair, reasonable, and adequate, and the settlement is hereby approved.

## B.    Class Certification

In addition to challenging the fairness of the settlement, some of the objectors also criticized the Court's certification of the settlement classes in these actions.  I will address each of these issues in turn.

---

[176]    *See* 7/29/09 Objection of Theodore Bechtold.

[177]    *Id.* at 1.

[178]    *See* Pl. Mem. at 35.

[179]    Bechtold submitted two letters challenging the proposed settlement after the objections period had concluded.  This Court has not considered those letters because they were untimely.

## 1. Class Definition

JKM Company contends that the class definition incorrectly includes investors "who were damaged."[180] JKM Company suggests that the class certification should include only those individuals who purchased shares of the Subject Securities during the class period regardless of whether they were damaged.[181] It argues that inclusion of such a phrase in the class definition "(1) does not provide a precise, objective and presently ascertainable way to identify class members, (2) requires a 'mini trial' to determine whether a particular person is in the class, and (3) requires the Court to address the central issue of liability (whether a person has suffered damages)."[182]

This argument has no merit. Class definitions are important because (1) they identify the individuals who are precluded from bringing suit in the future, in accordance with the Stipulation's bar provision, and (2) they identify the individuals who may recover pursuant to the Plan of Allocation.

*First*, an investor who was not damaged by defendants' alleged misconduct would not otherwise be able to bring a claim based on the same

---

[180]    8/6/09 Objection of JKM Company ("JKM Objection") at 2.

[181]    *See* Fairness Hearing Tr. at 19:21-22 (arguing that including the phrase "and damaged thereby" is problematic).

[182]    JKM Objection at 3.

53

misconduct in a subsequent action. It is therefore of little consequence that the class definition contains the "and were damaged thereby" phrase.[183] For purposes of determining who can bring suit in the future, that phrase is simply superfluous because an investor who is not damaged would not have a viable claim.

*Second*, at the fairness hearing, JKM Company argued further that it could not ascertain easily whether it was a member of the class because the phrase "and were damaged thereby" was not defined.[184] But an investor incurs damages on his, her, or its purchase by losing money. A quick look at trading records would

---

[183] Ironically, others – erroneously believing that the class definition *failed* to exclude those investors who profited from the alleged manipulative scheme – argue that the class definition is unfair and overbroad. *See* 8/4/09 Objection of Ronald L. Haddad ("Haddad Objection") at 2 (noting that "'releasing claims of parties who receive[] no compensation in the settlement is a recurring potential abuse of the class action settlement process'") (quoting *Manual for Complex Litigation*, Fourth, § 21.61); *see* 8/10/09 Objection of Lester Baum, Mike Hart, and Sue Shadley ("Baum, Hart, and Shadley Objection") at 8-11 (arguing that the putative settlement class is overbroad because the class definition does not parallel the class definition rejected by the Second Circuit in *Miles I* which required investors to have been damaged in order to participate as class members). It should be noted that although Haddad calls himself an "objector" to the proposed settlement, the profit that he made from his trades renders him ineligible to be a class member and an objector. *See* Haddad Objection at 2 (noting that Haddad had sold his shares in Handspring, one of the Subject Securities, for a profit). Because those individuals who were not damaged by defendants' alleged misconduct have no viable claims, certification of a class that included such individuals and releasing their claims would have no practical significance.

[184] *See* Fairness Hearing Tr. at 20:21-21:7 (arguing that a mini-trial would be necessary to determine JKM Company's membership in the class).

54

show whether JKM Company had lost money on its investments. Thus, the cases to which JKM Company cites are inapposite. *Chiang v. Veneman* and *Williams v. Glickman* are discrimination cases.[185] In these cases, the Third Circuit and a district court in the District of Columbia rejected class definitions that required a determination as to whether potential class members suffered discrimination.[186] Similarly, in *Kenro, Inc. v. Fax Daily, Inc.*, the district court refused to certify a class defined as "all persons or entities who have received . . . a publication from Fax Daily, Inc. . . . without the prior expressed invitation or permission of such person or entity."[187] In each of these cases, class membership hinged on the courts' ability to determine whether an individual was discriminated against or whether he or she had invited the advertisements, necessitating individual mini-trials.[188] This

---

185 *See Chiang*, 385 F.3d 256 (3d Cir. 2004); *Williams*, No. 95 Civ. 1149, 1997 WL 33772612 (D.D.C. Feb. 14, 1997).

186 *See Chiang*, 385 F.3d at 260 (defining the proposed class in pertinent part as "[a]ll persons who are Black, Hispanic, female and /or Virgin Islanders . . . who believe they were discriminated against on the basis of race, gender or national origin."); *Williams*, 1997 WL 33772612, at *3 (defining the proposed class in pertinent part as "[a]ll African American or Hispanic American persons who, between 1981 and the present, have suffered from racial or national origin discrimination in the application for or the servicing of loans or credit from the FmHA (now Farm Services Agency) of the USDA . . . .").

187 962 F. Supp. 1162, 1169 (S.D. Ind. 1997).

188 *See In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 n.1 (S.D.N.Y. 2005) (contrasting the class definition in that case – which identified

55

is not the case here.

Moreover, the Plan of Allocation defines how damages will be
determined. Those who believe they have been damaged will submit their proofs
of claim, and each claim will be evaluated based upon an objective formula
pursuant to the Plan of Allocation. Thus, to the extent that JKM Company is
questioning how a determination will be made regarding who has been damaged,
its objection is properly directed to the Plan of Allocation, which I discuss later in
this Opinion.[189]

Finally, while this particular issue has never been addressed by the
Second Circuit, the Fifth Circuit has affirmed a class definition with the phrase

---

class members as those who purchased securities during the class period and "who
suffered losses by reason of defendants' manipulation" – to the class definition in
the 2004 class certification in this litigation and noting that where the definition
includes the phrase "and were damaged thereby," "[i]t is readily ascertainable from
an examination of a potential class member's trading records of that specific
security whether that investor suffered damages, *i.e.*, a financial loss, as a result of
purchasing that security").

[189]    *See infra* Part IV.C. Plaintiffs' counsel have also pointed to a decision
of the Second Circuit approving a plan of allocation that distributed the proceeds of
a settlement fund only to class members who suffered out-of-pocket losses as a
result of the defendants' alleged fraudulent conduct. *See* Pl. Mem. at 30 (citing
*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84
(2d Cir. 2006)).

"and were damaged thereby"[190] and similar classes have been certified by other courts in this district.[191]   JKM Company's objection is therefore unfounded.

## 2.   Class Period

Objector James J. Hayes contends that the class period is too long because any alleged inflation would have dissipated after the first quarterly earnings statement was issued by each issuer, apprising potential class members of the actual value of their investments and uncovering possible manipulation.[192] However, whether the first earnings report of any of the issuers would have informed shareholders and potential investors about the true value of their investment is an issue common to all class members.  Class certification requires only that the Court assess whether each element of plaintiffs' claim can be resolved class-wide.  The question of whether plaintiffs could succeed in showing that the alleged inflation persisted for the entire class period is properly addressed after

---

[190]    *See Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 129 n.2, 140 (5th Cir. 2005).

[191]    *See, e.g.*, *In re Parmalat Sec. Litig.*, No. 04 Civ. 30, 2008 WL 3895539, at *1 (S.D.N.Y. Aug. 21, 2008); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 114 (S.D.N.Y. 2008); *In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 344715, at *1.

[192]    *See* 8/10/09 Objection of James J. Hayes ("Hayes Objection") at 1-2.

class certification.[193]

### 3. Adequacy of Representation

Hayes also claims that the Court failed to find by a preponderance of the evidence the adequacy of the representation with respect to plaintiffs' counsel.[194] In the June Opinion and Order, I appointed class counsel pursuant to Rule 23(g), noted that several of the findings that I made in 2004 regarding class certification would not change even when evaluated against the preponderance of the evidence standard, and found that plaintiffs had satisfied the adequacy of representation requirement with respect to *class representatives*.[195] I will now address the adequacy of representation with respect to *plaintiffs' counsel*.

In order to conclude that the adequacy of representation requirement has been satisfied, courts must determine that "plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[196] Each of the firms that comprise

---

[193] Hayes also argues throughout his letter that the Court's finding of market efficiency in each of the stocks is not consistent with prolonged periods of inflation. *See id.* at 5-6. This argument was addressed in the Court's June Opinion and Order. *See In re Initial Pub. Offering Sec. Litig.*, 2009 WL 1649704, at *22.

[194] *See* Hayes Objection at 2-4.

[195] *See In re Initial Pub. Offering Sec. Litig.*, 2009 WL 1649704, at *11 & *11 n.138.

[196] *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291

the Committee has tremendous experience in complex securities litigation.[197] They

have secured multi-million dollar settlements in a number of class actions, have

won awards for their advocacy, and been praised by judges in other litigation.[198]

They have expended enormous resources to litigate these actions and negotiate this

settlement, as is clear from the documentation they have submitted in support of

their fee and expense request. They are knowledgeable about the issues and have

vigorously represented the interests of class members. Hayes notes that counsel

are inadequate because the recovery they negotiated was small compared to the

expected damages,[199] but that is properly an objection to plaintiffs' counsel's fees,

rather than to the adequacy of their representation. I therefore hold that the

---

(2d Cir. 1992)).

[197]    *See* Firm Resume of Bernstein Liebhard LLP ("Bernstein Liebhard
Firm Resume"), Ex. 1 to Bernstein Decl., at 1; Firm Resume of Milberg LLP
("Milberg Firm Resume"), Ex. 1 to Fraser Decl., at 1; Firm Resume of Barroway
Topaz Kessler Meltzer Check LLP, Ex. 1 to Kessler Decl., at 1; Firm Resume of
Sirota & Sirota LLP, Ex. 1 to Sirota Decl., at 1; Firm Resume of Stull, Stull &
Brody LLP, Ex. 1 to Brody Decl., at 1; Firm Resume of Wolf Haldenstein Adler
Freeman & Herz LLP ("Wolf Haldenstein Firm Resume"), Ex. 1 to Isquith Decl.,
at 2-3; Firm Resume of Lovell Stewart Halebian LLP, Ex. 1 to Stewart Decl., at 1.

[198]    *See, e.g.*, Milberg Firm Resume at 1 (noting settlements in the
millions and billions); Bernstein Liebhard Firm Resume at 1 (noting that the firm
was one of only two firms named by The National Law Journal to the "Plaintiffs'
Hot List" for six years in a row); Wolf Haldenstein Firm Resume at 1 (noting that
it has received judicial recognition for work performed on other litigations).

[199]    *See* Hayes Objection at 2.

59

adequacy of representation requirement has been met.

### 4. Knowledge

Leslie Baum, Mike Hart, and Sue Shadley, through counsel, filed a joint letter contending that the new settlement class definition does not resolve the question of knowledge.[200] They note that although the settlement classes have been narrowed to exclude those *institutional investors* who received allocations in the IPOs, they do not exclude *natural persons* who were identified as recipients of an allocation of shares from the "institutional pot."[201] However, the Second Circuit in *Miles I* was largely concerned with the knowledge of institutional investors who were initial allocants and their employees.[202] Also, the Amended Master Allegations state that "the overwhelming majority of retail allocants, who generally receive relatively small allocations, also traded in ignorance of the scheme, as the Underwriter Defendants focused their requirements on certain investors, who generally receive relatively large allocations."[203]

Additionally, this Court has held that plaintiffs are entitled to a

---

[200]    *See* Baum, Hart, and Shadley Objection at 3-5.

[201]    *See id.*

[202]    *See Miles I*, 471 F.3d at 43.

[203]    Am. Master Allegations ¶ 35.

presumption of reliance.[204] While some natural persons who received initial allocations *may* have possessed knowledge of the scheme, objectors have not produced evidence to show that the number of such investors was more than a very small percentage of retail investors. Thus, the presumption remains unrebutted.

Finally, in *Miles I*, the Second Circuit noted in particular plaintiffs' identification of more than eleven thousand institutions and individuals that were allegedly induced into improper trading arrangements by defendants, ruling that this statistic called into doubt the vitality of the presumption of reliance.[205] Plaintiffs have determined that seven thousand "unique entities (other than natural persons) [] received allocations from an institutional pot list."[206] That means that only four thousand retail allocants *may* have been aware of the scheme. When these investors are compared to the more than one hundred thousand class members who have submitted proofs of claim thus far, it is clear that common issues will predominate over individual issues. The exclusion of institutional investors who were initial allocants from the classes therefore resolves the predominance problem.

---

[204] *See Initial Pub. Offering Sec. Litig.*, 2009 WL 1649704, at *18.

[205] *See Miles I*, 471 F.3d at 43.

[206] Pl. Mem. at 24.

61

## 5. Reliance

Baum, Hart, and Shadley also challenge the application of the *Affiliated Ute* presumption to cases involving price manipulation.[207] They cite to the Ninth Circuit case of *Desai v. Deutsche Bank Securities, Ltd.* for the proposition that the presumption is only applicable to cases that "'can be characterized as . . . primarily alleg[ing] omissions'" and that "'manipulative conduct has always been distinct from actionable omissions.'"[208] Because the Court held in its June Opinion and Order that plaintiffs had failed to show by a preponderance of the evidence that the markets for shares were efficient during the quiet period for each stock and therefore that plaintiffs are not entitled to rely on the *Basic* presumption,[209] Baum, Hart, and Shadley argue that the class should exclude all investors who purchased during the quiet periods.[210]

However, *Affiliated Ute* itself was a case based on manipulative

---

[207]　Plaintiffs in a securities fraud omission case are entitled to rely on the *Affiliated Ute* presumption for satisfaction of the reliance requirement so long as plaintiffs show that defendants had an obligation to disclose the information and the information withheld is material. *See Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154 (1972).

[208]　Baum, Hart, and Shadley Objection at 6-7 (quoting *Desai v. Deutsche Bank Sec., Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009)).

[209]　*See In re Initial Pub. Offering Sec. Litig.*, 2009 WL 1649704, at *18.

[210]　*See* Baum, Hart, and Shadley Objection at 7-8.

conduct. *Affiliated Ute* involved the partition of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah.[211] According to the articles of the Ute Distribution Corporation ("UDC") – the corporation that was established for the purpose of managing the assets – any mixed-blood shareholder wishing to sell his shares in the UDC was required to offer a right of first refusal to other full-blood and mixed-blood members of the tribe prior to making the same offer to a non-member.[212] In violation of the UDC articles, two non-Indian men – employees of the bank that was the transfer agent of these shares – concocted a scheme whereby they solicited and purchased UDC shares from mixed-blood Indians for themselves or for other non-Indian purchasers and made a profit doing so.[213] The Supreme Court concluded that "defendants had devised a plan and induced the mixed-blood holders of UDC stock to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell" such as that they were profiting from their purchases of shares.[214] The Court thus held that in this situation, involving "primarily a failure to disclose,

---

[211]    *See Affiliated Ute*, 406 U.S. at 133-34.

[212]    *See id.* at 137.

[213]    *See id.* at 148-49.

[214]    *Id.* at 153.

positive proof of reliance is not a prerequisite to recovery."[215]

Similarly, here, plaintiffs allege that defendants engaged in a scheme to induce the purchase of IPO shares at inflated prices and for undisclosed compensation and also sustained the price inflation by publishing misleading analyst reports.[216] They further allege that defendants failed to disclose the nature of the scheme and the underwriter and analyst compensation in the prospectuses that were sent to investors.[217] The Supreme Court specifically contemplated that *Affiliated Ute* would apply in this situation. And the Second Circuit has given no indication that the *Affiliated Ute* presumption should not apply in this case.[218] This argument is therefore rejected.

### 6. Conclusory Objections

Finally, a number of objectors argue conclusorily that the settlement

---

[215] *Id.*

[216] *See* Am. Master Allegations ¶¶ 32, 36, 86.

[217] *See id.* ¶¶ 33, 35.

[218] If the Circuit has given *any* indication, it is that the *Affiliated Ute* presumption *is* available in omissions cases where the plaintiff alleges that the defendant failed to disclose the price manipulation. *See, e.g.*, *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) (in a price manipulation case, indicating that the plaintiff may rely on the *Affiliated Ute* presumption because defendants had failed to disclose the scheme but that in any event he was entitled to the *Basic* presumption and that defendants had presented insufficient evidence that he had not relied on the price when purchasing the stock).

64

classes should not be certified because the revised class definition does not adequately resolve issues of reliance, causation, and ascertainability.[219] In my June Opinion and Order, I discussed in detail plaintiffs' burden in meeting these requirements. I found that plaintiffs had demonstrated by a preponderance of the evidence that reliance and loss causation could be proven on a class-wide basis and determined that the settlement classes were ascertainable. Nothing in these objections persuade me of the need to revisit the conclusions in my June Opinion and Order. I am therefore fully satisfied that plaintiffs have demonstrated by a preponderance of the evidence that the class certification requirements have been

---

[219]    *See* 8/4/09 Objection of David Murray and Jackie Pio ("While manageability may no longer be a concern in a settlement context since there will be no trial, the reasons that led the Second Circuit to reverse certification – reliance, causation, and ascertainability – are not eliminated by the settlement."); 8/10/09 Objection of Timothy Sears ("[T]he class certification will likely be reversed by the Second Circuit as it did in [*Miles I*]. This settlement has not eliminated the issues that led to reversal of certification in *Miles*: reliance, causation and ascertainability."). Plaintiffs note that the counsel that represent these objectors are professional objectors. For instance, they inform the Court that attorney John Pentz, who filed the objection on behalf of David Murray and Jackie Pio, has been criticized by courts for his canned objections. *See In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853, 2007 WL 4225486, at *3 (S.D.N.Y. Nov. 28, 2007) (calling Pentz and another attorney's arguments "counterproductive" and "irrelevant or simply incorrect"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006) (noting that Pentz is a professional objector who "attached himself" to a plaintiff and holding that his objection was "not well reasoned and was not helpful."); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (faulting Pentz for failing to articulate his client's argument and putting forth "conclusory assertions" in his client's written objection).

met.

**C.    Plan of Allocation**

A Plan of Allocation has been recommended by plaintiffs' counsel, a

group of competent and qualified counsel. As such, I need only review the plan to

confirm that it has a reasonable, rational basis. After a thorough review of the

plan, I conclude that it is fair and reasonable.

Because defendants would only agree to a global settlement of all of

the actions, the parties propose a minimum designation from the Settlement Fund

of $300,000 per case in this settlement.[220] Plaintiffs' counsel assert that the

purpose of this "floor" is to allow class members from each of the actions to

participate meaningfully in the proposed settlement even where the expected

damages for such action was comparatively small.[221] Only thirty-five cases will

receive a $300,000 minimum designation, and the total additional designations to

these cases is $3,925,139 over the amount that would be paid if no "floor" were to

apply.[222] Because only a small portion of the gross settlement fund is deducted in

order to provide these minimum designations and such decrease in the fund affects

[220]    *See* Notice of Pendency at 8.

[221]    *See* Pl. Mem. at 25.

[222]    *See* Notice of Pendency at 8.

66

the remaining 274 actions equally, I find that these minimum designations are reasonable and just.

According to the Plan of Allocation, each Authorized Claimant will receive a pro rata share of the Net Settlement Fund in proportion to the damages he or she sustained.[223] Where Subject Securities are purchased *and sold* during the class period, an Authorized Claimant's "Recognized Claim" is calculated as the lesser of either the difference between the alleged inflation of the shares at the time of purchase and the alleged inflation at the time of sale or the difference between the purchase price paid and the sales proceeds received.[224] Where Subject Securities are purchased during the class period *and held* throughout the rest of the class period, the Recognized Claim is equal to the inflation per share at the date of purchase multiplied by the number of shares purchased during the class period.[225]

The Plan of Allocation also provides a minimum claim amount. Each Authorized Claimant with a valid Recognized Claim will receive – at a minimum – ten dollars no matter how small his, her, or its Recognized Claim.[226] Many of the

---

[223]   *See id.* at 14.

[224]   *See id.* at 14-15.

[225]   *See id.* at 15.

[226]   *See id.*

objectors have calculated their recovery to be insubstantial. They complain that the proposed settlement is insufficient to cover postage for the proof of claim and the efforts expended to retrieve documents.[227] Just as the minimum designation amounts are necessary and reasonable to enable each case to participate meaningfully in the proposed settlement, a minimum claim amount is required to enable class members with relatively small claims to participate meaningfully.

Finally, any excess from the Net Settlement Fund in a case will be re-directed to satisfy the Recognized Claims of Authorized Claimants in all other cases.[228] No Authorized Claimant will be paid more than his or her Recognized Claim until all Authorized Claimants have been paid fully.[229] In the unlikely scenario that there are remaining funds after distribution, they will be pooled together and distributed to all Authorized Claimants in proportion to each

---

[227] *See, e.g.*, 7/6/09 Objection of Erin Hall Meade ("The amount of settlement monies paid out to damaged sharesholders relative to the amount paid out to attorneys seems disproportionately small . . . . For the paltry amount I would receive, it is not worthwhile for me to fill out the required paperwork."); 7/17/09 Objection of Greg Linden ("For investors with 1000 or less shares, the [] burden of filing the documentation exceeds the expected payment from the settlement."); 7/28/09 Objection of Tomaz Slivnik ("In my own case, by the time I have read all the paperwork, paid for postage and bank charges, I have spent the entire amount of the proposed compensation and then some.").

[228] *See* Notice of Pendency at 14.

[229] *See id.*

Authorized Claimant's "Unpaid Market Loss."[230]  No objections have been received with respect to the Plan.  Because I find that the Plan is fair and reasonable, it is hereby approved.

### D.    PSLRA Awards

The Committee has submitted a request for PSLRA awards on behalf of 439 lead plaintiffs, class representatives, and settlement class representatives in the 309 actions.  As explained in the Notice, the Committee is seeking no more than four million dollars in awards for class representatives.

Section 27(a)(4) of the PSLRA mandates that a class representative should not receive a greater share of the settlement than other class members.[231]  Nevertheless, it also permits this Court to award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class."[232]  In a number of recent district court decisions in this Circuit, the court declined to award reasonable fees and expenses where the representative failed to show how the expenditure of time "'resulted in actual losses, whether in the form of diminishment in wages, lost sales commissions, missed business opportunities, use

---

[230]    *See id.*

[231]    *See* 15 U.S.C. § 78u-4(a)(4).

[232]    *Id.*

of leave or vacation time or actual expenses incurred.'"[233]  Indeed, the language of

section 27(a)(4) indicates the intent that no class representative benefit

disproportionately from a settlement.

The Court has reviewed all of the declarations submitted in support of

the PSLRA applications.  Each declaration is based on a form declaration; the only

unique information is the hours the representative attests to spending on the

litigation and his or her hourly wage, if employed.[234]  If the representative was

employed by the hour, he or she was instructed by counsel to provide his or her

highest hourly rate.[235]  If the representative was employed in salaried work, he or

she was instructed to take his or her highest annual income and divide it by 2,080

hours to determine the appropriate hourly rate.[236]  If the representative was not

employed during the litigation, he or she was instructed by counsel to request an

---

[233]     *In re Merrill Lynch & Co., Inc. Research Reports Sec.*, No. 02 MDL
1484, 2007 WL 313474, at *25 (S.D.N.Y. Feb. 1, 2007) (quoting *In re KeySpan
Corp. Sec. Litig.*, No. 01 Civ. 5852, 2005 WL 3093399, at *21 (E.D.N.Y. Sept. 30,
2005)). *Accord In re AMF Bowling*, 334 F. Supp. 2d 462, 470 (S.D.N.Y. 2004)
("There is no assertion that either [class representative] lost time at work or gave
up employer-granted vacation time.  Neither cites to lost sales commissions nor
missed business opportunities.").

[234]     *See* Kessler PSLRA Decl. ¶ 3.

[235]     *See id.* ¶ 4.

[236]     *See id.*

hourly wage of twenty-five dollars per hour.[237]  In some declarations, the paragraph

that provides this information includes the following sentence: "Had I not been

working on this litigation, the time I spent would have otherwise been directly

devoted to my employment as a _____ and therefore amounts to foregone income

opportunities."[238]  Other declarations do not contain this sentence.[239]

Each declaration further provides that the representative reviewed

drafts of pleadings, pleadings, and other documents pertinent to the litigation.[240]

Each representative also attests to having completed a "detailed" questionnaire that

was provided to defendants.[241]  Each declaration states that the representative has

not been "provided or promised any consideration or benefit, directly or indirectly .

. . ."[242]  Finally, each declarant states that "[a]t all times during this litigation, I

---

[237]     *See id.*

[238]     *See, e.g.*, 8/13/09 Declaration of Saswata Basu ("Basu Decl."), Ex. 1
to Focus Case Plaintiffs' PSLRA Declarations ("Focus Case Decl."), ¶ 8.

[239]     *See, e.g.*, 7/13/09 Declaration of Greg Antoniono ("Antoniono
Decl."), Ex. 15 to Non-Focus Case Plaintiffs' PSLRA Declarations ("Non-Focus
Case Decl."), ¶ 5 (attesting only that he was a Manager of Strategic Sourcing for a
Health Insurance Company during the course of this litigation and informing the
court of his maximum compensation level).

[240]     *See, e.g.*, Basu Decl. ¶ 7.

[241]     *Id.*

[242]     *Id.* ¶ 9.

have taken my obligations as representative party seriously and have been committed to performing my duties in a manner that benefits the best interests of the Class."[243]  Plaintiffs' counsel, David Kessler, informs the Court that a number of focus case representatives sat for depositions during the litigation and their declarations reflect the work performed for those depositions.[244]

Those representatives who were unemployed during the litigation have submitted declarations attesting that they were not working and requesting twenty-five dollars per hour for work performed on this litigation. The PSLRA makes clear that only lost wages may be awarded. Simply put, unemployed representatives cannot show that they incurred any lost wages. Their requests are therefore denied.

The requests of those representatives who were employed during the litigation but who attest only to the hours spent on this litigation and their hourly rate are also denied. These representatives make no mention of having *lost* wages as a direct result of the work performed on these cases and thus are not entitled to awards for lost wages.

That leaves those representatives who were employed during the

---

[243]     *Id.* ¶ 10.

[244]     *See* Kessler PSLRA Decl. ¶ 5.

litigation and who attest that they "would have" otherwise devoted time spent on this litigation to their employment. I note that the declarations of these representatives fail to give further details of the vacation time foregone to perform work for this litigation or that work for this litigation was performed during normal working hours. Such generalized assertions would, under other circumstances, be insufficient. Nevertheless, given the extraordinary length of this litigation and the difficulties I suspect many representatives encountered difficulties identifying the occasions in which lost wages were incurred, such assertions are sufficient. However, I cannot refrain from making certain observations regarding these requests.

As noted by a number of objectors who appeared at the fairness hearing, some of the requests are plainly excessive.[245] For instance, Saswata Basu – a class representative and settlement class representative in the Lante Corporation, Neoforma, Onvia.com, Ventre Corporation, Corvis, and Avenue A actions and lead plaintiff in the Lante Corporation, Neoforma, Corvis, and Avenue A actions – attests to spending 1,200 hours "monitoring the progress of the case" and reviewing "drafts of pleadings, pleadings, discovery requests and various

---

[245]     *See* Fairness Hearing Tr. at 26:14-15 (objection of Steve Miller); 34:24-35:8 (objection of Bechtold).

73

status letters" provided by counsel in this litigation.[246] Because he is an entrepreneur who would have otherwise spent the time on other opportunities, he asks for $500 per hour.[247] Basu thus requests a total of $600,000 for his representation of the classes.[248] Such request is exorbitant when measured against any scale of reasonableness.

A number of representatives hold executive positions in corporations and are paid handsomely. For instance, Marc Gelman, lead plaintiff, class representative, and settlement class representative for ITXC, is the Chief Executive Officer of Enhanced Affordable Development and ZRS Construction.[249] He asks to be paid at his hourly rate of $2,000.[250] He attests to spending thirty-five hours performing work as a class representative and therefore requests a total award of $70,000.[251] Jack Schwartz, lead plaintiff of Drkoop.com, is the President of Jack

---

[246]    Basu Decl. ¶¶ 6-7.

[247]    *See id.* ¶ 8.

[248]    *See id.*

[249]    *See* 7/22/09 Declaration of Marc Gelman, Ex. 145 to Non-Focus Decl., ¶¶ 2, 3, 4, 8.

[250]    *See id.* ¶ 8.

[251]    *See id.*

Schwartz Shoes, Inc.[252] In that capacity, he makes \$1,200 per hour.[253] Because he

spent 120 hours on this litigation, he requests an award of \$144,000.[254]

In yet other instances, class representatives requested a fee award that

exceeds the hours spent working on this litigation multiplied by their hourly rate.[255]

The declarations provide no explanation for why the requested amount exceeds the

lost wages.

After reviewing all of the declarations, I am imposing the following

rules to ensure the reasonableness of the fee awards. *First*, I have limited the hours

expended by each representative eligible to receive an award to the median number

of hours expended by focus case representatives and the median number of hours

spent by non-focus case representatives. The median number of hours for focus

case representatives is one hundred hours. The median number of hours spent by

representatives in non-focus cases is fifty hours. Although a number of individuals

are serving as class representatives in multiple actions, all 309 actions have

---

[252]    *See* 7/23/09 Declaration of Jack Schwartz, Ex. 349 to Non-Focus
Decl., ¶¶ 2, 6.

[253]    *See id.* ¶ 6.

[254]    *See id.*

[255]    *See, e.g.*, 7/22/09 Declaration of Claude Amsellem, Ex. 12 to Non-
Focus Case Decl. ¶ 8 (attesting to spending forty-seven hours on this litigation at
eighty-five dollars per hour and requesting \$7,990).

proceeded during the last eight years as one consolidated action, and these representatives should not have performed a substantially greater amount of work than those who are representatives in only one action.

*Second*, I am also imposing a two hundred dollar cap on the hourly rate of all representatives. This is appropriate given that all representatives were instructed by counsel to provide their highest hourly rate notwithstanding that this litigation has been ongoing for eight years, and therefore, these individuals may not have been earning the hourly rate requested for the entire period. In addition, awarding these individuals such high rates without documentation substantiating their compensation or providing further details regarding specific instances of lost wages would be unjust.

*Third*, some class representatives attested to being employed for only part of the litigation period, without specifying the length during which they were employed. For those representatives, I limited the number of hours of work performed at half of their reported hours.

*Fourth*, a few class representatives also request out-of-pocket expenses. For instance, Abraham Kassin, a class representative and settlement class representative in nineteen actions and lead plaintiff in seven actions, requests $18,960 in expenses for "obtaining documents, copying documents, [] shipping

documents, and meeting with counsel, among other things."[256] There is no

itemized list, nor are any receipts attached to substantiate these costs. Another

representative attaches receipts to substantiate his expenses, but there is also an

indication that the expenses were already reimbursed by plaintiffs' counsel.[257]

Only one representative attests to having incurred out-of-pocket expenses of fifty

dollars and informs the Court that receipts will be produced if requested.[258]

Because no representative properly submitted an itemized list of expenses, attached

receipts, *and* attested that none of the expenses had already been reimbursed, I

decline to grant any request for out-of-pocket expenses.[259]

Based on the above rules, I have determined the awards of each lead

plaintiff and class representative. A list of these awards is appended to this

---

[256]    7/17/09 Declaration of Abraham Kassin, Ex. 204 to Non-Focus Case
Decl., ¶ 8.

[257]    *See* 7/28/09 Declaration of Paulsen K. Bailey, Ex. 27 to Non-Focus
Case Decl. (attaching receipts for expenses associated with fulfilling his
representative duties, but also an invoice addressed to Neil Fraser, plaintiffs'
counsel, for such expenses).

[258]    *See* Antoniono Decl., Ex. 15 to Non-Focus Case Decl., ¶ 5.

[259]    Finally, there are two class representatives in the non-focus cases who
capped their own requests. In other words, although they could have requested a
higher award based on the number of hours spent and multiplied by their hourly
rate, they have requested a lower amount. Because in both cases, their requested
amount was less than the maximum I have awarded others in non-focus cases, I
granted their requests without modification.

Opinion and Order as Exhibit 1. The PSLRA awards for class representatives total $1,303,593.05.

## E. Attorneys' Fees and Reimbursement of Expenses

Almost all of the objectors criticized the amount of the requested attorneys' fees, claiming that plaintiffs' counsel are getting a big pay day at the expense of class members. Without denigrating these objections, one point is worth making at the outset. A class action is a policy device that was designed to "overcome the problems that small recoveries do not provide the incentive for any individual to bring a sole action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually the attorney's) labor."[260] It is precisely the promise of a reasonable fee that encourages plaintiffs' attorneys to accept cases such as these and risk spending their own financial resources and personal efforts for years until recovery can be obtained for the class. Nevertheless, the Second Circuit has instructed district courts considering fee requests by class action counsel to act "as a fiduciary who must serve as a guardian of the rights of absent

---

[260]    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

class members."[261]

## 1. Reimbursement of Expenses

The Committee requests $50,354,709.03 in expenses on behalf of all

of the firms that comprise plaintiffs' counsel.[262] These expenses alone represent

approximately 8.6 percent of the gross settlement fund. In support of these

expenses, the Committee has submitted a summary expense report for each of the

firms comprising the Committee and a summary report of the expenses for all of

the other firms.[263] These costs include routine expenses relating to copying, court

fees, postage and shipping, staff overtime, phone charges, and travel and

transportation.[264] Plaintiffs' counsel also request the reimbursement of those

---

[261]    *Goldberger*, 209 F.3d at 52.

[262]    *See* 9/8/09 Letter from Bernstein Liebhard on behalf of the Plaintiffs'
Executive Committee ("9/8/09 Letter") (also informing the Court that the August
25, 2009 submission incorrectly requested a reimbursement of expenses of
$50,400,390.71).

[263]    *See* Summary Expense Report for Bernstein Liebhard LLP
("Bernstein Expense Report"), Ex. 3 to Bernstein Decl.; Summary Expense Report
for Milberg LLP, Ex. 3 to Tadler Decl.; Summary Expense Report for Barroway
Topaz Kessler Meltzer & Check LLP, Ex. 3 to Kessler Decl.; Summary Expense
Report for Stull, Stull & Brody LLP, Ex. 3 to Brody Decl.; Summary Expense
Report for Wolf Haldenstein Adler Freeman & Herz LLP, Ex. 3 to Isquith Decl.;
Summary Expense Report for Lovell Stewart Halebian LLP, Ex. 3 to Stewart
Decl.; Summary Expense Report for Non-Executive Committee Firms.

[264]    *See, e.g.*, Bernstein Expense Report, Ex. 3 to Bernstein Decl.

79

expenses incurred and paid for by the Plaintiffs' Litigation Fund (the "Fund"), to which each firm contributed, for a total of $14,174,318.32.[265] The Fund was used for similar routine expenses such as copying and travel costs, as well as other costs unique to this litigation such as bank charges, rental and relocation costs associated with a document depository, and temporary personnel.[266]

As noted, the Court entered an Order on August 17, 2009 directing the Committee to post counsel's fee and expense application on the IPO website and allowing class members an additional period within which to submit objections to that application.[267] Although a number of attorneys and class members objected generally to the fee application – in writing and at the fairness hearing – only one objection was received with respect to the expense request.

The objection letter, submitted on September 8, 2009 by counsel for class members James J. Mary, Mark Merrill, Vondell Tyler, Ernest Browne, Jr.,

---

[265]     This equals the total contributions to the litigation fund of $14,245,000 minus $30,365.16 in "non-reimbursable litigation fund expenses" and the leftover balance of the fund of $40,316.52.   *See* 9/8/09 Letter.

[266]     *See* Schedule of Litigation Fund Expenses ("Fund Expenses Report"), Ex. C to Fee Compendium.

[267]     *See* 8/17/09 Order.

and Susan Browne, asks the Court to scrutinize the expense request carefully.[268] The letter notes that no substantiation of any of the expenses has been submitted in order to allow the Court to properly ensure that reasonable rates were charged for items such as copying and travel expenses.[269] The letter also raises a question regarding the firms' request for reimbursement of their contributions to the Fund, noting that many of the Fund's expenses have also been requested in each individual firm's summary report.[270] Finally, the letter argues that the Court should deny counsel's request for computerized research fees, contending that these charges are properly part of a law firm's overhead and should not be charged to the class.[271]

On September 17, 2009, the Committee submitted a response to this objection. In its submission, the Committee represents that most of the firms charged ten cents per copy, but noted that reimbursement of copying at a rate of

---

[268]    *See* 9/8/09 Objection of James J. Mary, Mark Merrill, Vondell Tyler, Ernest Browne, Jr. and Susan Browne at 4.

[269]    *See id.*

[270]    *See id.* at 5.

[271]    *See id.* at 6.

twenty-five cents per copy is "not uncommon."[272] The Committee also represents

that there is no overlap between the expenses incurred by each firm and the

expenses incurred by the Fund.[273] Moreover, the Committee argues that the

Second Circuit has allowed reimbursement of computer research fees as part of a

fee award.[274] It also notes, in any case, that the costs under the category of

"Computer & Other Research Fees" include primarily expenses associated with

electronic discovery management.[275] Finally, the Committee concedes that some of

its attorneys may have flown business or first-class when traveling, but notes that

"[t]he instances were limited, [] and in the exercise of each lawyer's business

judgment."[276]

The Committee attaches a list itemizing the combined expenses under

_____

[272]    9/17/09 Letter from Bernstein Liebhard on behalf of plaintiffs'
counsel ("9/17/09 Letter") at 2 (citing two cases in other districts).

[273]    *See id.*

[274]    *See id.* (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v.
County of Albany*, 369 F.3d 91, 98 (2d Cir. 2004) (noting that "the use of online
research services likely reduces the number of hours required for an attorney's
manual search, thereby lowering the lodestar" and holding that if the law firm
usually charges clients fees associated with computer research, this expense should
be included in the attorneys' fee award)).

[275]    *See id.*

[276]    *Id.*

82

each category of the firms comprising the Committee, the fifty other firms, and those paid for from the Fund.[277] On September 14, 2009, this Court issued an Order directing the Committee to file a declaration explaining any guidelines imposed on counsel with respect to travel charges, phone charges, copying costs, and other expenses.[278] In response, Stanley Bernstein, Chair of the Committee, submitted a declaration stating that the Committee "limited to $250 the daily living expenses of out-of-town personnel traveling to New York for long-term assignments at the IPO headquarters."[279] Bernstein also attests that each firm was expected to "charge its expenses at its customary rates and as it would in the normal course of business."[280]

Although the Committee has attempted to clarify some of the rates underlying the various costs for which plaintiffs' counsel are collectively requesting reimbursement, its submission is woefully inadequate. While submitting receipts to substantiate every expense would have been unreasonably taxing on counsel and burdensome for the Court to review, counsel's request is

---

[277] *See id.* at Exhibit A.

[278] *See* 9/14/09 Order.

[279] 9/17/09 Supplemental Declaration of Stanley D. Bernstein ¶ 2.

[280] *Id.*

otherwise unsupported by any detailed information upon which the Court can rely in ascertaining whether the rates charged are reasonable. For instance, plaintiffs' counsel are asking for over four million dollars in commercial copying costs, but have not provided information related to the per-copy cost they are charging nor the number of copies made. The Committee argues that "[m]ost firms charged \$0.10 per copy," but it does not identify which portion of the costs were charged at that rate, nor does it inform the Court of the reasons why so much copying appears to have been sent outside of the firms. Although it is unclear what the difference is between "Commercial Copies" and "Reproduction," the Court will assume – to the Committee's benefit – that "Reproduction" is the category of expenses detailing charges due to in-house copying while the category of "Commercial Copies" includes charges related to outside copying. Accordingly, I am reducing expenses associated with "Commercial Copies" by thirty percent to account for copies that could have been made in-house. I am also reducing "Reproduction" expenses by ten percent to account for those firms who charged more than ten cents per copy.

Some of the firms comprising the Committee are requesting reimbursement of costs related to secretarial and other staff overtime, but it is unclear how many overtime hours were worked or at what hourly rates.[281] I am

---

[281]   *See id.*

84

therefore also reducing the expenses related to such overtime costs by fifty-seven percent.[282]  I have also reduced the costs associated with "Temporary Personnel" by the same percentage.

A $250 per day limit on lodging and meal expenses seems reasonable. However, no reasons are given for why some of these firms incurred hotel costs for their attorneys when the New York office of their firm was spearheading this litigation.[283]  In addition, the Committee concedes that some attorneys may have flown business or first-class to work on this litigation.  A cap that includes only lodging and meals has little significance if no limit exists for airfare and other travel costs.  I am therefore reducing travel costs by twenty percent.[284]

---

[282]    Later in this opinion I will address the lodestar of the fifty other firms who failed to submit hourly rates and hours and explain why it is reasonable to reduce their lodestar by fifty-seven percent. *See infra* Part IV.E.2.a.

[283]    For instance, Isquith's declaration specifically attests to the $250 limit on travel expenses and notes that these travel costs are associated with "out-of[-]town attorneys who spent dedicated periods in New York City working on these cases during the discovery phase of the litigation." Isquith Decl. ¶ 6.  However, the headquarters of Wolf Haldenstein Adler Freeman & Herz LLP is in New York, and Isquith himself practices in the New York office.  While some attorneys may have traveled outside of New York for depositions or other discovery-related activities, Isquith did not provide any such explanation and neither did Bernstein in his supplemental declaration.

[284]    Reimbursement was requested for "External Box Storage," "Internal Box Storage," and "Storage Costs."  Because the Committee has not explained the differences in these categories, I have disallowed the expenses under "Storage Costs."  Reimbursement of costs associated with "External Box Storage" and

Finally, because the Second Circuit has allowed expenses associated with computer research fees to be reimbursed, I am reimbursing the costs of all such research.[285] The Committee has also represented that it has not included in the Fund request any expenses that are duplicative of the expenses reported by individual firms.[286] I accept this representation. Plaintiffs' counsel are therefore awarded reimbursement of expenses in the total amount of $46,941,556.96.

## 2. Award of Fees

In addition to over fifty million dollars in expenses, the Committee also requests a total fee of one-third of the gross settlement fund, or $195 million, for *all* counsel.[287] Although only a few of the objectors expressed concern regarding the expense request, almost every objector opined that the fee request in this case is unreasonable.

### a. Counsel's Lodestar

---

"Internal Box Storage" is granted.

[285] *See Arbor Hill*, 369 F.3d at 98.

[286] *See* 9/17/09 Letter at 2.

[287] *See* Bernstein and Tadler Decl. ¶ 114. This request represents fifty-two percent of the alleged lodestar of the firms in the Committee and all other firms — $195 million divided by $378 million ($278 million lodestar for the Committee + $100 million lodestar for the other firms) = a forty-eight percent reduction.

Although I intend to use the percentage method to award fees in this matter, the lodestar is often used as a cross-check. I will therefore review the requested lodestar before evaluating the *Goldberger* factors.

The Committee contends that its lodestar is $278 million. In support of this lodestar, the Committee has submitted a summary of the hours expended by and the billing rates for every attorney, paralegal, and staff member that worked on this litigation over the last eight years. Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable.[288] However, a review of the rates charged by counsel suggests that there is ample room for downward adjustment.

*First*, I note that the rates charged are the current billing rates of each attorney, paralegal, and staff member.[289] In those cases in which the attorney has since left the firm, the Committee used the attorney's rate at the time of

---

[288]    *See Goldberger*, 209 F.3d at 50 (citing *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 342 (3d Cir. 1998) ("Of course, where [the lodestar is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.").

[289]    *See* Bernstein Decl. ¶ 7; Fraser Decl. ¶ 3; Kessler Decl. ¶ 3; Sirota Decl. ¶ 3; Brody Decl. ¶ 3; Isquith Decl. ¶ 3; Stewart Decl. ¶ 3.

departure.[290] In a litigation as long as this one, it is obvious that current billing

rates are likely to be much higher than those used in 2001. In fact, during the eight

years of this litigation, a junior associate could have been promoted to partner, and

his or her billing rate could have increased two or three-fold. It would therefore be

unreasonable to apply his or her current billing rates to all of the hours worked

throughout the eight years of litigation. I therefore find the rates charged by

counsel to be excessive.[291]

*Second*, although the appropriate hourly rates are "'those [rates]

prevailing in the community for similar services of lawyers of reasonably

comparable skill, experience, and reputation,'"[292] I note that it is often the practice

among law firms to accord clients a discount on fees while maintaining high billing

rates. Therefore, while a partner's stated hourly rate might be nine hundred dollars

per hour, the client may not actually pay this rate. In addition, a number of firms

have begun utilizing flat fees, which are often substantially less than the fees a firm

---

[290] *See id.*

[291] In coming to this conclusion, I have considered the role of inflation in the rate increase. Also, because counsel's compensation has been deferred for a number of years, rates somewhat higher than the 2001 rates are appropriate.

[292] *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).

would receive if it billed by the hour.[293]

Based on these two observations, I have decided to reduce the hourly rates of all attorneys and paralegals and recalculate the Committee's lodestar. In determining maximum rates for partners and associates, I considered the proposed hourly rates of the most senior partners and associates. For instance, Arthur Miller of Milberg LLP charges $995 per hour. Such rate is clearly exorbitant. Although senior partners from large law firms were known to charge such rates in 2007,[294] it is hard to imagine clients from almost a decade ago, much less today, paying such rates. While the Committee may argue that Miller's high billable rate is justified by his status as a nationally renowned scholar of civil procedure, his expertise in that field was not instrumental in this case.

I therefore capped partners' fees at five hundred dollars per hour and assigned that rate to only the most senior partners at each firm. Senior associates were assigned a rate of three hundred dollars per hour. The rates for partners and associates decrease according to experience. Where the Committee provided

---

[293]     *See* Nathan Koppel and Ashby Jones, *'Billable Hour' Under Attack*, Wall St. J., Aug. 24, 2009,
http://online.wsj.com/article/SB125106954159552335.html.

[294]     *See* Nathan Koppel, *Lawyers Gear Up Grand New Fees*, Wall St. J., Aug. 22, 2007, http://online.wsj.com/article/SB118775188828405048.html.

attorney biographies, I reviewed that information when assigning a reasonable billable rate for a particular lawyer. Where the Committee failed to provide such information – which is the case for a large portion of the attorneys who worked on this matter – there was no way for me to ascertain the experience of the attorneys. Because most junior partners for whom I had information were assigned a rate of $425 per hour, partners for which I had no information were assigned the lesser of $425 per hour or that particular partner's requested rate. Because most junior associates for whom I had information were assigned a rate of two hundred dollars per hour, associates for whom I had no information were assigned the lesser of two hundred dollars per hour or that particular associate's requested rate.

Finally, all paralegals were assigned either the lesser of their requested rate or one hundred dollars per hour. The requested rate of compensation for paralegals was both shocking and unconscionable. The maximum requested fee for such service was $355 per hour. Typically, a paralegal is a college graduate with no legal training whatsoever. My assigned rates are more than reasonable, considering the lack of professional information for a number of the attorneys and my decision not to reduce the number of hours counsel assert was spent on this litigation.

I note that the Committee also requested compensation for work

performed by clerks. Clerks are identified separately from paralegals, even though it is unclear what type of work a clerk performs and how it differs from that performed by paralegals. I can only assume that clerks perform work that is similar to that done by secretaries and other support staff. In addition, compensation is sought for a number of individuals who are identified as "other." I assume that this category includes secretaries and other support staff. Because the salaries of secretaries and other support staff are usually considered overhead costs and included as part of the attorneys' fees, I am denying compensation for clerks and those individuals under the "other" category.[295] I also excluded the lodestar of experts and investigators because their fees were already included the expense request. The "adjusted lodestar" for the Committee is therefore $159,099,407.75.

No lodestar summaries were provided by the fifty other plaintiffs' firms in support of their one hundred million dollar lodestar. This number appears

---

[295]     *See Kowal v. Andy Const., Inc.*, No. 05 Civ. 576, 2008 WL 4426996, at \*3 (E.D.N.Y. Sept. 25, 2008) ("'[C]ourts of this Circuit have recognized that clerical and secretarial services are part of overhead and are not generally charged to clients.'") (quoting *Sulkowska v. City of New York*, 170 F. Supp. 2d 359, 368-69 (S.D.N.Y. 2001)). Stull, Stull & Brody LLP did not identify which of the individuals categorized under "paralegals/clerks" were paralegals and which were clerks. As a result, I recalculated the lodestar based on the adjusted hourly rate of one hundred dollars and halved that amount. *See* Stull, Stull & Brody Time & Lodestar Chart, Ex. 2 to Brody Decl., at 2-3.

91

to be an estimate rather than actual calculation. Based on the lack of information

supporting this figure, I am reducing the lodestar of these firms by the same

percentage as the Executive Committee firm with the highest percentage reduction

– fifty-seven percent.[296] The "adjusted lodestar" for the fifty other firms is

$43,260,015.88. The "total adjusted lodestar" for all firms is therefore

$202,359,423.63.

### b. *Goldberger* **Factors**

Having determined the appropriate lodestar for purposes of

comparison, I turn next to the *Goldberger* factors to determine the reasonable fee

that should be awarded in this case. I will discuss each factor in turn.

### i. **Time and Labor Expended by Counsel**

As noted, the Committee has expended over 677,000 hours,[297]

producing an adjusted lodestar of more than $159 million. The Committee expects

additional time to be expended in conjunction with the approval of the proposed

settlement and the administration and distribution of the settlement funds.[298] These

amounts do not include the hours and lodestar of the over fifty firms that were

---

[296]    The Executive Committee firm with the highest percentage reduction
is Stull, Stull & Brody LLP ($22,850,372.45 reduced to $9,885,074.75).

[297]    *See* Bernstein and Tadler Decl. ¶ 116.

[298]    *See id.*

involved in this litigation.  Collectively, those firms have reported spending over 350,000 hours on this litigation[299] and almost forty-three million dollars in adjusted lodestar.

In some ways, these extraordinary figures are not surprising.  As discussed in this Court's evaluation of the *Grinnell* factors, this litigation spanned eight years and has involved the review of over thirty million pages of documents and the taking of 145 depositions.[300]  The parties briefed numerous procedural and substantive motions,[301] after which this Court issued twenty-nine opinions.  The Court of Appeals has issued three opinions resolving various motions filed by the parties, each of which were preceded by extensive briefing and oral argument.[302]

## ii.    Magnitude and Complexities of the Litigation

This litigation will certainly go down in history as one of the longest and most protracted multi-district securities litigations in the country.  Over one thousand initial complaints were filed.[303]  The actions were filed against fifty-five

---

[299]    *See id.* ¶ 121.

[300]    *See id.* ¶ 118.

[301]    *See id.*

[302]    *See id.*

[303]    *See id.* ¶ 5.

securities underwriters, over three hundred issuers, and one thousand officers and directors of the issuers.[304] Defendants were represented by over 110 law firms, not including the law firms that represented insurance companies with an interest in the litigation.[305]

Plaintiffs' counsel submitted more than three hundred amended pleadings in the actions, successfully defended against and opposed numerous motions to dismiss, and briefed and argued three hotly contested class certification motions.[306] In addition, counsel engaged in extensive discovery efforts, including the serving of over six hundred third-party subpoenas and the retention of twelve experts.[307]

Not only were the cases factually complex, but the issues were also legally complicated. Defendants consistently maintained that the allegations in the Complaints should be dismissed and that plaintiffs would fail to prove "liability, loss causation, damages or that the classes were even appropriate for

---

[304]   *See id.*

[305]   *See id.*

[306]   *See id.* ¶ 122.

[307]   *See id.* ¶ 5.

94

certification."[308] The Notice of Pendency sets out additional key issues upon which

the parties disagreed, including (1) whether the alleged misconduct by the

defendants was actionable; (2) whether the alleged omissions and

misrepresentations were material; (3) whether there existed an appropriate

economic model for determining artificial inflation during the settlement class

period; (4) the amounts by which the Subject Securities were allegedly inflated

during the period; (5) the extent to which other market forces influenced the

trading prices of the Subject Securities during the period; and (6) the extent to

which the conduct of defendants and their statements allegedly influenced the

trading prices of the Subject Securities during the period.[309]

### iii.    The Risk of the Litigation

Plaintiffs' counsel have not been paid any fees during this litigation.[310]

Counsel have advanced millions of dollars and attorney hours without

reimbursement.[311] Of course, this is not unusual in class actions, and plaintiffs'

counsel concede that they undertook this complex litigation knowing that fees and

---

[308]    *Id.* ¶ 7.

[309]    *See* Notice of Pendency at 2.

[310]    *See* Bernstein and Tadler Decl. ¶ 114.

[311]    *See id.*

95

costs would only be paid upon a successful outcome.[312] That is precisely what they did, completing eight years of work and demonstrating a commitment to vigorously prosecuting plaintiffs' claims.

Although "[i]t is well-established that litigation risk must be measured as of when the case is filed,"[313] the risk of losing it all was heightened with the Second Circuit's decision in *Miles I.* The findings in *Miles I* dramatically increased the risks of continuing this litigation by severely restricting the class size and reducing the estimated aggregate damages.

Counsel could have thrown up their hands at this juncture, reasoning that further efforts would likely fail to lead to any concrete results. Instead, they petitioned the Court of Appeals for a rehearing (resulting in *Miles II*) and filed amended complaints in each of the six focus cases and an amended set of "Master Allegations" that re-defined the class pursuant to the Second Circuit's rulings.[314] They also submitted extensive briefing opposing defendants' motions to dismiss.[315]

---

[312]  *See id.* ¶ 126.

[313]  *Goldberger*, 209 F.3d at 55 (citations omitted).

[314]  *See* Bernstein and Tadler Decl. ¶ 68.

[315]  *See id.* ¶ 69.

96

After this Court largely denied defendants' motions,[316] counsel then moved for class certification again. In response, counsel notes, defendants "unleashed an army of countervailing expert reports."[317] Plaintiffs' counsel then engaged in protracted settlement negotiations with defendants that lasted nine months.[318] There was a serious risk that work performed even in the last three years would fail to yield any results.

### iv. The Quality of Representation

I have presided over these cases since their commencement and have nothing but the highest respect for the professionalism of the many attorneys that comprise the Committee. These law firms are some of the most reputable in the country – the "cream of the crop" among plaintiffs' firms. Over the years, they have recovered millions, if not billions, of dollars for their clients.[319] In addition, many of them have received judicial accolades for their efforts in other

---

[316]    *See In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008).

[317]    Bernstein and Tadler Decl. ¶ 73.

[318]    *See id.* ¶¶ 77, 80 (noting that negotiations began in June 2008 and a settlement agreement was finally signed on April 1, 2009).

[319]    *See, e.g.*, Bernstein Liebhard Firm Resume at 1; Milberg Firm Resume at 1.

litigations.[320]

Indeed, the hurdles overcome in this litigation further underscore the high quality of representation by plaintiffs' counsel. Not only did counsel successfully defend against numerous motions to dismiss, but they also exhibited extraordinary perseverance when they petitioned the Court of Appeals for rehearing of *Miles I* and obtained clarification in *Miles II* that the action was not precluded from continuing, albeit with certain restrictions. Finally, notwithstanding the reduction in the expected damages and class size, counsel was able to negotiate a fair settlement with defendants.

Courts have also looked to the quality of defense counsel as an indicator of the quality of representation of plaintiffs' counsel.[321] Here, plaintiffs' counsel were pitted against 110 of the most prominent national defense firms, including Sullivan & Cromwell LLP and Morrison & Foerster LLP, liaison counsel for the defendants. That plaintiffs' counsel were able to prosecute this action for eight years against such formidable opponents is an impressive feat.

Still, the Second Circuit has held that "the quality of representation is

---

[320]    *See, e.g.*, Wolf Haldenstein Firm Resume at 1.

[321]    *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) (citing *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 332 (D.N.J. 1998)).

98

best measured by results, and that such results may be calculated by comparing 'the extent of possible recovery with the amount of actual verdict or settlement.'"[322] In this case, plaintiffs' counsel has admittedly been able to secure only two percent of the estimated damages. Although the Circuit also opined in *Grinnell* that for the purposes of approving a settlement, a "satisfactory" settlement could represent one-thousandth of one percent of the estimated damages in an action,[323] a recovery of two percent is surely on the low end of any spectrum. Indeed, this is one case in which the result is underwhelming despite counsel's best efforts. This factor weighs in favor of reducing the fee award.

### v. The Requested Fee in Relation to the Settlement

Not only is the recovery in this case small, but the stark difference between counsel's fee request and each class member's share of the settlement gives this Court great pause. The request for attorneys' fees and expenses amounts to approximately forty-three percent of the gross settlement fund. If this amount were awarded, the class members would recover less than one cent on every dollar

---

[322] *Goldberger*, 209 F.3d at 55 (quoting *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102, 118 (3d Cir. 1976)).

[323] *See* 495 F.2d at 455 n.2.

lost.[324] This remains the case even considering the reduction in the PSLRA awards

and counsel's expenses.[325] Indeed, the Committee admits that the fee request is on

"the higher side of the range of fee requests."[326] This factor also weighs in favor of

reducing the fee award.

### vi. Public Policy Considerations

Finally, I consider what fee would adequately encourage plaintiffs'

counsel to continue bringing cases of merit in the future. Courts have noted that in

considering this factor, "[t]he fees awarded must be reasonable, but they must also

serve as an inducement for lawyers to make similar efforts in the future."[327]

Certainly, plaintiffs' counsel would not have taken this case and vigorously

prosecuted the action had it not been for the expectation of a reasonable fee at the

conclusion of the litigation. That counsel continued to zealously represent class

---

[324] Other costs and expenses include the administrator's fee of $27.5 million and the request for PSLRA awards of four million dollars, as well as counsel's expense request of over fifty million dollars.

[325] This assumes PSLRA awards of approximately $1.3 million, reimbursement of expenses of approximately forty-seven million dollars, and the administrator's fee of $27.5 million.

[326] Pl. Fee Mem. at 27.

[327] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003). *Accord Goldberger*, 209 F.3d at 51 (citations omitted) ("There is also commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.").

100

members in this litigation even after a devastating loss before the Court of Appeals is a testament to their commitment. Such tenacity should be rewarded.

Nevertheless, objectors urge this Court to consider another public policy issue. They suggest that plaintiffs' counsel settled this action for pennies on the dollar in order to ensure payment of their fees.[328] Some objectors even accuse plaintiffs' counsel of "blackmail[ing]" defendants – implying that they brought these claims for the sole purpose of settling with defendants and obtaining compensation.[329] The objectors ask the Court not to endorse such tactics.[330]

---

[328] *See, e.g.*, 7/14/09 Objection of Gary L. Hall ("Attorneys get millions . . . . all the other plaintiffs [] get pennies on the dollar, not hundreds of dollars back [in] compensation . . . . Your Honor [], I have lost all faith in the financial and judicial system here in the old 'U.S. of A.'"); 7/28/09 Objection of Jim Rushton ("This lawsuit benefits the victim none and does nothing more than fill the pockets of greedy lawyers . . . . They retrieve pennies for the victim and take home millions of dollars in the process. Flat out an egregious use of our court and judicial process."); 8/1/09 Objection of Douglas G. Yule ("After reading the information which has been sent [to] me about this settlement I am left with the very strong impression that this set of settlements have been proposed primarily to assure that the attorneys involved in the case receive remuneration for their involvement in the [] original claims filed against the various companies.").

[329] 7/6/09 Objection of Niels Riemers ("This appears simply another case of legal blackmail of American corporations, where the overwhelming beneficiaries are the law firms bringing the class action, not members of the class, which receive pennies . . . . The system of excessive enrichment of class action attorneys is outrageous and the Judge of the District Court of the Southern District of New York is as complicit in the system of legal blackmail as are the plaintiff law firms."); Kuhn Objection ("I have zero doubt that Agilent Technologies et al. was coerced to settle the case to bring closure to [the] costly and endless legal

101

After many years of presiding over class action securities cases, I note

that there is an inherent conflict of interest between plaintiffs' counsel and the class

members they represent.[331] As Douglas Parker expressed at the fairness hearing,

from class members' perspectives, the recovery in these cases is so small that

proceeding to trial would pose little risk for class members and refusing to

participate in the settlement would present little loss.[332] Instead, it is plaintiffs'

counsel with the most at stake. Plaintiffs' counsel therefore have a strong incentive

to settle, even if the recovery obtained is a fraction of the expected damages.

---

blackmail known as discovery.").

[330] *See, e.g.*, 7/9/09 Objection of William Sword, Jr. ("[W]hat public good can possibly come from this case and all of the lawyers and 'experts' feasting on it? I hope your Honor will take a deep breath and throw the whole thing out . . . .").

[331] *See* John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions: Why "Exit" Works Better than "Voice,"* 30 Cardozo L. Rev. 407, 414 (2008) ("Th[e] thesis, that plaintiff's attorneys tend to be motivated to settle 'cheaply' on terms that class members, if they had perfect knowledge and full control over their 'agent,' would reject, is corroborated by the extraordinarily low rate of recovery in securities class actions."); Martha Pacold, *Attorneys' Fees in Class Actions Governed by Fee Shifting Statutes*, 68 U. Chi. L. Rev. 1007, 1028 (2001) ("Attorneys' self-interests may persist over their clients' interests, resulting in few class actions that actually reach judgment . . . plaintiffs' attorneys settle in their own best interests at the expense of the classes they purport to represent.").

[332] *See* Fairness Hearing Tr. at 68:20-24 ("Well, once you actually disapprove the settlement, if that's all your Honor did, I think it would have a marvelous [effect of] concentrating the minds of the lawyers. But if it didn't, frankly, as a class member, the loss of half of 2 percent would not be a big loss.").

Indeed, because plaintiffs' attorneys exercise control over class actions, they may be motivated to file dubious claims seeking large damages with the expectation that the litigation will settle and they will be compensated handsomely.[333]

However, any suggestion that by approving this settlement and awarding counsel fees, this Court is somehow encouraging the plaintiffs' bar to file meritless claims is simply wrong. It may be true that the viability of plaintiffs' claims from the start was doubtful – their claims were certainly called into question when the Circuit found plaintiffs' allegations of widespread knowledge to negate reliance and opined that the IPO markets were not efficient. But the Circuit also dealt an unexpected blow to counsel by modifying its class certification standards – making it more difficult for these classes to be certified – in the middle of this litigation. Even after *Miles I* substantially narrowed the claims in this litigation, plaintiffs' counsel were still able to negotiate a settlement with defendants. The fact that defendants agreed to settle at all indicates that plaintiffs' claims were not entirely meritless.

---

[333]     Parker put it eloquently at the fairness hearing, "I think the inconvenient truth is that a great many securities class actions are commenced on the theory that if there is a large damage claim made, those cases will be settled at some point along the way and they will be settled at a level that will provide more than adequate compensation to the lawyers without regard to whether it provides a meaningful settlement to the class, and [] I think that's an issue that deserves consideration . . . ." Fairness Hearing Tr. at 69:18-70:1.

Moreover, although I am mindful of these concerns, forcing this case

to go to trial will not benefit anyone – not plaintiffs' counsel, not the defendants,

not this Court, and certainly not class members who have been waiting nearly a

decade for some recovery and resolution of this litigation. Indeed, disapproving

this settlement would have a significant chilling effect on future class actions – a

bad result at a time when serious questions have been raised over the conduct of

many banks during the recent financial crisis.[334]

### c.    Specific Objections and Counsel's Responses

After giving great thought to the *Goldberger* factors, I now turn to

specific objections I have received with respect to the requested fee and the

Committee's responses. A number of objectors – pointing to the Second Circuit's

---

[334]    *See, e.g.*, Zachary Kouwe, *S.E.C. to Proceed With Trial in BofA Case*,
N.Y. Times, Sept. 21, 2009,
http://dealbook.blogs.nytimes.com/2009/09/21/sec-to-proceed-with-trial-in-bofa-ca
se/ (reporting about Judge Jed Rakoff's decision to reject the proposed settlement
between the Securities and Exchange Commission and Bank of America over its
non-disclosure of excessive bonuses to Merrill Lynch employees, forcing the case
to proceed to trial); Jonathan D. Glater, *Financial Crisis Provides Fertile Ground
for Boom in Lawsuits*, N.Y. Times, Oct. 18, 2008 at B1 (noting that the financial
crisis is likely to lead to increased litigation and discussing four lawsuits filed
against financial institutions); Jenny Anderson, *Florida Pension Fund Is Suing
A.I.G.*, N.Y. Times, May 22, 2008 at C3 (discussing a class action lawsuit filed
against A.I.G. and its "top executives" accusing A.I.G. of "understating the
company's exposure to the subprime mortgage crisis in order to inflate its stock
prices artificially").

decision in *Goldberger* – dismiss plaintiffs' counsel's request as out-of-hand.[335]  In

*Goldberger*, plaintiffs' counsel requested a fee of twenty-five percent of the

settlement, but the district court awarded only a four percent fee.[336]  The Court of

Appeals held that this award was not an abuse of discretion, notwithstanding

awards in similar common fund cases in the range of eleven to nineteen percent.[337]

The objectors also note that courts have routinely decreased the

percentage fee as the size of the fund increases.[338]  They argue that a fund of $586

million is certainly at the top of the range of settlement fund sizes and that

plaintiffs' counsel should therefore receive a percentage fee much lower than what

they are requesting.[339]

Finally, some objectors contend that this Court should award a

---

[335]     *See, e.g.*, 8/6/09 Objection of James J. Mary, Mark Merrill, Vondell
Tyler, Ernest Browne, Jr., Susan Browne, Richard Paul Warren Sep, and D&S
Partnership #2 ("Mary, Merrill, Tyler, Browne, Sep, and D&S Objection") at 3;
Baum, Hart, and Shadley Objection at 14.

[336]     *See Goldberger*, 209 F.3d at 53.

[337]     *See id.*

[338]     *See* Mary, Merrill, Tyler, Browne, Sep, and D&S Objection at 4
(quoting *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 and No. 03 Civ. 1194, 2004
WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (quotations omitted) ("In cases
where a class recovers more than $75-$200 million . . . fees in the range of 6-10
percent and even lower are common.")).

[339]     *See id.* at 5.

percentage of the *net* settlement fund, rather than the *gross* settlement fund. For

instance, David Murray and Jacqueline Pio, who appeared at the fairness hearing

through counsel, opined that granting a percentage fee based on the gross

settlement fund would mean that plaintiffs' counsel would not only receive

reimbursement for their expenses, but also a percentage of those expenses as part

of their fee.[340]

        The Committee responds that the requested fee is reasonable,

comparing its request to other mega-fund cases in which the fee award was

approximately thirty percent.[341]  In addition, the Committee argues that the global

settlement represents 309 individual settlements, and it is therefore appropriate to

consider cases in which the settlement amounts ranged from $300,000 to twenty

million dollars.[342]  The Committee notes that a one-third fee appears to fall within

---

[340]     *See* Fairness Hearing Tr. at 56:6-13. *See also id.* at 57:22-58:1
(Counsel for Lester Baum, Mike Hart, and Sue Shadley noting that basing the
percentage fee on the gross settlement rather than the net settlement could make a
large difference).

[341]     *See* Pl. Fee Mem. at 42 (citing *In re Priceline.com*, No. 00 Civ. 1884,
2007 WL 2115592, at *5 (D. Conn. July 20, 2007) (awarding a fee of thirty percent
for an eighty million dollar fund); *In re Ikon*, 194 F.R.D. 166, 197 (E.D. Pa. 2000)
(awarding a fee of thirty percent of the net settlement fund for a $111 million
recovery); *In re Prudential*, 912 F. Supp. 97, 104 (S.D.N.Y. 1996) (awarding a fee
of twenty-seven percent for a $110 million recovery or thirty percent of the net
settlement fund)).

[342]     *See id.*

the range of reasonableness for settlements within that range.[343]

It further notes that the fee requested represents a negative multiplier of 0.7 based on the lodestar calculated by the Committee.[344] The inclusion of the lodestar of the other fifty firms produces a 0.5 negative multiplier.[345] The Committee contends that "a negative multiplier fully supports a higher percentage fee request."[346]

Finally, with respect to objectors' opinions that the percentage fee should be based on the net settlement fund, the Committee conceded at the fairness hearing that courts have awarded fees based on both the net and gross settlement funds.[347] The Committee nevertheless emphasized that it believed its request was

[343] *See id.* (citing a list of unpublished slip opinions in which the court awarded a fee of 30 to 33 1/3 percent for recoveries of between half a million to twenty million dollars).

[344] *See* Bernstein and Tadler Decl. ¶ 134. A multiplier that is less than one is called a "negative multiplier."

[345] *See id.*

[346] Pl. Fee Mem. at 31 (citing *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 1695, 2007 WL 4115808, at *10 (S.D.N.Y. Nov. 7, 2007)).

[347] *See* Fairness Hearing Tr. at 76:18-21 ("There was a short discussion about whether the fee is based on a percentage of the gross recovery or the net recovery. Courts go both ways . . . .").

107

"fair."[348]

### d.    The Court's Award

After reviewing the *Goldberger* factors and considering the arguments
by the objectors and by the Committee, I make the following determinations.
*First*, there is simply no reason why plaintiffs' counsel should be awarded a
percentage of their expenses in addition to being reimbursed for those reasonable
expenses. I therefore find that the percentage fee should be based on the net
settlement fund rather than the gross settlement fund.[349]

*Second*, there are certainly cases in which it would be reasonable to
award a fee in the lower range of reasonableness. Indeed, the Second Circuit
recently quoted one of my previous decisions in reasoning that "'a given fee award
must follow a sliding-scale and must bear an inverse relationship to the amount of
the settlement. Otherwise, those law firms who obtain huge settlements, whether
by happenstance or skill, will be over-compensated to the detriment of the class
members they represent.'"[350]

---

[348]    *Id.* at 77:4-7.

[349]    I have previously awarded percentage fees net of expenses. *See In re
Indep. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676, at *9
(S.D.N.Y. Sept. 29, 2003).

[350]    *Wal-Mart Stores*, 396 F.3d at 122 (quoting *In re Indep. Energy*, 2003
WL 22244676, at *6).

Nonetheless, this principle cannot be considered in isolation without also reviewing the amount of work and time spent by counsel in this litigation. For those cases in which settlement is quick and the time and labor expended by counsel is low, a high percentage fee would be a windfall and therefore inappropriate. Thus, in *Goldberger* and other recent Second Circuit class action fee decisions, the Circuit affirmed awards of a low percentage fee, but noted that such fees represented positive multipliers to counsel's lodestar figures.[351] This case is different. Here, counsel is requesting a high percentage fee, but that fee ($195 million) still represents a negative multiplier to the total adjusted lodestar as calculated by this Court ($202 million). There is therefore no real danger of over-compensation.

*Third*, in other cases for which I have awarded fees to counsel, I have applied an additional discount to the adjusted lodestar for limited success.[352] There

---

[351] *See, e.g.*, *Nortel*, 539 F.3d at 134 (ruling that a district court's fee award of three percent of the fund or more than two times the lodestar was not an abuse of discretion); *Wal-Mart Stores*, 396 F.3d at 123 (noting that the 7.2 percent fee nevertheless represented a 3.5 multiplier on counsel's lodestar); *Goldberger*, 209 F.3d at 46 (noting that the four percent fee was equal to a positive lodestar multiplier).

[352] *See, e.g.*, *Scott v. City of New York*, No. 02 Civ. 9530, 2009 WL 2610747, at *3 (S.D.N.Y. Aug. 25, 2009). Although *Scott* was a fee-shifting opinion, there is no reason why the same principles would not apply when determining the appropriate fees to award class action counsel.

is plenty of support for doing the same here. Although plaintiffs' counsel managed to resolve this litigation in favor of class members and obtained a large gross settlement fund, the results, in general, are disappointing. *First*, the per-share recovery is very small and class members are expected to receive only one cent on each dollar lost. *Second*, the settlement is based on a much smaller class and lower expected damages than contemplated at the commencement of this litigation. As a result, the discounted fee of fifty-two percent of the lodestar and a further discount of the adjusted lodestar is particularly appropriate where the fees awarded to the attorneys are taken from the settlement fund.

But counsel's requested fee already reflects a discount because the amount of time and labor counsel spent on this litigation is highly disproportionate to the settlement they achieved on behalf of the class. Moreover, the incremental benefit to each class member is trivial.[353] Quite frankly, reducing counsel's fees will not put more money in class members' pockets. Because counsel has already imposed a discount on its own fee, applying a further reduction will serve only to further penalize counsel and chill other class actions.

*Finally*, the important function that class actions serve in policing

---

[353] For instance, even if I were to award counsel half of their requested fees, or one hundred million dollars, the benefit to each class member would be three-tenths of a cent per dollar lost.

110

securities transactions should not be under-emphasized. Indeed, class actions serve as private enforcement tools when the Securities and Exchange Commission or other regulatory entities fail to adequately protect investors from securities fraud. Thus, plaintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who engage in misconduct will suffer serious financial consequences. Although the defendants in this action did not admit to wrongdoing by agreeing to settle, this class action succeeded – at the very least – in penalizing them for questionable conduct. Awarding counsel a fee that is too low would therefore be detrimental to this system of private enforcement.

I therefore award plaintiffs' counsel a fee of one-third of the net settlement fund, which amounts to $170,084,950.00.[354] This fee takes into account the risks counsel undertook to represent class members and the hard work that was put into resolving this litigation (particularly after the *Miles* decisions). It also appropriately accounts for the small recovery that was ultimately obtained for each class member.

Although the adjusted lodestar is used as a cross-check, there is no need for the adjusted lodestar and the percentage fee to be equivalent. Indeed, the

---

[354]     The net settlement fund is $510,254,849.99, which is calculated by subtracting $27,500,000 (administrator's fee), $1,303,593.05 (PSLRA awards), and $46,941,556.96 (expenses) from the gross settlement fund of $586,000,000.

only difference between the fee award and counsel's request is that the fee award is based on the net rather than gross settlement fund. And the remaining difference between the adjusted lodestar and the Committee's request is trivial.

This fee should therefore adequately compensate – but not overcompensate – counsel for their extraordinary time and labor. The award of fees and expenses are intended to compensate plaintiffs' counsel for all of the time and labor spent until the conclusion of this litigation, including that associated with the distribution of the settlement fund.

## V. CONCLUSION

For the reasons stated above, plaintiffs' motion for an Order of Final Approval of the Settlement, Plan of Allocation, and Class Certification is granted. The Committee's motion for Attorneys' Fees and Reimbursement of Expenses and PSLRA Awards to the Lead Plaintiffs and Class Representatives of the 309 settled actions is also granted but not for the amounts requested. The Clerk of the Court is directed to close this motion [document no. 5837 in action 21 MC 92], this action, and the 309 individual actions that comprise this multi-district litigation.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 5, 2009

113

## - Appearances -

### For Plaintiffs' Executive Committee:

Stanley D. Bernstein, Esq.
Rebecca M. Katz, Esq.
Christian Siebott, Esq.
Bernstein Liebhard LLP
10 East 40th Street
New York, New York 10016
(212) 779-1414

Robert A. Wallner, Esq.
Ariana J. Tadler, Esq.
Peter G.A. Safirstein, Esq.
Neil Fraser, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 946-9453

David Kessler, Esq.
Barroway Topaz Kessler Meltzer &
Check LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Jules Brody, Esq.
Stull, Stull & Brody LLP
6 East 45th Street
New York, New York 10017
(212) 687-7230

Howard B. Sirota, Esq.
Sirota & Sirota LLP
260 Madison Avenue
New York, New York 10016
(212) 425-9055

Fred Taylor Isquith, Esq.
Thomas H. Burt, Esq.
Wolf Haldenstein Adler Freeman & Herz
LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

**Liaison Counsel for Underwriter Defendants:**

Gandolfo V. DiBlasi, Esq.
Penny Shane, Esq.
David M.J. Rein, Esq.
Richard J.L. Lamuscio, Esq.
Sullivan and Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

**Liaison Counsel for Issuer Defendants:**

Jack C. Auspitz, Esq.
Joel C. Haims, Esq.
Hilary M. Williams, Esq.
Angela T. Rella, Esq.
Reema S. Abdelhamid, Esq.
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

## EXHIBIT 1:
## PSLRA AWARDS

| Name | Award |
|------|-------|
| Brenda Abbruzzino | $ 1,250.00 |
| Salvatore Abbruzzino | $ 1,750.00 |
| Joni Ray Abrams | $ 1,075.00 |
| Aaron H. Fleck | $ 9,000.00 |
| Barry Agranat | $ 10,000.00 |
| George J. Alexander | $ 3,060.00 |
| Katherine V. Alexander | $ 1,923.00 |
| Frederick Alfano | $ 7,500.00 |
| Richard S. Allegood | $ 1,000.00 |
| Thomas Allen | $ 2,447.50 |
| Horacio Altamirano | $ 4,235.00 |
| Claude Amsellem | $ 3,995.00 |
| Nicholas Anderson | $ 3,200.00 |
| Roger Anderson | $ 6,017.00 |
| Greg Antoniono | $ - |
| Frank Arduino | $ - |
| James F. Ashburn | $ - |
| John P. Ashou | $ 7,000.00 |
| Michael Atlas | $ 6,000.00 |
| Donald Attfeild | $ 2,150.00 |
| Philip Attfield | $ 3,173.00 |
| Seth Atwood | $ 4,520.00 |
| James August | $ 6,600.00 |
| Michael August | $ 9,615.50 |
| John Bagnasco | $ - |
| Gordon L. Bailey | $ - |
| Paulsen K. Bailey | $ - |
| Greg Balfanz | $ - |
| Kenneth Bank | $ 900.00 |
| Howard Barto / Darlyne Barto | $ 1,000.00 |
| Marek Bartula | $ 7,246.50 |

| | | |
|---|---|---:|
| Radi Batarseh | $ | 1,934.80 |
| Terrance Bates | $ | 1,534.00 |
| Joseph Baum | $ | 1,295.00 |
| Tony Bedwell | $ | 110.00 |
| Floyd Benigni | $ | 3,250.00 |
| Donald E. Benjamin | $ | 7,200.00 |
| Ben Berman | $ | 7,200.00 |
| David Bertoli | $ | 2,644.00 |
| David Best | $ | 4,807.50 |
| Mary Best | $ | 2,404.00 |
| James H. Bevels | $ | 730.00 |
| Ryan Beveridge | $ | - |
| Russell H. Blackstone | $ | - |
| Heather O'Gorman | $ | 1,250.00 |
| Roland Borromeo | $ | 1,400.00 |
| Howard Borus | $ | - |
| Korky Bostwick | $ | 5,400.00 |
| Charles M. Bower | $ | 1,260.00 |
| David F. Boyd | $ | - |
| Jeffry D. Breen | $ | 4,000.00 |
| Daniel Burchfield | $ | 9,750.00 |
| Percy C. Burns | $ | 4,500.00 |
| Jason Calabrese | $ | 3,365.50 |
| Joseph Calcaterra, Jr. | $ | 1,875.00 |
| Ronald Calderone | $ | 692.32 |
| Joseph Capece | $ | - |
| Gregory S. Carroll | $ | 10,000.00 |
| Walter Challenger | $ | 7,500.00 |
| Terry Chandler | $ | 2,046.50 |
| Nelson Chang | $ | 3,145.00 |
| Ronald Chapman | $ | 384.00 |
| Michael Chaves | $ | 10,000.00 |
| Adrian Chin | $ | 942.60 |
| Jimmy Chin | $ | - |
| Thomas Chipain | $ | 4,800.00 |

| Marat Chorny | $ | 1,435.00 |
|---|---|---|
| Neils Peter Christenson | $ | 10,000.00 |
| Jonathan Clifford | $ | 6,424.50 |
| Ronald Wyles | $ | 3,750.00 |
| Jack L. Cobb | $ | 4,600.00 |
| Todd Cohen | $ | - |
| Jack Ezon | $ | - |
| Jaun Carlos Sanchez Garcia | $ | 2,500.00 |
| Nathan Cosnowsky | $ | 3,125.00 |
| Gary M. Craft | $ | - |
| Gary Crandall | $ | 1,008.00 |
| Marvin Crenshaw | $ | 1,700.00 |
| Melvin Crenshaw | $ | 2,832.00 |
| Laura A. Cunningham | $ | 820.50 |
| Rosalie Cutter | $ | 1,125.00 |
| Paul Cyrek | $ | 950.00 |
| Paul Dachsteiner | $ | 6,418.50 |
| Shalom Daskal | $ | 10,000.00 |
| Rutherford Dawson | $ | 10,000.00 |
| Richard M. Dearnley | $ | 6,250.00 |
| Louis Decola, Jr. | $ | - |
| Arsenio Deguzman | $ | 3,096.50 |
| Clay De Mattei | $ | 10,000.00 |
| Louis DePietro | $ | 1,750.00 |
| Wallace Depuy | $ | 4,500.00 |
| Avinash M. Desai | $ | 10,000.00 |
| Donald Dezarn | $ | - |
| Joseph Diamant | $ | 4,800.00 |
| Jeffrey Diamond | $ | 2,394.00 |
| Charles Difazio, Jr. | $ | 5,000.00 |
| Jeffry Dillon | $ | 627.50 |
| Raymond Doerr | $ | - |
| Metha Doescher | $ | - |
| Arthur Dokes | $ | 721.00 |
| Gene Dolzhansky | $ | 1,890.00 |

| | | |
|---|---|---|
| Edward Donahue | $ | 10,000.00 |
| Raymond Dooley | $ | 2,383.00 |
| John Ecklund | $ | 2,884.50 |
| Ronald Eddy | $ | - |
| Bernard Edmonds | $ | 7,500.00 |
| Claire Eff | $ | - |
| Eric Egelman | $ | 8,094.50 |
| Ralph R. Elefant | $ | 5,000.00 |
| Robert Elkas | $ | 10,000.00 |
| Siegfried Endlichofer | $ | - |
| Robert Eslick | $ | 5,000.00 |
| Craig A. Euritt | $ | 1,472.00 |
| Mark Evens | $ | - |
| Lawrence A. Fantoli | $ | 1,618.00 |
| John Farrell | $ | - |
| Bradley Fay | $ | - |
| Angelo Fazari | $ | - |
| Todd Feldman | $ | 3,125.00 |
| Vincent Ferrer | $ | 2,356.00 |
| Daniel Field | $ | 1,130.00 |
| Thomas Fields | $ | - |
| Pat Figueiredo | $ | - |
| E. L. Fike | $ | 9,615.00 |
| Walter Finnegan | $ | 1,216.50 |
| Steven Fiore | $ | 4,500.00 |
| John Fitapelli | $ | 2,400.00 |
| Patrick Fitapelli | $ | 4,800.00 |
| Jerome Fitzmaurice | $ | - |
| Wendell Flatter | $ | - |
| Harvey Fleishman | $ | 2,283.50 |
| Joseph Fontenot | $ | 3,750.00 |
| Carl Foote | $ | - |
| Robert Ford | $ | 3,846.00 |
| Gabriel T. Frrest | $ | 5,000.00 |
| Timothy J. Fox | $ | - |

| | | |
|---|---|---|
| Richard S. Freeman | $ | - |
| Mark Fried | $ | 3,500.00 |
| Temma Furman | $ | - |
| David Gambini | $ | 1,490.50 |
| Michael Gardner | $ | - |
| Bernard Gateau | $ | - |
| Richard L. Gay | $ | - |
| Peter Gelfand | $ | 10,000.00 |
| Marc Gelman | $ | 7,000.00 |
| Joseph Genco | $ | 475.00 |
| Simon Gendler | $ | 3,694.95 |
| Wayne Gilbert | $ | 10,000.00 |
| Salvatore Giordano | $ | - |
| Kenneth J. Goffreda | $ | 4,250.00 |
| William Goggins | $ | 3,125.00 |
| Mark Goldberg | $ | - |
| Alberto Gonzalez | $ | - |
| Gordon Gordon | $ | 2,644.00 |
| Dora Gowdy | $ | - |
| Ezra Graber | $ | 3,341.50 |
| Ann Grace | $ | - |
| Daniel Grahl | $ | 7,692.50 |
| Robin E. Greif | $ | - |
| Narinder Grewal | $ | - |
| Bernard Grizzaffi | $ | 1,640.00 |
| Christian Grubb | $ | - |
| Fremont Gruss | $ | 6,009.50 |
| Rio Guzman | $ | 4,791.50 |
| Dror Hadari | $ | - |
| Hanna Hadari | $ | - |
| Tal Hadari | $ | - |
| Stanely Haiduk | $ | - |
| Buck D. Hallen | $ | 2,700.00 |
| William Hamilton | $ | - |
| Jerome Hammonds | $ | 2,009.50 |

| | | |
|---|---|---|
| Nina Hardoff | $ | - |
| Ralph Harrison | $ | - |
| Norris Kipper Harward | $ | - |
| Mariam Heelan | $ | 1,237.50 |
| David Heitz | $ | 1,960.00 |
| John Higman | $ | 4,134.50 |
| Richard Hirsch | $ | 2,400.00 |
| John F. Hodgson | $ | 7,500.00 |
| James B. Holman | $ | - |
| Pher Holmberg | $ | 9,800.00 |
| Hanson Wah Hom | $ | - |
| Raymond Homan | $ | - |
| Steven Hovedsven | $ | - |
| Edward Howden | $ | 1,100.00 |
| Carl Huang | $ | 2,700.00 |
| Bernd Huber | $ | - |
| Steven F. Marino, Esq. | $ | 5,540.50 |
| Daniel C. Irish | $ | - |
| Benjamin R. Isaiah | $ | 10,000.00 |
| Sanjay Israni | $ | 3,000.00 |
| Marv Jaffe | $ | 2,331.50 |
| Richard Jaross | $ | 9,342.50 |
| Sieglinde Jeffries | $ | 2,239.92 |
| Daniel Johnson | $ | - |
| Rachel Johnson | $ | 2,732.00 |
| H. Wayne Jones | $ | - |
| Terry Jones | $ | - |
| Michelle D. Stell | $ | 1,250.00 |
| Ken Kalla | $ | 1,750.00 |
| Mary Ellen Kana | $ | 3,894.00 |
| Barry Kantrowitz | $ | 10,000.00 |
| Gary Kaplowitz | $ | 10,000.00 |
| Abraham Kassin | $ | 10,000.00 |
| Morris Kassin | $ | 10,000.00 |
| Saul Kassin | $ | 10,000.00 |

| | | |
|---|---|---|
| Val Kay | $ | 3,750.00 |
| Cindy Marie Keller | $ | 1,202.00 |
| Thomas Kenney | $ | 2,884.50 |
| Dr. Suresh Kahnna | $ | 3,000.00 |
| Ian Kideys | $ | 7,800.00 |
| Carolyn Kiefer | $ | - |
| E. Howard King, Jr. | $ | 1,920.00 |
| K. Peter Koch | $ | - |
| James Kotsopoulos | $ | 6,512.00 |
| Linda Frey Kremer | $ | 675.00 |
| Todd J. Krouner, Esq. | $ | 10,000.00 |
| Arvind Kumra | $ | 6,300.00 |
| Gary W. Kurtz | $ | - |
| John L. Labansky | $ | - |
| Jacqueline Lachance | $ | - |
| Donald Lamps | $ | 1,000.00 |
| Robert Lang | $ | 1,538.40 |
| David Langer | $ | 10,000.00 |
| Craig Larocco | $ | - |
| Gregory Lawton | $ | 1,225.70 |
| Jonathan Lawton | $ | 157.50 |
| Lawrence Lawton | $ | - |
| Sarah Lerner | $ | 625.00 |
| Ronald Lessnau | $ | 3,250.00 |
| Carl Letts | $ | 2,404.00 |
| Richard Levien | $ | 2,750.00 |
| Brian Levy | $ | 1,000.00 |
| Han Lew | $ | - |
| James Liapakis / Christine Liapakis | $ | 1,800.00 |
| Paul Lightbody | $ | 2,271.50 |
| Stanley Lindon | $ | 3,726.00 |
| Bart Lloyd | $ | 9,279.00 |
| Martin Lowenstein | $ | 504.00 |
| Caryn Pace | $ | - |
| Kristina Ly | $ | - |

| | | |
|---|---|---|
| Thomas Lynch | $ | - |
| Ciaran Macneill | $ | 2,400.00 |
| Shailendra Majmundar | $ | 1,750.00 |
| Robert Malafronte | $ | 3,000.00 |
| Marilyn Male | $ | - |
| Roy Manawendra | $ | 665.00 |
| Michael Mangan | $ | 1,125.00 |
| Zachary Maragoudakis | $ | 3,750.00 |
| Jeff D. Martin | $ | 7,500.00 |
| Marry Ann Martindale | $ | - |
| Norman Martindale | $ | - |
| W. Carl Mayer | $ | - |
| Thomas McDaniel | $ | 10,000.00 |
| Barbara L. McFarland | $ | - |
| Richard W. McKee | $ | 10,000.00 |
| Charles Medalie | $ | 1,750.00 |
| Jose Daniel Vivieros De Medieros | $ | 6,972.50 |
| Sharon Merkin | $ | 400.00 |
| Solomon N. Merkin | $ | 500.00 |
| Scott Middleton | $ | - |
| Patrick Miller | $ | 6,009.50 |
| Frank Mistretta | $ | 990.20 |
| William S. Mitchell | $ | 3,000.00 |
| Steven Mizerovsky | $ | 5,000.00 |
| Dr. Theodore Mobley | $ | 6,000.00 |
| Natalia Baron | $ | - |
| Kenneth H. Moeslein | $ | 10,000.00 |
| Brian Mohr | $ | 5,760.00 |
| Mark L. Monroe | $ | - |
| Anthony Montanaro | $ | 2,650.00 |
| Domenica Montanaro | $ | - |
| David J. Moody | $ | 750.00 |
| Evonne Moore | $ | 1,100.00 |
| Luciano Mor | $ | - |
| James Morris | $ | 5,288.50 |

| | | |
|---|---|---:|
| Stephen Mountain | $ | 3,450.00 |
| Kathleen Mundy | $ | 1,800.00 |
| Robert F. Munsey | $ | - |
| Adeline Murphy(Shattuck) | $ | 1,875.00 |
| George Murphy | $ | - |
| Donald K. Natale | $ | - |
| Jonathan P. Nelson | $ | - |
| Paul Ng / Therese Ng | $ | 540.00 |
| Paul Nguyen | $ | 733.00 |
| Maria Nishanian / Taniel Nishanian | $ | - |
| Dane Scott Nuanes | $ | 832.50 |
| Marcus Oates | $ | - |
| Edward T. O'Brien | $ | 1,422.80 |
| John O'Hern | $ | 3,108.50 |
| Dareld Olson | $ | 1,084.50 |
| David Orange | $ | - |
| Donald Ormond | $ | 3,747.50 |
| Evelyn Ortiz | $ | - |
| Pat O'Shea | $ | 4,000.00 |
| Darrell M. Padgette | $ | 1,803.00 |
| Richard Palladino | $ | 2,163.50 |
| Lyle Paquette | $ | - |
| Alice Paulin | $ | - |
| Claudine Paulin | $ | 4,800.00 |
| Stafford Perkins | $ | 2,070.00 |
| Loenard Perlman | $ | - |
| Don Peterson | $ | - |
| Roslyn Pfeffer | $ | - |
| Robert Phillips | $ | 2,750.00 |
| Wallace Pierce | $ | - |
| Thomas Pilarz | $ | 2,884.50 |
| Branko Polak | $ | 2,250.00 |
| Dean Polizzotto | $ | - |
| Gabriel Poloni | $ | 5,800.00 |
| Robert Ponce | $ | 1,941.36 |

| | | |
|---|---|---|
| Antoine Porges | $ | - |
| John Pouliot | $ | 2,400.00 |
| Sujan Armand Pradhan | $ | 4,250.00 |
| B.V. Prasad | $ | 250.00 |
| Willliam Price | $ | 1,442.50 |
| Suzanne Privette | $ | 375.00 |
| Robert Procaccianti | $ | - |
| Janis Prusis | $ | 1,840.50 |
| Susan Prusis | $ | 800.00 |
| Jamil S. Quwaider | $ | 1,400.00 |
| Manuel Raimi | $ | 3,000.00 |
| Renee Raimi | $ | 1,150.00 |
| Joseph Rana | $ | - |
| Barbara Raskob | $ | 8,918.50 |
| Carlos Reeberg | $ | 10,000.00 |
| Drew A Ricco | $ | 7,200.00 |
| James Robert Rickey | $ | - |
| Harry Ridgely | $ | 1,995.00 |
| Dane Risley | $ | - |
| Michael Rivers | $ | - |
| Sompong Singshinsuk | $ | 5,750.00 |
| Peter Rooney | $ | 6,000.00 |
| Joey F. Rosario | $ | 1,211.70 |
| Julian Rosenberg | $ | - |
| Joseph C. Rowe, Jr. | $ | 10,000.00 |
| Andrew Rowley | $ | 10,000.00 |
| Kathleen Ruane | $ | 706.80 |
| Thomas Ruane | $ | 1,136.00 |
| Judy Rubin | $ | 1,513.50 |
| Linda Rubin | $ | - |
| Michael Sabbia | $ | 4,912.00 |
| Sayed Sadat | $ | - |
| Amir Sahebi | $ | 10,000.00 |
| Diane Salvadore | $ | 5,280.00 |
| Javad Samadi | $ | 2,500.00 |

| | | |
|---|---|---|
| Mathew Samuel | $ | 2,120.00 |
| Jay Schainholz | $ | 6,250.00 |
| Jack Schwartz | $ | 10,000.00 |
| Zhen Shao | $ | 3,005.00 |
| Major Sherwin | $ | 1,067.40 |
| Stuart Shiltz | $ | 2,625.00 |
| William Siegel | $ | 5,000.00 |
| Farideh Sigari | $ | - |
| Samuel Sinay | $ | 7,500.00 |
| Simon Siu | $ | 4,250.00 |
| Allan Sklar | $ | 8,328.50 |
| Arie Slot | $ | - |
| Richard L. Slotkin | $ | 3,750.00 |
| Carl Smith | $ | - |
| Eugene Smith | $ | 913.50 |
| John Smith | $ | 10,000.00 |
| Steven E. Smith | $ | 750.00 |
| Tracy Spaeth | $ | 10,000.00 |
| Michael Spero | $ | 1,682.50 |
| Vladimir Spira | $ | 8,000.00 |
| Dr. Pradeep Srivastava | $ | 10,000.00 |
| Paul Statham | $ | 7,200.00 |
| Richard Stein | $ | - |
| Thomas R. Stelter, Trustee for the Thomas R. Stelter Declaration of Trust | $ | 1,000.00 |
| Glenn Stept | $ | 4,200.00 |
| Patrick Stevenson | $ | - |
| Scott Stitcher | $ | - |
| Steven J. Stranieri | $ | 4,807.50 |
| Diane Strauss | $ | 814.00 |
| Gary Stubbers | $ | 2,750.00 |
| Aleksandr Sukennik | $ | 8,250.00 |
| Allen Sumner | $ | 1,250.00 |
| Jimmy A. Sutton | $ | 4,375.00 |
| James Swearngin, Jr. | $ | 1,925.00 |

| | | |
|---|---|---|
| Michael Szmanowski | $ | 2,406.00 |
| Allen Taylor | $ | 10,000.00 |
| Thomas Thale | $ | 500.00 |
| Angela Thompson | $ | 1,350.00 |
| William Todd Thompson | $ | 1,200.00 |
| David Tomei | $ | 7,211.50 |
| James Tran | $ | 5,750.00 |
| Pamela Trujillo | $ | - |
| Richard Trujillo | $ | 3,337.50 |
| Tony Tse | $ | 1,650.00 |
| Robert F. Tuele | $ | 1,933.00 |
| Brad Turck | $ | 1,856.50 |
| Barry S. Unger | $ | 5,200.00 |
| Jeffrey Van Ryen | $ | - |
| Amy Varani | $ | 196.60 |
| Guy Vitello | $ | - |
| Clyde W. Waite | $ | 3,870.00 |
| Murray L. Waldron | $ | - |
| Michael Wallace | $ | 6,697.00 |
| Grace Walsh | $ | 200.00 |
| Lee S. Walsh | $ | 400.00 |
| Vick Walsh | $ | 750.00 |
| Wendy Wanderman | $ | 2,022.00 |
| John M. Warner | $ | - |
| James Weber | $ | - |
| Richard Wettergreen | $ | 2,000.00 |
| Gary Whittenghill | $ | 4,705.00 |
| Maurice Wilber | $ | 2,000.00 |
| John G. Williams | $ | - |
| Dale Wilson | $ | 2,569.50 |
| Mitchell Wolf | $ | 2,404.00 |
| Ralph B. Wood | $ | - |
| Edward Woodard, Jr. | $ | 4,807.50 |
| Robert M. Wright | $ | - |
| Emmett Zahn | $ | 10,000.00 |

| | | |
|---|---|---|
| Saswata Basu | $ | 20,000.00 |
| Spiros Gianos | $ | - |
| Frederick B. Henerson | $ | - |
| Michael Lance Huff | $ | 12,350.00 |
| Steven Janicak | $ | - |
| Krikor Kasbarian | $ | 11,300.00 |
| Barry Lemberg | $ | 7,600.00 |
| Geroges Levy | $ | 12,500.00 |
| John G. Miles | $ | - |
| Stathis Pappas | $ | 4,454.00 |
| Leonard Peddy | $ | - |
| Deborah Belcore | $ | - |
| Sean Rooney | $ | 15,000.00 |
| J. Chris Rowe | $ | 5,288.00 |
| Harald Zagoda | $ | 16,400.00 |
| Joseph Zhen | $ | 2,960.00 |
| Alvaro Tomas | $ | - |
| Anita Budich | $ | 8,750.00 |
| Linda Caldwell | $ | - |
| Diane Collins | $ | 2,500.00 |
| James Collins | $ | 2,500.00 |
| Vasanthakumar Gangaiah | $ | 7,093.00 |
| Harlan Getman | $ | - |
| Mary Jane Gianos | $ | - |
| Total | $ | 1,303,593.05 |